IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| MARIA ARENAS, individually | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action File |
| | § | 4:16-cv-00320-WTM-GRS |
| GEORGIA DEPARTMENT OF | § | |
| CORRECTIONS, et al. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S AMENDED RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Maria Arenas files this amended response[1] to Defendants' motion to dismiss her amended complaint (Doc. 34) pursuant to Federal Rule of Civil Procedure 12(b)(6). Because Ms. Arenas has more than adequately alleged Defendants violated her son's civil rights, causing his death, the motion must be denied in its entirety.

## I.   SUMMARY OF THE RESPONSE – MS. ARENAS STATES CLAIMS FOR RELIEF

Defendants' motion to dismiss Plaintiff's 42 U.S.C. § 1983, Americans with Disabilities Act/Rehabilitation Act, and Georgia Tort Claims Act claims should be denied for four reasons:

First, Ms. Arenas' complaint states a claim against the individual Defendants for violating her son, Richard Tavera's, Eighth Amendment rights, causing his suicide death. Due to Defendant Warden Williams' policies and practices at the Georgia Department of Corrections' Smith State Prison, supervising officers failed to intervene when they were

---

[1] Plaintiff previously filed a timely response to the motion to dismiss the amended complaint, while simultaneously seeking leave to extend the deadline to respond. This response is intended to supersede the prior response (Doc. 40).

told Tavera was actively hanging himself in his cell, and failed to timely summon medical attention for him though they knew he was asphyxiating. This was not an isolated incident, but Warden Williams' established practice at the Smith State Prison.

Second, the individual Defendants are not entitled to qualified immunity because it is clearly established in the Eleventh Circuit that ignoring an inmate's ongoing suicide violates an inmate's constitutional rights. *See*, *e.g.*, *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990); *Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005). As such, Ms. Arenas states a claim against Defendants Shelby, Dickson, and Williams, and they are not entitled to qualified immunity.

Third, Ms. Arenas has alleged facts that GDOC and Georgia Correctional Health Care (GCHC) officials discriminated against her 24-year-old, mentally-ill son by intentionally denying him reasonable accommodations for his mental illness, resulting in his death by suicide. Under the Americans with Disabilities Act and Rehabilitation Act, failing to provide reasonable accommodations is intentional discrimination on the basis of disability. Thus, Ms. Arenas' ADA and Rehabilitation Act claims cannot be dismissed.

Finally, Plaintiff complied with all the notice provisions of the Georgia Tort Claims Act, which waives Defendants' immunity from suits where inmates are denied adequate medical care. Defendants violated the duty of ordinary care owed to Tavera by negligently failing to provide him medical care during his entire incarceration, and negligently failing to intervene to stop his suicide.

## II.     FACTS – DEFENDANTS IGNORED RICHARD TAVERA'S SUICIDE ATTEMPT

Numerous Defendants' stood by and did nothing while Ms. Arenas' 24-year-old son, Richard Tavera, took his own life inside the Georgia Department of Corrections' Smith State Prison.

Prior to his incarceration, Tavera had a long history of serious mental illness and suicide attempts, despite his young age. Doc. 34, ¶¶ 14-18. Tavera was slight, standing just 5' 6" tall, and weighing only approximately 142 lbs. *Id*. at ¶ 21. GDOC and GCHC knew Tavera had previously been admitted to inpatient psychiatric facilities, attempted suicide, and been diagnosed with bipolar disorder. *Id*. Though he was prescribed psychiatric medications for his disability in the past, none were provided to him during his incarceration in GDOC facilities. *Id*., at ¶ 17. In fact, he was provided no mental health care at all. *Id*., at ¶ 18.

Instead, despite knowing of his serious mental disabilities and previous suicide attempts, GDOC and GCHC made no accommodations for his serious disability. GDOC and GCHC assigned Tavera to a cell with a known "tie off point" (a fire extinguisher sprinkler) that they knew a ligature could be secured from. *Id*., at ¶¶ 31-32. Likewise, GDOC and GCHC housed Tavera in a single cell, though such cells are well known to be dangerous for suicidal inmates (who are far less likely to take their own lives in the presence of others). *Id*., at ¶ 33. There was no penological reason to house Tavera by himself. Moreover, GDOC practice at the prison prohibited officers from entering an inmate's cell, even in circumstances where the inmate was committing suicide and there was little risk to the officer. *Id*. at ¶ 34. These conditions put Tavera at extreme risk of suicide.

Tragically, this risk was realized when Defendants' officers failed to interrupt Tavera's ongoing suicide attempt. At 10:50 pm on December 7, 2014, a GDOC correctional officer at the prison, John Calhoun, found Tavera in his cell, attempting to hang himself. *Id.*, at ¶ 19.[2] "He had tied a bedsheet to the fire extinguisher sprinkler on the ceiling of his cell, and was wrapping it around his neck to hang himself, but was not yet suspended by the ligature." *Id.* Though he saw Tavera preparing to die, Calhoun did nothing to intervene, but only called his supervisors, Defendants Sgt. Shelby and Lt. Dickson. *Id.* ¶¶ 20-22. Calhoun told Shelby and Dickson that "Tavera was actively suicidal, and currently working to end his own life." *Id.*, at ¶ 22. Neither supervisor instructed Calhoun to intervene or do anything at all to help Tavera, though they knew Tavera was beginning to kill himself. *Id.* Instead, Shelby and Dickson just went to join Calhoun outside the cell. Shelby and Dickson did not call an ambulance (or any other medical provider), direct Calhoun to save Tavera, or do anything else, though they knew Tavera was going to asphyxiate within minutes during the suicide attempt. *Id.*, at ¶ 25.

Incredibly, no help arrived for eight minutes after Calhoun's initial call. Then, Shelby arrived at Tavera's cell. *Id.* at ¶ 23. By that time, Tavera was hanging from the ligature. "Shelby saw Tavera hanging when he arrived at the cell, and saw Calhoun standing by, doing nothing. But instead of entering the cell with Calhoun to save Tavera, Shelby did nothing" except yell  "hay, hay" at Tavera. *Id.* Shelby and Calhoun stood together outside the cell, watching Tavera hang, for another two minutes. *Id.*

---

[2] Calhoun is not a party to this case. After the events of this case, Calhoun moved to San Antonio, Texas. He has been sued in a separate proceeding currently pending before the Western District of Texas. *See Arenas v. Calhoun*, 5:16-cv-1203 (W.D. Tex.). Calhoun's motion to dismiss the Western District of Texas case was denied (Doc. 18), and discovery is proceeding.

Dickson arrived another two minutes later – a total of ten minutes after he was told Tavera was actually hanging himself. Only on his arrival did Dickson instruct his subordinates to finally open the cell and assist Tavera. *Id*., at ¶ 24. At that time, ten minutes after Shelby and Dickson learned Tavera was beginning to hang himself – and two minutes after Shelby actually arrived at the scene – officers actually entered the cell to assist Tavera. But by that time, it was too late. *Id*. As Dickson was a correctional lieutenant, he was Calhoun and Shelby's direct supervisor, and capable of instructing them to save Tavera at any time, but did not. *Id*. at ¶ 29.

Because Shelby and Dickson knew Tavera began hanging himself in his cell – and it is obvious to even an incompetent layman that hanging deprives the body of oxygen – Shelby and Dickson knew Tavera would require medical attention. *Id*., at ¶ 25. But they did not call 911, or for any other medical providers, until a full fifteen minutes after Calhoun first reported Tavera hanging – five minutes after actually entering the cell. *Id*. Thus, EMS did not arrive until over half an hour after Calhoun found Tavera beginning to hang himself. *Id*. By that time, any hope of reviving Tavera had long expired.

Ultimately, Calhoun, Shelby, and Dickson were acting according to the dangerous practice of the Smith State Prison, enforced by Defendant Warden Williams. Williams' practice was no officer could enter an inmate's cell, under any circumstances, without "first obtaining the permission of an officer with the rank of lieutenant or higher," even when necessary to save a prisoner's life. *Id.*, at ¶ 27. As such, Williams failed to train officers at the prison about their obligations to protect inmates from suicide. *Id*. at ¶ 28. Though suicide is an obvious and recurring problem in prisons, and is well known to

competent prison administrators, Williams did not train his officers about their duty to intervene to stop a suicide in progress or otherwise about preventing inmate suicide. *Id*.

Thus, when Calhoun, Shelby, and Dickson did nothing after learning Tavera was hanging himself, they were acting also pursuant to Williams' instructions and practices. *Id*. at ¶ 28.

## III.   PROCEDURAL POSTURE

This case was filed in the Savannah Division on November 29, 2016, alleging 42 U.S.C. § 1983 claims against Defendants Shelby, Dickson, and Williams (the "Savannah Case"). A companion case was filed against the Georgia Department of Corrections and Georgia Correctional Health Care in Tattnall County, Georgia, alleging Georgia Tort Claims Act and Americans with Disabilities Act/Rehabilitation Act claims (the "Tattnall County case"). The Tattnall County case was removed to federal court in the Statesboro Division, then transferred to this Court for consolidation with the Savannah Case. Doc. 31.[3] At the direction of the Court, Plaintiff filed an amended, consolidated complaint (Doc. 34). Defendants now move to this amended complaint. Defendants have objected to any discovery taking place until resolution of their motion to dismiss. Doc. 21. As such, no discovery has taken place.

## IV.   STANDARD OF REVIEW

Motions to dismiss are "viewed with disfavor and rarely granted." *Int'l Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv.*, 400 F.2d 465, 471 (5th Cir. 1968). *See also Guarantee Ins. Co. v. Merchants Employer Benefits, Inc.*, 2008 WL 2559436, *1 (M.D.

---

[3] A third case, *Arenas v. Calhoun*, as noted above, at n. 1, is currently pending before the Western District of Texas.

Ga. June 23, 2008). All facts alleged in the complaint must be viewed in the light most favorable to the plaintiff. *Belcher v. City of Foley, Ala.*, 30 F.d 1390, 1392 (11th Cir. 1994).

A claim is correctly pleaded when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations," it only "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

Likewise, to overcome qualified immunity, "the complaint must allege sufficient facts for the court to determine whether the alleged constitutional violation was clearly established at the time of the incident." *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1179 (11th Cir. 2009). The Plaintiff "need only plead some factual detail from which the court may determine whether [d]efendants' alleged actions violated a clearly established constitutional right." *Id.* at 1180 (internal citations omitted). Even a "concededly sparse" complaint can satisfy this standard. *Id.*

## V.   ARGUMENT AND AUTHORITIES

Plaintiff Arenas has adequately alleged her 42 U.S.C. § 1983, ADA/Rehabilitation Act, and Georgia Tort Claims Act claims.

### A.   Eighth Amendment Claims: GDOC Officials Were Deliberately Indifferent to Tavera's Right to Access Medical Care and Watched him Die

The entire supervisory chain of command at the prison – Sgt. Shelby, Lt. Dickson, and Warden Williams – violated Tavera's rights by failing to provide him medical care, declining to intervene Shelby and Dickson knew Calhoun was violating his rights,

implementing unconstitutional practices, and training subordinates to violate inmates' rights.

### 1. Defendants Shelby and Dickson Failed to Provide Medical Care and Intervene

Shelby and Dickson actually knew Tavera was in the process of hanging himself and needed immediate help, but did nothing. This failure to act violated Tavera's Eighth Amendment rights, and caused his death.

"A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." *Marsh v. Butler Co., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001). An inmate's rights are violated when "a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not reasonably respond to the risk." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

The complaint alleges Shelby and Dickson knew of a substantial risk of serious harm – Tavera's suicide – when Calhoun told them "unequivocally" that "Tavera was actively suicidal, and currently working to end his own life." Doc. 34, ¶ 22. Their response – nothing – epitomizes deliberate indifference. *Id*. Even after he arrived at the scene eight minutes after Calhoun's first report, Shelby did literally nothing, waiting another two minutes – while Tavera hanged in front of him – for Dickson to arrive. Doc. 34, ¶ 23. Moreover, Shelby and Dickson did not call for any medical assistance until fifteen minutes after Calhoun's initial report, despite knowing Tavera was hanging in the midst of a suicide attempt. Doc. 34, ¶ 25. Both failing to prevent a "substantial" risk of suicide – which includes an actual, in-progress attempt – and delaying an inmate's access to emergency medical care violate the Eighth Amendment. *See Jackson v. West*, 787 F.3d 1345, 1358 (11th Cir. 2015); *Wallace v. Jackson*, 667 F.Supp.2d 1267, 1272 (M.D. Ala.

8

2009) ("failing to call for medical assistance … after discovering [an inmate] hanging in his cell" is "distinct claim"). Thus, Plaintiff sufficiently alleges Shelby and Dickson were deliberately indifferent to Tavera's dire emergency.

Furthermore, Shelby and Dickson failed to intervene when they knew Calhoun was delaying Tavera's rescue. When an officer fails to intercede to prevent a constitutional violation committed by a fellow officer, it is well settled that he violates the constitution himself as he has a legal duty to intervene. *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986).[4] Here, Plaintiff has alleged her son suffered a "serious medical need" where the officers intentionally delayed intervention to prevent her son's death – a clearly established violation of constitutional rights. *See Jackson*, 787 F.3d at 1358. Shelby and Dickson knew Calhoun was not going to rescue Tavera, but they did nothing. Doc. 34, ¶¶ 22-25.

Shelby and Dickson are also liable as Calhoun's supervisors for directing him to violate Tavera's constitutional rights. Supervisors are liable for violations of inmates' Eighth Amendment rights when either (1) "the supervisor personally participates in the alleged constitutional violation" or (2) "when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Amnesty Int'l*, 559 F.3d at 1180-81. "[F]acts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so" satisfy these requirements. *Id*. at 1180. *See also Cottone*, 326 F.3d at 1360. A plaintiff can allege the necessary causal connection through

---

[4] It is simply not true that failure to intervene claims are only "clearly established" for excessive force claims. *See Heflin v. Miami-Dade County*, 393 Fed. Appx. 658, 660 (11th Cir. 2010) (per curiam) (reversing order granting motion to dismiss in false arrest *and* excessive force case).

"facts that support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cooper v. City of Starke, Fla.*, 2011 WL 1100142, *5 (M.D. Fla. Mar. 23, 2011).

Shelby and Dickson are liable for Tavera's death under either theory. First, Shelby and Dickson personally participated in failing to provide Tavera necessary medical attention when they learned he was hanging in his cell. Both Shelby and Dickson could have called EMS or another medical provider, but neither did. It is clearly established in the Eleventh Circuit that correctional officers are required to immediately provide medical assistance to an inmate who appears to have asphyxiated. *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005). "A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *Id*. In *Bozeman*, the Circuit denied qualified immunity to correctional officers when they intentionally delayed fourteen minutes – less time than at issue here – in checking an inmate's condition, calling for medical assistance, administering CPR, or doing "anything else to help." *Id*. In fact, under facts identical to this case, officers' dispositive motions were denied. *Wallace*, 667 F.Supp.2d at 1274 ("The complaint alleges that [the officer] found decedent … unconscious and hanging in his cell, yet [the officer] did not check [the decedent's] pulse, perform CPR, or summon medical help. Under these alleged extreme circumstances, [the officer] violated [the decedent's] clearly established constitutional rights"). Shelby and Dickson neither initiated calling 911 when they learned Tavera was hanging (delaying his

access to critical medical care) nor told Calhoun to intervene (to actually save Tavera's life).

Second, Shelby and Dickson directed their subordinate (Calhoun) to act unlawfully by delaying provision of medical care until a lieutenant approved entering a cell. Doc. 34, ¶¶ 22-25. In these circumstances – an inmate beginning to hang himself – there is an obvious "causal connection" between a supervisor instructing a subordinate to sit on his hands and the denial of emergency medical care to save Tavera's life. *See*, *e.g.*, *Wallace*, 667 F.Supp.2d at 1274. Shelby and Dickson knew Calhoun was acting unlawfully, but did nothing to save Tavera. Shelby even followed Calhoun's indifferent lead when he arrived at the cell and continued to wait another crucial two minutes for Dickson to arrive.

Thus, Plaintiff more than adequately alleges Shelby and Dickson violated Tavera's constitutional rights.

> 2.   *Williams Implemented Unconstitutional Practices and Failed to Train his Subordinates*

Likewise, Warden Williams implemented dangerous and unconstitutional practices at the Smith State Prison that his subordinates – including Shelby, Dickson, and Calhoun – followed, causing Tavera's death.

> a.   Williams' Unconstitutional Practice – Delay Medical Care to Actively Suicidal Prisoners

Like Shelby and Dickson, Williams directed all his subordinates at the prison to delay providing medical care to inmates in emergencies where "time sensitive" delays mean life or death. *See supra* § V(A)(1), p. 10 (citing *Bozeman*, 422 F.3d at 1273); Doc. 34, ¶ 27 ("Williams maintained a policy and practice at the prison that officers were not

to enter a cell without first obtaining the permission [of a lieutenant], even to save a prisoner's life"). Suicide is a well-known hazard, and likely to occur, in a correctional environment. Doc. 1, ¶ 24; *Wallace*, 667 F.Supp.2d at 1274; Margaret Noonan et al., U.S. Dep't of Justice, Mortality in Local Jails and State Prisons, Table 16 (2015), available at http://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf (Bureau of Justice Statistics report, suicide leading cause of death in jails and prisons). Williams knew that this practice would obviously result in situations just like Tavera's – where an officer finds a prisoner in the act of committing suicide, but is required to delay intervention until seeking permission from his supervisor. This specific practice delayed Tavera's access to medical care, causing his death.

Unlike the *Cooper v. Starke* plaintiff, which Defendants mistakenly rely on, here Plaintiff Arenas does identify "specific policies" that lead to her son's death. *Compare Greason*, 891 F.2d at 839-40 (denying summary judgment to warden in prison suicide case) *with Cooper v. Starke*, 2011 WL 1100142, *5 (M.D. Fla. Mar. 3, 2011). The Eleventh Circuit's opinion in *Greason* is instructive. There, the Circuit upheld a district court order denying qualified immunity to a warden. Like Plaintiff alleges here, the *Greason* warden (1) "failed to take adequate measure to cure the serious problems of which he was aware," (2) "a reasonable person in [the warden's] position would have known this conduct constituted deliberate indifference," and (3) "because [the warden] was in a position to rectify … most of these serious problems, his failure to do so was casually related to the violation of [the deceased's] [E]ighth [A]mendment rights." *Greason*, 891 F.2d at 840. Had Williams not prohibited Calhoun, Shelby, and Dickson from entering a cell before a lieutenant arrived, Calhoun likely would have entered the

cell and rescued Tavera in time. Doc. 34, ¶ 27. This specific policy therefore proximately caused the violation of Tavera's Eighth Amendment rights.

b.    <u>Williams' Dangerous Training – Delay Emergency Intervention</u>

Likewise, Warden Williams unconstitutionally trained his subordinates – Calhoun, Shelby, and Dickson – to delay providing emergency medical care to prisoners engaged in suicide. A supervisor is liable for a failing to train his subordinates when "his failure to train amounts to deliberate indifference to the rights of person with whom the subordinates come into contact and the failure has actually caused the injury." *Belcher*, 30 F.3d at 1397. "Failure to train can amount to deliberate indifference when the need for more or different training is obvious" because "the failure to train is likely to result in the violation of a constitutional right." *Id*. at 1397-98. A risk that is "obvious in the abstract" will satisfy the requirements of a failure to train claim. *Gold v. City of Miami, Fla.*, 151 F.3d 1346, 1352 (11th Cir. 1998) (citing *Brown v. Bryan Co., Okla.*, 520 U.S. 397, 409 (1997)).

Plaintiff alleges Williams failed to train his officers to protect inmates from suicide, and actually did train them to delay providing necessary emergency medical care. Doc. 34, ¶¶ 28-29. These are risks "obvious in the abstract" which correctional officers are highly likely to confront. The need for contrary training – to immediately intervene to stop a suicide or assist an inmate before it is too late – is obvious. Yet Williams had his subordinates do the exact opposite. As a consequence, a death became inevitable.

Thus, Plaintiff has successfully alleged Warden Williams' practices and training decisions violated her son's constitutional rights.

**B.      Qualified Immunity: Shelby, Dickson, and Williams are not Entitled to Qualified Immunity**

Qualified immunity does not protect governmental employees when "the officials violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McBride v. Houston County Health Care Author.*, 658 Fed. Appx. 991, 996 (11th Cir. Sept. 30, 2016). Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. ____, 136 S.Ct. 305, slip op. at 5 (2015). To overcome qualified immunity, the plaintiff need only show "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *McBride*, 658 Fed. Appx. at 996. Because Tavera's rights to access medical care and be protected from suicide were clearly established, Shelby, Dickson, and Williams are not entitled to qualified immunity.

In the Eleventh Circuit, constitutional rights are "clearly established" by a decision of the Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the injury occurred. *Amnesty Int'l*, 559 F.3d at 1184. Prior cases "need not be 'materially similar' to the present circumstances so long as the right is 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "A prior case wherein the very action in question has previously been held unlawful" is unnecessary. *Id.* Prior caselaw need only provide officers "fair warning" their conduct is illegal. *Id.*

Inmates have a clearly established right to be "protected from self-inflicted injuries, including suicide." *Belcher*, 30 F.3d at 1396. "Prison guards who display deliberate indifference to the serious medical and psychiatric needs of a prisoner, or deliberate indifference to a strong likelihood that a prisoner will take his own life" violate

inmates' constitutional rights. *Belcher*, 30 F.3d at 1396. "Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason*, 891 F.2d 829, 836 (11th Cir. 1990). Though deliberate indifference requires more than negligence, the standard does not require "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

The Eleventh Circuit has reversed denial of summary judgment against a jailer where "a jury could find that [the jailer] subjectively believed that there was a strong risk that [the inmate] would attempt suicide and deliberately did not take any action to prevent [the inmate's] suicide." *Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1270 (11th Cir. 2005). In applying the qualified immunity analysis, the Eleventh Circuit held that "it was clearly established that an officer's deliberate indifference to the risk of serious harm to a detainee is a violation of the Fourteenth Amendment." *Id*.

Though there is no Eleventh Circuit case dealing directly with a suicide in progress, the Circuit's many opinions discussing suicide prevention generally, and the *Bozeman* opinion discussing the need for immediate care when an inmate has "asphyxiated," provided ample warning to the Defendants their conduct was unlawful. *See*, *e.g.*, *Greason*, 891 F.2d at 836; *Bozeman*, 422 F.3d at 1274. With this "stark and simple" fact pattern – officers knowing an inmate has stopped breathing and has asphyxiated – officers are not entitled to qualified immunity. *Bozeman*, 422 F.3d at

1274.[5] "General statements" of the law can provide "fair and clear warning" to officials when "in light of the pre-existing law the unlawfulness [of the conduct] is apparent." *White v. Pauly*, 580 U.S. ____, 2017 WL 69170, slip op. at 7 (2017). "A core principle of our Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *Benson v. Gordon County, Ga.*, 479 Fed. Appx. 315, 318 (11th Cir. 2012) (denying qualified immunity to jail nurse). As the district court in the companion case noted, "[i]t is difficult to imagine [in a prison suicide case] how a plaintiff could state a claim for deliberate indifference where a guard leaves an inmate unsupervised, but not make out a similar claim for exercising deliberate indifference while actively (but inadequately) supervising that same inmate." *Arenas v. Calhoun*, No. 5:16-cv-01203-XR, Slip Op. at p. 10 (W.D. Tex. March 20, 2017) (companion case, denying qualified immunity to Calhoun).

Thus, because Tavera's rights were clearly established in the Eleventh Circuit, Shelby, Dickson, and Williams are not entitled to qualified immunity.

### C. ADA/Rehabilitation Act Claims: GDOC and GCHC Intentionally Discriminated Against Tavera

Plaintiff also alleges facts sufficient to state a claim GDOC and GCHC's failure to provide reasonable accommodations to Tavera resulted in his suicide death.

---

[5] Likewise, Williams is not entitled to qualified immunity for implementing practices and training that would obviously require the same deadly result – it would be obvious any delay in entering a cell when a suicide is in progress would fail to protect the inmate from a serious medical need.

To state a claim under the ADA, a plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated [against] by such entity; (3) by reason of such disability." *Schotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). Plaintiff easily satisfies these requirements. To state a Rehabilitation Act claim, a plaintiff must only also allege the defendant accepts federal funding.[6]

First, the complaint alleges Tavera suffered from severe mental illnesses (including bipolar disorder), and had required inpatient hospitalization after previous suicide attempts. Doc. 34, ¶¶ 14-18. Mental illnesses qualify as disabilities under the ADA and Rehabilitation Act. *See, e.g.*, *Bishop v. Ga. Dep't of Family and Children Svcs.*, 2006 WL 572031, *3-4 (11th Cir. Mar. 10, 2006) (affirming denial of dispositive motion,

---

[6] The complaint alleges GDOC and GCHC accept federal funding. Doc. 34, ¶¶ 7-8. After resolving the federal funding requirement, courts treat the ADA and Rehabilitation Act identically, and apply the same standards in interpreting them. *Cash v. Smith*, 231 F.3d 1301, 1305 n. 2 (11th Cir. 2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice versa."). Though the Rehabilitation Act also has a "sole causation" requirement, that standard is inapplicable here because the complaint alleges a failure to accommodate Tavera's disabilities. *See Martone v. Livingston*, 2014 WL 3534696, *15 n. 6 (S.D. Tex. July 16, 2014) (denying motion to dismiss prison Rehabilitation Act wrongful death claims). *See also Gaylor v. Ga. Dep't of Natural Resources*, 2013 WL 4790158, *3 (N.D. Ga. Sept. 6, 2013) ("the only material difference between … [the ADA and Rehabilitation Act] lay in their respective causation requirements, but … this difference was immaterial where the plaintiffs' claims were based on a failure to make reasonable accommodations for disabled individuals") (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005)). Defendants rely on ADA/Rehabilitation Act employment decisions, where "mixed motive" terminations do not violate the Rehabilitation Act. *Compare McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1074-75 (11th Cir. 1991) (discussing mixed motive termination) *with Martone*, 2014 WL 3534696, *15 (prison failure to accommodate case). Unlike a mixed-motive termination case (where illegal discrimination is only one factor leading to an adverse employment decision), here, the denial of the accommodations to Tavera were the "sole" cause of his death.

identifying bipolar disorder as "disability"). Defendants do not argue the complaint fails to allege this element.

Second, confinement in a jail or prison itself is a program or service for ADA/Rehabilitation Act purposes. *Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs.'") (Scalia, J.). Thus, safe confinement in the Smith State Prison during his incarceration was a "service" or "program" where GDOC and GCHC were required to accommodate Tavera. Defendants also do not contest that Plaintiff's complaint satisfies this element.

Finally, GDOC and GCHC denied Tavera access to its programs by failing to reasonably accommodate his serious mental illness – this is "[denial] of the benefits of the services … by reason of [his] disability." *Schotz*, 256 F.3d at 1079. When there is no dispute about the first two elements, the focus should lay on "whether [the plaintiff] was excluded from participation in, or denied the benefit of, some services, programs, or activities of [the defendant] by reason of his disability *or* was subjected to discrimination by [the defendant] by reason of his disability." *Bircoll v. Miami-Dade Co., Fla.*, 480 F.3d 1072, 1083 (11th Cir. 2007) (emphasis in original). Plaintiffs can satisfy this element by alleging "the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people." *Pruitt v. Emmanuel Co., Ga.,* 2012 WL 1161612, *1 (S.D. Ga. Apr. 9, 2012) (Smith, Maj. J.) adopted at 2012 WL1458012 (S.D. Ga. Apr. 26, 2012) (citing *Culvahouse v. City of LaPorte*, 679 F.Supp.2d 931, 937 (N.D. Ind. 2009)).

Here, the complaint alleges GDOC and GCHC discriminated against Tavera by failing to reasonably accommodate his mental illness by (1) housing him in a cell with a "tie off" point (Doc. 34, ¶¶ 31-32), (2) not housing him with a cellmate (Doc. 34, ¶ 33), (3) not providing him any mental health treatment during his incarceration (Doc. 34, ¶ 18), and (4) its officers intentionally delaying his rescue when he was found beginning to hang himself in his cell (Doc. 34, ¶¶ 19-28). Likewise, GDOC failed to train its officers about the necessity of immediately rescuing inmates in the process of taking their own lives, and maintained practices that prohibited officers from doing so. Doc. 34, ¶¶ 27-28.

These failures to accommodate Tavera were discrimination denying him benefits and services by reason of his disability. Unlike other anti-discrimination statutes, the ADA and Rehabilitation Act create an "affirmative obligation" that requires public entities, like GDOC and GCHC, to provide accommodations to people with disabilities – *not* simply treat people with disabilities the same as able-bodied people. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 533 (2004).

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility.

*Id.*, at 531; *see* 28 C.F.R. § 35.130 (b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"). Title II places an affirmative "duty to accommodate" on GDOC and GCHC. *See Lane*, 541 U.S. at 532. "[A] plaintiff may establish discrimination by showing that the public entity refused to provide a reasonable accommodation for a disabled person." *Wolfe v. Fla. Dep't of Corrections*, 2012 WL 4052334, *4 (M.D. Fla. Sept. 14, 2012). Instead, GDOC and GCHC "outright excluded"

Tavera from programs and services at the prison by failing to accommodate his disabilities, tragically causing his death.

Like the inmate in *U.S. v. Georgia*, Tavera could not safely access any programs and services in the prison without an accommodation from GDOC and GCHC. In *Georgia*, a paraplegic inmate was "denied . . . access to virtually all prison programs and services on account of his disability." 546 U.S. 151, 155 (2006) (Scalia, J.). The *Georgia* inmate required accommodations for his inability to walk. Without accommodations, he could not leave his cell to access the prison's other programs and services. There were no allegations the Georgia prison's failure to provide accommodations was motived by discriminatory animus against paraplegics: the prison simply failed to accommodate his needs. Indeed, the Supreme Court has expressly noted "discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). "[M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult, if not impossible to reach were the Act construed to proscribe only conduct fueled by discriminatory intent." *Id.*, at 296-97. Like the *Georgia* inmate, Tavera could not safely access any programs or services at the prison without reasonable accommodations to protect him from his deadly mental illness. In fact, instead of accommodating him, GDOC and GCHC increased his risk of suicide by housing him, alone, in a cell with an obvious "tie off" point.

Other federal district courts in the Eleventh Circuit have denied dispositive motions in similar cases. In *Wolfe v. Florida Department of Corrections*, 2012 WL4052334 (M.D. Fla. Sept. 14, 2012), the plaintiff alleged the Florida prisons failed to

accommodate her son, who died of an asthma attack. There, the Florida prison housed the asthmatic prisoner in a cell without an emergency call button. When he suffered a serious asthma attack, he was locked in his cell, could not summon help, and died. The court determined a jury could find, due to his known history of asthma attacks, that the prison discriminated against him by failing to house him in a cell that accommodated his disability. *See id*., at **4-5. This failure to accommodate the inmate was "deliberately indifferent to [the inmate']s need for a reasonable accommodation, both through their actions and their policies." *Id. See also Kruger v. Jenne*, 164 F.Supp.2d 1330, 1337-38 (S.D. Fla. 2000). Like the prisoner in *Wolfe*, Tavera was locked in a cell made dangerous by his disability – and he died as a result.

The question is not, as the Defendants pose, whether "GDOC and GCHC's failure to provide [Tavera] with mental health treatment or safe housing … [was] by reason of his disability," Doc. 36, p. 6, but whether Tavera was "excluded from participation in or denied the benefits of services, programs, or activities … by reason of his disability." *See*, *e.g.*, *Bircoll*, 480 F.3d at 1083. Defendants construction of the statute and elements of the claim are wrong. Plaintiff, conversely, alleges the correct elements: GDOC and GCHC knew Tavera needed accommodations – mental health care and protection from suicide – "because of" his mental illness to "participate" in incarceration. *See*, *e.g.*, *U.S. v. Georgia*, 546 U.S. at 153-54. This is denial of a benefit, service, or program "because of" Tavera's mental illnesses. Defendants' proposed construction would essentially require animus against people with disabilities – that a ramp was not installed into a building because the owner hates people using wheelchairs, instead of just "because of" the costs attendant building a ramp. Just like the wheelchair user who cannot enter a building with

steps, Tavera could not access the services and programs of the Smith State Prison without an accommodation.

This is not a case where Plaintiff attempts to cloak a medical malpractice claim as a disability discrimination claim, as Defendants allege. *See* Doc. 36, p. 8. GDOC and GCHC did not provide Tavera incorrect or negligent medical care – they did not provide him any mental health care *at all*. Doc. 34, ¶ 18. Moreover, the accommodations GDOC and GCHC failed to provide Tavera – housing with a cellmate, in a safe cell, and emergency rescue and medical care – are not "medical malpractice" as defined by Georgia law. *See* O.C.G.A. § 9-9-60 (defining "medical malpractice").[7] Courts routinely distinguish between negligently provided medical care (classic medical malpractice) and a total failure to provide care required by a disability.[8]

Indeed, many other district courts in other circuits denied similar dispositive motions in prisoner disability cases, including suicide wrongful death actions. *See*, *e.g.*, *Wright v. Tex. Dep't Crim. Justice*, 2013 WL 6578994 (N.D. Tex. Dec. 16, 2013) (O'Connor, J.) (denying motion to dismiss ADA claims when prison officials watch

---

[7] Of course, to the extent GDOC or GCHC merely provided negligent medical care – as opposed to completely failing to provide care necessitated by Tavera's disability – that malpractice would fall within the GTCA waiver of immunity, as discussed below.

[8] While *zero* medical care is certainly below the standard of care, and also may give rise to a medical malpractice claim, a complete failure to provide any medical care is also a failure to accommodate a disabled inmate's physical or mental impairment. *See*, *e.g.*, *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 287 (1st Cir. 2006) (prescription medication for ALS patient); *Rouse v. Plantier*, 997 F.Supp. 575, 582 (D. N.J. 1998) (insulin for diabetics) (reversed on other grounds); *McNally v. Prison Health Services*, 46 F.Supp.2d 49 (D. Me. Apr. 27, 1999) (anti-retroviral drugs to treat HIV-positive patients); *Payne v. Arizona*, 2012 WL 1151957, *7 (D. Ariz. Apr. 5, 2012) (diabetic denied various accommodations); *Paine v. Bergland*, 2012 WL 6727243, *11 (N.D. Ill. Dec. 28, 2012) (denying summary judgment to jail that failed to provide mental health evaluation before releasing mentally ill woman in dangerous part of Chicago).

inmate commit suicide).[9] "[F]ailure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCoy*, 2006 WL 2331055, at *22. Tavera undoubtedly suffered more than non-disabled prisoners when his disability led him to commit suicide as Defendants stood back and watched.

Finally, GDOC and GCHC's arguments that they are entitled to Eleventh Amendment immunity from the ADA and Rehabilitation Act claims should be rejected. First, the Rehabilitation Act undisputedly abrogates both entities immunities because GDOC and GCHC both accept federal funding. By accepting federal funds, the State waives its immunity. *Garrett v. Univ. of Alabama – Birmingham Bd. of Trustees*, 344 F.3d 1288, 1293 (11th Cir. 2003). Even if GDOC and GCHC are immune under the ADA – though they are not – Plaintiff's Rehabilitation Act claims remain.

Second, because the ADA and Rehabilitation Act are essentially identical, *see supra* n. 6, the State's Eleventh Amendment immunity from ADA claims is "a purely academic question." *Gaylord v. Ga. Dep't of Natural Resources*, 2013 WL 4790158, *3 (N.D. Ga. Sept. 6, 2013) (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 449

---

[9] *See also Romero v. Bd. of County Comm'ns for County of Curry, N.M.*, --- F.Supp.2d ----, 2016 WL 4483867, *27-28 (D. N.M. Aug. 15, 2016); *Cleveland v. Gautreaux*, ---F.Supp.2d ----, 2016 WL 4107702, *17-18 (M.D. La. Aug. 1, 2016); *Hacker v. Cain*, 2016 WL 3167176, *13 (M.D. La. June 6, 2016); *Martone v. Livingston*, No. 4:13-CV-3369, 2014 WL 3534696, at *16 (S.D. Tex. July 16, 2014); *McCoy v. Tex. Dep't of Crim. Justice*, C.A. No. C-05-370, 2006 WL 2331055, *22 (S.D. Tex. 2006) (Jack, J.); *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532, 538 (N.D. Tex. 2011); *Hinojosa v. Livingston*, 994 F.Supp.2d 840 (S.D. Tex. 2014); *Borum v. Swisher Co.*, 2015 WL 327508 (N.D. Tex. Jan. 26, 2015) ($1,000,000 jury verdict where jail failed to accommodate disabled inmate suffering alcohol withdrawal).

(5th Cir. 2005)). Because the "rights and remedies" under both the Rehabilitation Act and ADA are identical, and because there is no question the Rehabilitation Act vitiates the State's immunity from suit, there is no need for the Court to address whether the ADA abrogates the immunity as well. *Id*. If, however, the Court wishes to address the immunity from the ADA, Plaintiff overcomes this hurdle as she alleges GDOC and GCHC's agents also violated Tavera's constitutional rights. *See supra* at pp. 7-15. The Supreme Court made it clear that Congress successfully abrogated the entities' immunities under the congressional power to enforce the Fourteenth Amendment by passing the ADA. *See U.S. v. Georgia*, 546 U.S. at 158-59 ("This enforcement power includes the power to abrogate state sovereign immunity by authorizing private suits for damages against the States. Thus, insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.") (internal citations omitted).

Thus, the complaint alleges sufficient facts to establish GDOC and GCHC discriminated against Tavera by denying him reasonable accommodations, resulting in his death, and Plaintiff's ADA and Rehabilitation Act claims cannot be dismissed.

### D.    Plaintiff Sufficiently Alleges a Valid Georgia Tort Claims Act Claim

Under the GCTA, Plaintiff has alleged a claim for negligence for which GDOC and GCHC are not immune, and provided the State proper notice.

### 1.    *Plaintiff's Ante-Litem Notice was Valid.*

First, there is no dispute that GDOC received an ante-litem notice of Plaintiff's claims. *See* Doc. 34-1; O.C.G.A. § 50-21-26(a)(5). The motion to dismiss only alleges GCHC did not receive notice.

Second, the ante-litem notice to GDOC does provide adequate notice of Plaintiff's claims. The notice provision's purpose is to "ensure that the state receives adequate notice of the claim to facilitate settlement before the filing of a lawsuit." *Cummings v. Ga. Dep't of Juvenile Justice*, 653 S.E.2d 729, 731 (Ga. 2007).

Here, the notice unquestionably provided sufficient notice to GDOC of the "acts or omissions that caused the loss," based on Ms. Arenas' "knowledge and belief … as … practicable under the circumstances." O.C.G.A. § 50-21-26(a)(5)(F). The notice to GDOC specifically alleges Tavera "was not given adequate medical attention for his severe mental disorder," and "a lack of training and lack of policies and procedures towards the protection of inmates from inmate self-inflicted injuries" caused Tavera's death. Doc. 34-1, p. 2. The notice plainly states GDOC's decision to "[hold] [Tavera] in the segregation or lockdown unit" – i.e. in a single-person cell, without a cellmate (Amd. Complaint, ¶ 33) – while failing to provide him "adequate medical attention" caused his death.[10] *Id*. The notice identifies "Georgia Department of Corrections, … Stanley Williams, … and correction officers at Smith State Prison who failed to protect [Tavera]." *Id*. These are the same claims brought in this lawsuit – that GDOC negligently failed to provide Tavera medical care (both before, during, and after his suicide attempt) and that negligent practices and training resulted in Tavera's death. The ante litem notice clearly identifies "correction officers" (whose names were unknown to Plaintiff but certainly known to GDOC), providing the Department of Administrative Services ample

---

[10] At its core, constitutional claims related to protections from suicide are derived from inmates' entitlement to medical care. *Greason*, 891 F.2d at 834.

opportunity to review the officers' own statements after receipt of the notice letter.[11] The GTCA's notice provisions simply do not require the Defendants' proposed "hyper-technical construction that would not measurably advance the purpose of the ante litem notice provisions." *Bd. of Regents of Univ. Sys. of Ga. v. Myers*, 764 S.E.2d 543, 546 (Ga. 2014).

Third, the notice to GDOC was effective as to GCHC. GCHC is a contractor for GDOC. Doc. 34-8. That Plaintiff later learned GCHC was involved in providing – or here, not providing – medical care to GDOC inmates does not make the notice defective. In fact, the Georgia Supreme Court held in a similar case, where the plaintiff did not know the identity of the responsible agency, that the notice was sufficient because the notice provided Plaintiff's best "knowledge and belief" at the time notice was given. *Cummings v. Ga. Dep't of Juvenile Justice*, 653 S.E.2d 729, 732 (Ga. 2007) (plaintiff provided timely notice to incorrect agency). Simply put, "the plain language of the statute requires the identification of the agency *asserted* to be responsible, rather than identification of the agency *actually* responsible." *Id*. (emphasis in original).

Finally, GCHC has not suffered any prejudice because Plaintiff's ante litem notice was sent only to GDOC and DOAS. Because the notice to GDOC clearly alleged Tavera was "not given adequate medical attention," it put GDOC and its contractor on notice of Plaintiff's denial of medical care claims. In *Cummings*, where a wholly different agency

---

[11] To the extent the notice is allegedly defective – though it is not – the notice statute only requires a description "to the extent of the claimant's knowledge and belief and as may be practicable under the circumstances." *See Driscoll v. Bd. of Regents of Univ. Sys. of Ga.*, 757 S.E.2d 138, 140 (Ga. App. 2014). Plaintiff is the mother of a prison inmate, with virtually no access to facts particularly within the prison's control, until discovery. It would be particularly unjust to require her to provide a more detailed description of defendants' tortious conduct when she was not present, and her son's death took placed behind the closed walls of a prison.

received notice of the claim, the Georgia Supreme Court still determined "there is no evidence that the State suffered any prejudice therefrom" when the agency had the opportunity to investigate the claim before suit was filed. 653 S.E.2d at 734.

2.    *GDOC's Conduct Does Not Fall Within An Exception to the General Waiver*

GDOC's negligence also does not fall within any exception to the GTCA's waiver of immunity. GDOC contends Georgia exempts all "law enforcement" activity from the GTCA's waiver. *See* O.C.GA. § 50-21-24(6). But GDOC cites no authority that operation of a prison (or any other correctional facility) falls within this exception.

Indeed, the text of the exception suggests corrections does not fall within the "providing law enforcement" exception. The statute provides "[t]he state shall have no liability for losses resulting from … [c]ivil disturbance, riot, insurrection, or rebellion or the failure to provide, or the method of providing, law enforcement, police, or fire protection." *Id*. The plain text of the exception states immunity is not waived only in cases where the plaintiff alleges a "failure to provide … law enforcement" – such as a case where the state fails to protect a citizen from crime. *See*, *e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) (town not liable harm resulting from failure to enforce domestic violence restraining order).

The leading Georgia Supreme Court case interpreting the exception does not suggest or imply that corrections falls within the exception. *See Georgia Forestry Com'n v. Canady*, 632 S.E.2d 105, 109 (Ga. 2006) (purpose of waiver is to protect state coffers from claims involving "decisions made by state employees and officers with regard to the amount, type, and disbursement of equipment and personnel *in response* to a need for the immediate provision of police, law enforcement, or fire protection services") (emphasis

in original). Likewise, reported decisions allowed plaintiffs' claims against GDOC to proceed. *See*, *e.g.*, *Romano v. Ga. Dep't of Corrections*, 693 S.E.2d 521 (Ga. App. 2010) (reversing grant of motion to dismiss where inmate alleged officers converted his personal property).

Though the GTCA does not define "law enforcement," other Georgia statutes do draw this distinction between police and prison guards. Georgia's criminal law on "obstructing officers" distinguishes between a "law enforcement officer," and a "prison guard" or "correctional officer." O.C.G.A. § 16-10-24(b). So does Georgia's compensation scheme for officers injured in the line of duty. O.C.G.A. § 20-3-451(4) & (6) (separate definitions of "law enforcement officer" and "prison guard"). Georgia law defines a "law enforcement unit" to include GDOC but only as to "personnel who are authorized to exercise the power of arrest" – which would not include correctional officers working in a prison. O.C.G.A. § 35-8-2(7)(C). Title 35 of the Georgia Code, which governs "Law Enforcement Officers and Agencies," does not govern the GDOC. (Instead, Title 42 governs "Penal Institutions," including GDOC.) The Eleventh Circuit, interpreting a similar Florida statute, also supports this distinction. *Pierre v. City of Miramar, Fla.*, 537 Fed. Appx. 821, 825 (11th Cir. 2013) (describing distinction between "law enforcement" and "correctional" officer). "Law enforcement" and "corrections" (especially as the field relates to providing medical care or safe housing) are simply different.

Moreover, even if the exception did broadly apply to corrections (though it does not), the exception does not even apply to *all* law enforcement activities, but only "the failure to provide or method of providing law enforcement." The "provision" of law

enforcement is particularly inapplicable to the facts of this case. None of the GDOC officers were "providing law enforcement" at the time they let Tavera die. They were not arresting him, detaining him, or charging him (or anyone else) with any violation of the law.

Indeed, the GDOC performs several functions distinct from "providing law enforcement," including incarcerating convicted inmates safely and providing them medical care. *See* O.C.G.A. § 42-2-11(c) (GDOC's board responsible for "assignment, housing, working, feeding, clothing, treatment, discipline, rehabilitation, training, and hospitalization of all inmates coming under its custody"). Safe housing and medical care are simply not "law enforcement" functions of GDOC. Providing medical treatment to inmates is plainly not a "law enforcement" function similar to any of the applications of the exception discussed in the case law. *See, e.g., Ga. Dep't of Public Safety v. Davis*, 676 S.E.2d 1, 207 (Ga. 2009) (denying application of exception where police officer rear-ended plaintiff); *James v. Ga. Dep't of Public Safety*, 789 S.E.2d 236, 243 (Ga. App. 2016) (applying exception where police officer followed policy during high-speed chase); *Dixon v. Ga. Dep't of Public Safety*, 135 F.Supp.3d 1362, 1371 (S.D. Ga. 2015) (denying application of exception where SWAT officer disregarded policy when shooting plaintiffs' decedent). Plaintiff's complaint alleges GDOC negligently (as well as deliberately) failed to provide Tavera medical care – both during his entire incarceration (Doc. 34, ¶ 18) and when he needed it most (when Calhoun found him about to hang himself) (Doc. 34, ¶¶ 19-26). Provision of medical or mental health care, or safe housing, to inmates is not "providing … law enforcement" under the exception.

Finally, if the "law enforcement" exception applies to a failure to provide medical care or safe housing to Tavera, the exception is not nearly as broad as GDOC suggests. *Canady* makes it clear the exception only applies to "making of policy decisions by state employees and officers including those relating to the amount, disbursement, and use of equipment and personnel to provide law enforcement, police or fire protection services, and to the acts and omissions of state employees and officers executing and implementing those policies." 632 S.E.2d at 110. There was no official policy to deny Tavera medical care or safe housing during the period leading up to his suicide attempt.[12] Thus, the exception to the waiver cannot apply to that claim. If the exception does apply to the decision not to enter Tavera's cell – though it does not – it can only immunize Georgia officials for "making" or "implementing" a law enforcement policy. To the extent the Amended Complaint alleges the correctional officers were acting pursuant to Warden Williams' official policy when they failed to rescue Tavera, Plaintiff is entitled to plead in the alternative, that if there was no official policy, that the officers acted negligently. *See* FED. R. CIV. PROC. 8(d)(2). It would be grossly unfair to dismiss Plaintiff's GTCA negligence claims now, when no discovery has taken place, if dismissal would allow Defendants to argue later that their conduct was "merely" negligent, not pursuant to an official policy, and not deliberately indifferent.

---

[12] Likewise, Plaintiff believes discovery will also reveal other negligence unrelated to Williams' policy regarding entering the cells. For example, during a hearing in the related case, counsel for defendants suggested Calhoun's two-way radio prevented him from communicating with Shelby and Dickson. Failing to maintain the radio, negligent use of the radio by Calhoun (or others), or to failing provide officers an alternative method of communication, would obviously be negligent in a prison, and unrelated to any GDOC policy. But Plaintiff requires discovery to flesh out this allegation.

**D.      In the Alternative, Plaintiff Should be Permitted Leave to Amend After Discovery**

"A complaint should not be dismissed under FED.R.CIV.P. 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bank v. Pitt*, 928 F.2d 1108, 1111-1112 (11th Cir. 1991).[13] A district court's ability to dismiss a complaint without giving the plaintiff at least one chance to amend her pleading to cure any defects is "severely restricted." *Id*. "Where it appears a more carefully drafted complaint might state a claim upon which relief can be granted, we have held that a district court should give a plaintiff an opportunity to amend his complaint instead of dismissing it." *Id*., at 1112.

Here, Plaintiff, the mother of a deceased inmate, has virtually no ability to discover relevant facts without the opportunity to conduct discovery. Indeed, Defendants have asserted immunity from discovery as well, preventing Plaintiff from deposing the critical witnesses or reviewing any documents beyond the extremely limited materials GDOC chose to release pursuant to Plaintiff's open records request. Doc. 36-1. Defendants' motion heightens this conundrum – though the sparse (but available) evidence suggests Calhoun, Dickson, and Shelby were acting pursuant to a policy or practice established by Warden Williams, if evidence in discovery reveals they were merely negligent the equities would heavily counsel an opportunity to amend. *See Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011) (discovery

---

[13] The Eleventh Circuit partially overruled *Bank* in *Wagner v. Daewoo Heavy Industries America Corp.*, 314 F.3d 541 (11th Cir. 2002), where the Circuit added a requirement that a complaint could be dismissed when a represented plaintiff failed to request leave to amend. To the extent any amendment is necessary to cure any defects in the pleading, Plaintiff hereby requests leave to amend.

necessary to show plaintiffs "specific details regarding the existence or absence of internal policies or training procedures"). Thus, if the Court were inclined to dismiss Plaintiff's complaint with prejudice, she first requests an opportunity to amend after conducting limited discovery.[14]

## VI.   CONCLUSION

Plaintiff Maria Arenas has adequately stated claims under the Americans with Disabilities Act, Rehabilitation Act, GTCA, and violations of Tavera's Eighth Amendment rights. As such, Defendants' motion to dismiss should be denied.

Carter Franklin. LLP
Post Office Box 27
Metter, Georgia 30439

brent@carterfranklin.com
     Tel.    912-685-5500
     Fax.    912-685-5030

/s/ Brent Carter
 BRENT CARTER
 State Bar No.: 153082

Edwards Law
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
     Tel.    512-623-7727
     Fax.    512-623-7729

By: /s/ Jeff Edwards
     JEFF EDWARDS
     TX State Bar No. 24014406
     *Pro Hac Vice Pending*
     Scott Medlock
     TX State Bar No. 24044783
     *Pro Hac Vice Pending*

ATTORNEYS FOR PLAINTIFF

---

[14] In particular, Plaintiff needs to depose Calhoun, Shelby, Dickson, and Williams. *See also supra* at n. 10.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing all attorneys of record.

/s/ Scott Medlock
Scott Medlock