IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| MARIA ARENAS, Individually and in her capacity as heir of and representative of the Estate of RICHARD TAVERA,<br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>GEORGIA DEPARTMENT OF CORRECTIONS, GEORGIA BOARD OF REGENTS d/b/a/ GEORGIA CORRECTIONAL HEALTH CARE and MARK SHELBY, STANLEY WILLIAMS, and MARVIN DICKSON in their individual capacities.<br><br>　　　　　　　　　　Defendants. | Civil Action No.:<br>CV-416-320 |

**PLAINTIFF'S SECOND CONSOLIDATED AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiff Maria Arenas, individually and in her capacity as heir of the Estate of Richard Tavera, files this Second Amended Consolidated Complaint in her lawsuit against Defendants Georgia Department of Corrections, Georgia Board of Regents d/b/a/ Georgia Correctional Health Care, Mark Shelby, Stanley Williams, and Marvin Dickson and will show:

# I.
# PARTIES

*A.    Plaintiff*

1.    Plaintiff Maria Arenas is the natural mother of the decedent, Richard Tavera, and resides in Austin, Texas.

2.    At the time of his death, Tavera had no children, and no surviving spouse.

3.      Tavera died intestate, and no administration of his estate is pending, as none was necessary. Accordingly, Ms. Arenas has standing to assert wrongful death claims under Georgia law for herself and the Estate of Richard Tavera, her son.

B.     *Defendants*

4.      Defendant Mark Shelby was a correctional sergeant at the Smith State Prison in Tattnall County, Georgia at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of GDOC. At all relevant times, he served as an employee/agent of GDOC. He is sued in his individual capacity for punitive and compensatory damages. Shelby is a resident of Liberty County, Georgia. He has been served and appeared in this case.

5.      Defendant Marvin Dickson was a correctional lieutenant at the Smith State Prison in Tattnall County, Georgia at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of GDOC. At all relevant times, he served as an employee/agent of GDOC. He is sued in his individual capacity for punitive and compensatory damages. Dickson is a resident of Liberty County, Georgia. He has been served and appeared in this case.

6.      Defendant Stanley Williams was the warden at the Smith State Prison in Tattnall County, Georgia at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of GDOC. At all relevant times, he served as an employee/agent of GDOC. He is sued in his individual capacity for punitive and compensatory damages. Williams is a resident of Lowndes County, Georgia. He has been served and appeared in this case.

7. Defendant Georgia Department of Corrections is the state prison system, an agency of the State of Georgia. At all relevant times, it operated the Smith State Prison, a public facility with programs and services for which Tavera was otherwise qualified. GDOC is a recipient of federal funds. GDOC is sued for compensatory relief only under federal law. GDOC has been served and appeared in this litigation.

8. Defendant Georgia Board of Regents, located in Augusta, is a component of the Augusta University system, a public university in the State of Georgia. Though a subsidiary entity called Georgia Correctional Health Care, the Board provides health care, including mental health care and psychiatric care, to GDOC prisoners, including prisoners at the Smith State Prison, pursuant to a contractual arrangement with GDOC. The Board and GCHC are recipients of federal funds. GCHC is sued for compensatory relief only under federal law. GCHC has been served and appeared in this litigation.

## II.

## JURISDICTION AND VENUE

9. As this case is brought pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act, 42 U.S.C. §12131 et seq., and Rehabilitation Act, 29 U.S.C. §794, this Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3).

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, and because Defendants removed the separate action containing Plaintiff's state law claims to federal court, which was consolidated with this litigation.

11. This Court has general personal jurisdiction over the Defendants as they reside and/or work in the Southern District of Georgia.

12. This Court has specific *in personam* jurisdiction over defendants because Defendants Shelby and Dickson reside in Liberty County, which is within the Savannah Division of the Southern District of Georgia.

13. Venue for this cause is proper in the Southern District of Georgia pursuant to 28 U.S.C. §1391(b) because Defendants Shelby and Dickson reside within Liberty County, which is within the Savannah Division of the Southern District of Georgia.

## III.
## FACTUAL BACKGROUND

14. Richard Tavera, Plaintiff's beloved son, took his own life while in the custody of GDOC's Smith State Prison. Incredibly, Defendants Dickson, and Shelby stood by, watched, and did nothing to save him.

15. Tavera was known by all of the defendants to suffer from severe mental illnesses. These serious conditions impaired the function of his brain, and limited his ability to think, interact with others, concentrate, sleep, eat, work, live, care for himself, and function on a day to day basis. Due to his serious mental illnesses, he had attempted suicide before his incarceration in Georgia.

16. Before his incarceration, Tavera had been civilly committed because his mental disabilities made him a threat to his own health and safety.

17. GDOC and GCHC were well aware of Tavera's serious mental illness and suicidal tendencies. Upon his admission to the prison, mental health providers noted he had a history of bipolar disorder and hospitalization in inpatient mental health facilities due to previous suicide attempts, as well as outpatient treatment. The mental health provider noted he was only sleeping two hours per night, and had a low appetite. Though he had previously been prescribed

4

psychiatric medications to treat his condition, the provider did not prescribe any medications for him in the prison.

18. In fact, though GDOC and GCHC knew of Tavera's mental disabilities, he was never provided any treatment for his disabilities while incarcerated in GDOC facilities.

19. On or about December 5, 2014, GDOC placed Tavera in a solitary confinement ("administrative segregation") cell. Tavera requested placement in the cell for his own protection.

20. Well-established correctional practices require all prisoners to receive a psychiatric evaluation before placement in solitary confinement, due to the well-known risk that prisoners isolated by themselves are at a heightened risk of suicide – especially when the prisoner has a previous history of serious mental illness and suicide attempts, like Tavera. Despite the necessity of this reasonable accommodation for his mental illness, GDOC and GCHC never provided Tavera a mental health examination while he was locked in the solitary confinement cell.

21. At 10:50 pm on December 7, 2014, a correctional officer, John Calhoun found Tavera in his cell, attempting to hang himself. He had tied a bedsheet to the fire extinguisher sprinkler on the ceiling of his cell, and was wrapping it around his neck to hang himself, but was not yet suspended by the ligature when Calhoun first found him.[1]

22. Though he saw Tavera beginning to take his own life, Calhoun did not intervene to save him. Instead, he stood back and watched. He also used his radio to call his supervisors, Defendants Sgt. Shelby and Lt. Dickson.

---

[1] Plaintiff has sued Calhoun in separate litigation in the Western District of Texas, where Calhoun now resides. *Arenas v. Calhoun*, No. 5:16-cv-01203 (W.D. Tex., filed Nov. 28, 2016).

23. Though Shelby and Dickson heard Calhoun describe the suicide in progress, they did not immediately respond. In fact, several calls were made to Shelby and Dickson by multiple officers before they responded to Tavera's cellblock. Either Calhoun's radio was not functioning properly, or Shelby and Dickson heard the call and ignored it.

24. Tavera was a small and slight young man, standing at 5' 6" tall, and weighing approximately 142 pounds, and was placed in solitary confinement for his own protection. Calhoun could have easily entered the cell to stop the suicide with little risk of physical injury. He had no weapons, and posed no danger to anyone when Calhoun found him committing suicide.

25. Though Shelby and Dickson were unequivocally told by Calhoun that Tavera was actively suicidal before they reached the cell, and knew Tavera was currently working to end his own life, they did not instruct Calhoun to intervene, alert the prison's medical provider, call EMS, or take any other action to help Tavera.

26. It took Shelby approximately eight minutes to arrive at Tavera's cell from Calhoun's initial call. By this time, Tavera was hanging from the ligature. Shelby saw Tavera hanging when he arrived at the cell, and saw Calhoun standing by, doing nothing. Instead of entering the cell with Calhoun to save Tavera, Shelby did nothing but yell "hay, hay" to Tavera. Now, two officers were literally standing around while a man died in front of them, waiting for Lt. Dickson.

27. Shortly thereafter, a third, unidentified officer arrived at the cell. This third officer began observing Tavera with Calhoun and Shelby, but the three assembled officers did nothing to assist Tavera.

28. After approximately another minute, Lt. Dickson arrived at the cell. It took Dickson approximately ten minutes to arrive at Tavera's cell. During this time, Dickson knew that Calhoun (and later, Shelby, and later a third officer) were standing by, doing nothing as Tavera hanged. Despite Dickson's knowledge Tavera was hanging, he did not instruct his subordinates to do anything to rescue Tavera and provide Tavera medical care.

29. Even after he arrived at the cell, Dickson still did not immediately order the assembled officers to enter and rescue Tavera. Instead, Dickson ordered Calhoun to make a video recording of Tavera hanging for another minute before entering the cell. During this time (and not during the preceding ten minutes), officers incompetently fumbled with the key to the cell door, further delaying Tavera's urgently needed access to medical care. Approximately another minute passed between Dickson's arrival and when the cell door finally opened.

30. When Dickson finally ordered officers to open the cell door, the officers' response was completely incompetent and well below the standard of care. Rather than lift Mr. Tavera's body to remove pressure from the ligature, officers pulled back on his body while lifting it, putting additional pressure on the ligature.

31. Moreover, a "suicide tool" or "cut down knife" is standard emergency equipment that every prison must have on hand in event of a suicide attempt. A "suicide tool" is a small, curved blade that can be used to quickly cut through a ligature to remove pressure on the neck. The officers who responded to Tavera's suicide did not have a "suicide tool" present, and, instead, wasted several minutes untying the ligature, further delaying necessary medical care. Having a "suicide tool" on hand, and training officers on its proper use, is the standard of care in prisons and a reasonable accommodation for people with mental disabilities at risk of suicide.

32. The lack of a "suicide tool" meant Tavera was hanging for at least another minute while officers incompetently tried to untie the ligature.

33. Given the lengthy amount of time that had passed watching Tavera commit suicide, Dickson and Shelby each knew Tavera would require medical attention beyond the care available at the prison, but they did not call 911 on his behalf until at least fifteen minutes after Calhoun first found him beginning to hang himself. EMS did not arrive at the prison approximately a half hour after Calhoun first found Tavera beginning to hang himself.

34. Had Calhoun, Dickson, and Shelby intervened sooner, Tavera would not have died. Thus, Calhoun, Dickson, and Shelby's inaction directly and proximately caused Tavera's death.

35. Upon information and belief, Warden Williams maintained a practice at the prison that officers were not to enter a cell without first obtaining the permission of an officer with the rank of lieutenant or higher, even to save a prisoner's life. Upon information and belief, Calhoun, Dickson, and Shelby were following Williams' orders when they delayed entering Tavera's cell to save him. Thus, Williams' practice at the Smith State Prison directly and proximately caused Tavera's death. In the alternative, if no such practice existed, all delays in rescuing Tavera and obtaining medical care for him resulted from the negligence and outright indifference of Calhoun, Shelby, Dickson, and GDOC in failing to enter the cell sooner, or failing to maintain the radios so that Calhoun's supervisors could have approved entering the cell and instructed Calhoun to do so.

36. Upon information and belief, Warden Williams failed to train the officers at the prison about their obligation to protect inmates from suicide, and about how to respond in a

minimally adequate fashion during a suicide attempt. Though it is obvious that inmates will periodically attempt to end their own lives, and that it is well known in correctional management that inmate suicide attempts will be a recurring problem officers encounter in almost any correctional environment, Williams failed to adequately train his officers in suicide prevention, response to suicide attempts, and their duty to intervene to prevent inmate suicides.

37. Likewise, when Shelby and Dickson knew Calhoun was failing to provide Tavera urgently needed medical attention, they did nothing. As his direct supervisors, Shelby and Dickson had an opportunity to instruct Calhoun to save Tavera. But instead, Shelby and Dickson chose to wait until it was too late, directly and proximately causing Tavera's death.

38. Under clearly established law, Shelby, Dickson, and Williams' actions were objectively unreasonable, as Tavera's right to be protected from suicide and to receive urgently needed mental health and medical care were clearly established, and his need for immediate medical attention was obvious to even an incompetent officer. No reasonable correctional officers would have chosen to stand by and let a man die while it was obvious he was attempting to take his own life.

39. Moreover, GDOC housed Tavera in a cell with an obvious "tie off point" (the fire extinguisher sprinkler), which would be an obvious hazard for a potentially suicidal inmate. Despite this obvious hazard, GDOC did not assign Tavera alternate housing without this dangerous feature. Instead, this "tie off" point was a standard feature of an already dangerous solitary confinement cell. Thus, GDOC denied Tavera this reasonable accommodation for his disability.

40. Similarly, upon information and belief, GCHC makes mandatory housing

recommendations to GDOC for where to house inmates with disabilities. For example, GCHC would instruct GDOC that inmates who use wheelchairs must be assigned to accessible cells. Despite GCHC's knowledge of Tavera's severe mental illness, no such recommendations were made to house him safely. Thus, GCHC denied Tavera this reasonable accommodation for his disability.

41. Likewise, neither GDOC nor GCHC ensured Tavera received a psychiatric examination at any time during his solitary confinement.

42. In the same way, Tavera was housed in a single cell with no cellmate. It is well known in correctional management that mentally ill inmates are far less likely to successfully commit suicide if they are evaluated or housed with another person. The presence of another person both deters suicide attempts, and allows for someone to rapidly intervene during an attempt. Despite the availability of this reasonable accommodation, neither GDOC nor GCHC took any steps to house Tavera with another person.

43. Likewise, GDOC and GCHC did not provide Tavera with any mental health care during his incarceration. Inmates, like Tavera, are entitled by the U.S. Constitution to adequate medical and mental health care during incarceration. Thus, it was eminently reasonable for GDOC and GCHC to provide mental health care to Tavera, and he was denied this accommodation for his disability.

44. Tavera was scheduled to be released from prison in less than three months after his death, and intended to return home to live with his mother in Travis County, Texas. He was only 24 years old.

## IV.     CAUSES OF ACTION

**A.     42 U.S.C. § 1983 Deliberate Indifference Claims Against Defendants Shelby, Dickson, and Williams**

45.     Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

46.     Tavera had a clearly established right to be protected from his suicidal tendencies and not to have his serious medical needs treated with deliberate indifference. Rather than provide Tavera the medical care and treatment he desperately needed, and was known to need by Defendants Shelby and Dickson, they deliberately disregarded Tavera's obvious condition, causing him to die.

47.     Likewise, Shelby, and Dickson knew Calhoun was violating Tavera's constitutional rights, had the opportunity to intervene by ordering him to rescue Tavera, and took no action. Therefore, Shelby and Dickson are liable for violations of Tavera's constitutional rights.

48.     Similarly, Williams, as the warden of the prison, maintained a practice prohibiting officers from intervening to save inmates' lives without the assistance of their supervisors. Williams knew, because it is obvious and because (presumably) through training he received he was obligated to know, that officers would periodically encounter inmates attempting to end their own lives, but consciously maintained a practice that the officers should delay doing so, even if the delay would likely cost the inmate his life. As such, Williams was deliberately indifferent to inmates' need to receive immediate medical care and to be protected from suicidal tendencies.

49.     Likewise, Williams, as the warden of the prison, failed to train his subordinates that they have a constitutional duty to protect inmates from suicide, that officers must respond

11

adequately to a suicide attempt (such as by responding quickly, taking pressure off the ligature, and using a "suicide tool") and are required to provide timely medical attention to inmates seen committing suicide. As such, Williams was deliberately indifferent to a likely violation of constitutional rights that would recur in the prison. Williams made a deliberate choice not to provide additional, minimally adequate training.

50.     As a direct and proximate consequence, Defendants Shelby, Dickson, and Williams are liable under 42 U.S.C. § 1983 for violations of Tavera's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

**B.     Americans with Disabilities Act and Rehabilitation Act Against Defendants GDOC and GCHC.**

51. GDOC and the Board (acting as GCHC) were, at all relevant times, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794.

52. Further, Title II of the ADA applies to GDOC and GCHC and has the same mandate as the Rehabilitation Act. 42 U.S.C. § 12131 *et seq*.

53. The Smith State Prison is a facility, and its operation comprises a program and service, for Rehabilitation Act and ADA purposes.

54. For purposes of the ADA and Rehabilitation Act, Tavera was a qualified individual regarded as having a mental impairment that substantially limited one or more of his major life activities. Defendants GDOC and GCHC knew Tavera was a person with a mental illness who had attempted suicide before.

55. Despite this knowledge, GDOC's officers intentionally discriminated against him, under the meaning of the ADA and Rehabilitation Act, by failing and refusing to provide him medical care as he was killing himself, placing him in a one-person cell, responding incompetently to his suicide, not having a suicide tool available, not providing him a psychiatric exam before placing him in solitary confinement, and housing him in a cell dangerous to people at risk of self-harm.

56. Likewise, GCHC's employees failed to accommodate his disability by failing to require GDOC to house him in a cell appropriate for someone with his well-known history of suicide attempts, failing to provide him a psychiatric examination before he was housed in solitary confinement, and failing to provide him any mental health care at any time during his incarceration.

57. Furthermore, both GDOC and GCHC failed to provide Tavera any mental health treatment while he was incarcerated in their facilities. Providing Tavera with mental health care would be a reasonable accommodation for his mental disabilities, and would likely have prevented his death.

58. Thus, as alleged above, GDOC and GCHC failed and refused to reasonably accommodate Tavera's mental disability while in custody, in violation of the ADA and Rehabilitation Act.  That failure and refusal caused his death.

59. GDOC and GCHC failed and refused to reasonably modify its facilities, services, and programs to reasonably accommodate Tavera's mental disability, including failing to house him in a safe cell, failing to provide him mental health care, and failing to rescue him during his suicide.

60. Tavera died as a direct result of GDOC and GCHC's intentional discrimination against him. Plaintiff is entitled to the maximum amount of compensatory damages allowed by law.

**C.  Georgia State Tort Claims Act Against GDOC and GCHC**

61. This claim is brought against GDOC and GCHC pursuant to the Georgia State Tort Claims Act based on the actions and omissions of Calhoun, Williams, Shelby, and Dickson and other correctional officers and medical providers at the Smith State Prison.

62. Calhoun, Williams, Shelby, and Dickson failed to protect Tavera from self harm, and denied him necessary protection and medical care when he was found attempting to take his own life.

63. GDOC failed to maintain functioning radios in Tavera's cellblock, though a lack of functioning radios would make the cellblock dangerous. GDOC knew (or should have known) of this obvious hazard. This negligent failure to provide functioning communication equipment endangered inmates like Tavera, and proximately caused his death.

64. GDOC's officers responded negligently, well below the standard of care, to Tavera's suicide attempt by delaying entering the cell to rescue him, failing to alleviate pressure on the ligature when they entered the cell, failing to cut down the ligature immediately, and delaying calling EMS, proximately causing his death.

65. Likewise, GDOC and GCHC failed to provide Tavera any medical or psychiatric care for his mental illnesses, leading to his suicide death.

66. Said actions and omissions of Calhoun, Williams, Shelby, Dickson, and GCHC medical providers constitute negligence and/or intentional misconduct in delaying necessary

14

medical care and protection from harm for Tavera.

67. Calhoun, Williams, Shelby, and Dickson and all other agents/employees of GDOC and GCHC at Smith State Prison were responsible for providing Tavera adequate medical care, including protection from harm, and owed him a duty to act to prevent his self-harm. Calhoun, Williams, Shelby, and Dickson were employees of the State of Georgia at all relevant times.

68. GCHC, GDOC, Calhoun, Williams, Shelby, and Dickson's actions did not involve policy judgments based on social, political, or economic factors. As a result of Calhoun, Williams, Shelby, and Dickson's actions and inactions, Tavera died.

69. Defendants GDOC and GCHC are liable and responsible for all negligent acts and omissions of each of its actual and/or apparent agents, employees, and/or partners, including all correctional officers, physicians, nurses, clerical, administrative and other personnel responsible for the medical care, referral and treatment of Tavera pursuant to the principles of agency and/or *respondeat superior*.

70. As a direct and proximate result of the negligent actions and omissions of GDOC and GCHC and its agents on and before December 7, 2014, Tavera suffered great physical and mental pain and suffering, mental anguish, and death, and the Estate of Tavera is entitled to recover all damages allowable by law.

71. Due notice of claim for Plaintiffs' injuries were duly served on the appropriate State of Georgia entities on or about December 8 and 9, 1999, within 12 months of when Plaintiffs' claims arose, (on or about April 14, 2015) and no action was taken by Defendants, other than to deny the claims. Copies of these documents are attached as Exhibit A and Exhibits B1-B4.

72. To the extent that evidence would demonstrate Plaintiff's 42 U.S.C. § 1983, the

ADA, or Rehabilitation Act claims are not viable as a matter of law, and that, instead, GDOC, GCHC, or its agents were merely negligent in causing Tavera's death, Plaintiff pleads in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2), that she is entitled to relief under the GTCA.

## IV.
## DAMAGES

73. The actions and omissions of Defendants deprived Tavera of his civil rights under the United States Constitution and the ADA/Rehabilitation Act. Moreover, Defendants' acts and omissions proximately caused Tavera's death and Plaintiff's damages. Accordingly, Plaintiff asserts claims for compensatory damages under 42 U.S.C. § 1983, the ADA, the Rehabilitation Act, the GTCA, as well as the wrongful death and survivorship statutes.

74. The actions and omissions of agents and employees of GDOC and GCHC were negligent and grossly negligent, and resulted in Tavera's suicide death.

75. Likewise, because Shelby, Dickson, and Williams' conduct was egregious, Plaintiff asserts claims for punitive damages against them only.

76. More particularly, Plaintiff, in her capacity as heir of the Estate of Richard Tavera, asserts a survival claim on behalf of the estate. The Estate has incurred damages including, but not limited to, including the following:

- conscious pain and suffering; and
- funeral and burial expenses.

77. Plaintiff, in her individual capacity, asserts a wrongful death claim. She has incurred damages including, but not limited to, the full value of Tavera's life, including the following:

- past and future potential lifetime earnings, income, or services; and,

- past and future loss of companionship, support, society, services, advice, counsel, and affection with her son.

## VIII.
## JURY DEMAND

78. Plaintiff respectfully demands a jury trial on all factual issues in dispute.

## IX.
## ATTORNEYS' FEES

79. Plaintiff is entitled to recover attorneys' fees and costs, including reasonable expert witness fees, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205.

## X.
## PRAYER FOR RELIEF

80. Plaintiff hereby asks that Defendants be cited to appear and answer and that Plaintiff be awarded judgment against Defendants for:

(a) compensatory damages against all Defendants;

(b) punitive damages against Defendants Shelby, Dickson, and Williams only, in their individual capacities;

(c) attorneys' fees and costs, including but not limited to expert fees, under 42 U.S.C. §1988 and 42 U.S.C. § 12205;

(d) pre-judgment interest and post-judgment interest at the highest rate allowable under the law;

(e) all other costs; and

(f) all other relief in equity or in law, to which Plaintiff may be entitled.

Respectfully submitted,


The Edwards Law Firm
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
    Tel.    512-623-7727
    Fax.   512-623-7729

Carter Franklin. LLP
Post Office Box 27
Metter, Georgia 30439
brent@carterfranklin.com
    Tel.    912-685-5500
    Fax.   912-685-5030


By: /s/ Jeff Edwards
    JEFF EDWARDS
    TX State Bar No. 24014406
    *Admission Pro Hac Vice Pending*
    Scott Medlock
    TX State Bar No. 24044783
    *Admission Pro Hac Vice Pending*

    /s/ Brent Carter
    BRENT CARTER
    State Bar No.: 153082

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 17, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing all attorneys of record.

    */s/ Scott Medlock*
    Scott Medlock