**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| MARIA ARENAS, Individually and in her capacity as heir of and representative of the Estate of RICHARD TAVARA, | * * * * | |
| Plaintiff, | * * | |
| v. | * * * | CIVIL ACTION FILE No. 4:16-cv-00320-WTM-GRS |
| GEORGIA DEPARTMENT OF CORRECTIONS, GEORGIA BOARD OF REGENTS d/b/a/ GEORGIA CORRECTIONAL HEALTH CARE and MARK SHELBY, STANLEY WILLIAMS, and MARVIN DICKSON in their individual capacities, | * * * * * * * | |
| Defendants. | * * | |

<u>**AMENDED BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**</u>

COME NOW Georgia Department of Corrections ("GDOC"), Georgia Board of Regents[1]

d/b/a Georgia Correctional Health Care ("BOR"), Mark Shelby, Marvin Dickson, and Stanley

Williams (collectively, "Defendants") and respectfully submit this Amended brief in support of

their motion to dismiss Plaintiff's Second Amended Complaint.

## I.    STATEMENT OF FACTS[2]

Plaintiff Maria Arenas is the mother of a deceased twenty-four-year-old, Richard Tavara

("Tavara"), who committed suicide during his incarceration at Smith State Prison.  (Doc. 52, ¶¶

---

[1] This Defendant's correct name is the Board of Regents of the University System of Georgia.

[2] Defendants do not concede that Plaintiff's allegations are true, but instead recognize that Plaintiff's factual averments will be construed as true under Rule 12(b)(6).

1, 14).  According to Plaintiff, Tavara suffered from mental illnesses that "impaired the function of his brain" and limited his ability to "think, interact with others, concentrate, sleep, eat, work, live, care for himself, and function on a daily basis."  (Id. at ¶ 15).  Plaintiff also claims that Tavara had previously attempted suicide and had, at one point, been civilly committed.  (Id. at ¶¶ 15-16).

Plaintiff alleges that at 10:50 P.M. on December 7, 2014, Officer Calhoun (who is not a defendant in this action)[3] saw Tavara attempting to hang himself by tying a bedsheet to a fire extinguisher sprinkler on the ceiling and wrapping the bedsheet around his neck.  (Id. at ¶ 21).  Officer Calhoun called his supervisors, Defendant Shelby (a correctional sergeant) and Defendant Dickson (a correctional lieutenant), over the radio and allegedly informed them that Tavara was "actively suicidal" and "currently working to end his own life." (Id. at ¶¶ 22, 25).  According to Plaintiff, Defendants Shelby and Dickson did not instruct Officer Calhoun to take any action to help Tavara, alert the prison's medical provider, or call EMS.  (Id. at ¶ 25).  Instead, Defendant Shelby allegedly arrived at Tavara's cell eight minutes after the call from Officer Calhoun, at which point Tavara was already "hanging from the ligature."  (Id. at ¶ 26).  Plaintiff claims that Defendant Shelby yelled "hay, hay" to Tavara instead of entering the cell.  (Id.).  Two minutes later (i.e., ten minutes after the phone call), Defendant Dickson arrived at Tavara's cell with additional officers and ordered them to open the cell door.  (Id. at ¶ 28).

Plaintiff takes issue with several events that occurred once the officers entered the cell.  She claims that the officers negligently removed Tavara from the noose by simultaneously lifting and pulling back on his body.  (Id. at ¶ 30).  She also claims that the prison's absence of a

---

[3] Plaintiff has sued Officer Calhoun in a separate lawsuit that is currently pending in the Western District of Texas.  See Arenas v. Calhoun, Civil Action No. 5:16-cv-1203-XR (W.D. Tx.).

"suicide tool" or "cut down knife" fell below the standard of care and had the effect of denying Tavara a reasonable accommodation for his disability. (Id. at ¶ 31). Lastly, Plaintiff claims that Defendants Shelby and Dickson were negligent in not calling 911 until approximately fifteen minutes after Officer Calhoun first found Tavara. (Id. ¶ 25).

Plaintiff contends that, if Officer Calhoun and Defendants Dickson and Shelby had intervened sooner, Tavara would not have died. (Doc. 52 at ¶ 34). According to Plaintiff, the reason the officers did not intervene sooner was because of a policy maintained by Defendant Williams (the Warden at the prison) that "officers were not allowed to enter a cell without first obtaining the permission of an officer with the rank of lieutenant or higher." (Id. at ¶ 35). Plaintiff, therefore, claims that Tavara's death was directly and proximately caused by Defendant William's policy. (Id.). She further claims that Defendant Williams failed to "adequately train his officers in suicide prevention and their duty to intervene to prevent inmate suicides." (Id. at ¶ 36).

Based on the above allegations, Plaintiff asserts the following claims in her Second Amended Complaint (Doc. 52):

(1)   *Violations of the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA")*: Plaintiff alleges that Tavara was disabled for the purposes of the ADA and RA due to his mental illnesses. (Complaint, ¶ 54). She further claims that Defendants GDOC and BOR violated the ADA and RA in two different ways. First, she claims that Defendant GDOC discriminated against Tavara by allegedly "failing and refusing to provide him medical care as he was killing himself, placing him in a one-person cell, responding incompetently to his suicide, not having a suicide tool available, not

3

providing him a psychiatric exam before placing him in solitary confinement, and housing him in a cell dangerous to people at risk of self-harm." (Doc. 52, ¶ 55).  Second, Plaintiff claims that Defendants GDOC and BOR failed to accommodate Tavara's disability by allegedly "failing to require GDOC to house him in a cell appropriate for someone with his well-known history of suicide attempts, failing to provide him a psychiatric examination before he was housed in solitary confinement, and failing to provide him with mental health care at any time during his incarceration."  (Id. at ¶ 56)

(2)    *Section 1983 Deliberate Indifference Claim*:  Plaintiff also claims that Defendants Shelby and Dickson violated the Eighth and Fourteenth Amendment by failing to order Officer Calhoun, over the radio, to rescue Tavara.  (Id. at ¶ 47).  Plaintiff also claims that Defendant Williams violated the Constitution by maintaining a policy "prohibiting officers from intervening to save inmates' lives without the assistance of their supervisors."  (Id. at ¶ 48).

(3)    *Section 1983 Failure to Train Claim*:  Plaintiff claims that Defendant Williams failed to adequately train the officers at the prison in suicide prevention.  (Id. at ¶ 49).

(4)    *State Law Tort Claims*:  Lastly, Plaintiff is suing GDOC and BOR under the Georgia Tort Claims Act ("GTCA") for the individual Defendants' allegedly negligent failure to protect Tavara from self-harm, make sure their radios were correctly functioning, delay in entering the cell, delay in calling EMS, and failure to provide Tavara with adequate psychiatric care.  (Id. at ¶¶ 62-65).

## II.   ARGUMENT AND CITATION OF AUTHORITY

Defendants now move to partially dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. Pro. 12(b)(6), and for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. Pro. 12(b)(1).

### A.   Motion to Dismiss Standard

A claim should be dismissed under Federal Rule of Civil Procedure 12(b)(6) if the plaintiff does not plead "enough facts to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007); Chandler v. Sec'y of Fla. Dep't of Transp., 695 F.3d 1194, 1199 (11th Cir. 2012). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Resnick v. AvMed, Inc., 693 F.3d 1317, 1325 (11th Cir. 2012). Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level," and a "formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Additionally, while all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011), the court need not accept the plaintiff's legal conclusions as true, including those that are couched as factual allegations, Iqbal, 556 U.S. at 678. Following this framework, the *factual* allegations in

Plaintiff's Second Amended Complaint, even when construed in her favor, fail to state a plausible claim for relief for the reasons set forth below.

**B.      Plaintiff Fails to State a Claim Under the ADA or RA**

Plaintiff has failed to adequately plead a claim against GDOC and BOR under the ADA or the RA.  Title II of the ADA prohibits public entities from discriminating against individuals with disabilities or denying them services because of their disabilities as follows:

> [N]o qualified individual with a disability shall, ***by reason of such disability***, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

See 42 U.S.C. § 12132 (emphasis added).[4]  To establish a prima facie case under the ADA, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) the exclusion, denial of benefits, or discrimination was by reason of his disability.  Bircoll v. Miami-Dade County, 480 F.3d 1072, 1083 (11th Cir. 2007). Plaintiff's claims for violations of the ADA and RA should be dismissed for several reasons, set forth below.

**1.   Plaintiff fails to allege that GDOC and BOR's alleged conduct was "because of"
Tavara's disability**

Here, even assuming *arguendo* (for the purposes of this motion only) that Tavara suffered from a disability and was otherwise a qualified individual, Plaintiff has failed to allege that

---

[4] The RA similarly provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in [this Act] shall, ***solely by reason of her or his disability***, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . . "  29 U.S.C. § 794(a) (emphasis added).

GDOC and BOR's alleged failure to provide Tavara with mental health treatment or safe housing was done "by reason of [his] disability."  Since Plaintiff does not even attempt to allege that GDOC and BOR denied benefits to Tavara ***because of*** his disability, or acted with any discriminatory intent, her ADA claim should be dismissed.  Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 211 (1998) (explaining that a disabled prisoner can state a Title II ADA claim if he is "denied participation in an activity provided in state prison *by reason of his disability*") (emphasis added); Redding v. Georgia, 557 Fed. Appx. 840, 844 (11th Cir. 2014) (affirming dismissal of ADA Title II claim where prisoner failed to allege that top-bunk assignment "was discriminatory in any way"); Bearden v. McKeithen, 2012 U.S. Dist. LEXIS 127911 (N.D. Fla. 2012) (holding that the alleged deprivation of treatment and adequate supervision of an inmate could not support an ADA claim because there was no allegation that this occurred "by reason of [the inmate's] disability"); Estate of Crandall v. Godinez, 2015 U.S. Dist. LEXIS 40950 (Illinois Central District Court 2015) (dismissing the plaintiff's claim that a prison officer violated the ADA by placing an inmate "into a segregation cell in which he could hang himself" because the plaintiff failed to alleged that the placement was "because or [the inmate's] disability or for reasons relating to his disability"; further, "[a]lthough it is possible that a differently-designed cell could have prevented [the inmate] from taking his own life, the cell-design did not have the effect of inhibiting [the inmate's] access to prison services to which he would have otherwise had access"); Lopes v. Beland, 2014 U.S. Dist. LEXIS 42665 (D. Ct. of Mass. 2014) (rejecting an inmate's claim that the prison discriminated against him on the basis of his disability because he "does not provide a factual basis for the contention that the DOC failed to abide by his single cell status or otherwise discriminated against him *because he was disabled*.") (emphasis added);

Davidson v. Texas Department of Criminal Justice, 91 Fed.Appx. 963 (5th Cir. 2004) (rejecting inmate's ADA claim because the inmate failed to show that he was adversely treated solely *because of his handicap*); Simmons v. Navajo County, 2008 U.S. Dist. LEXIS 8990 (Ariz. D. Ct. 2008) (rejecting the plaintiff's ADA claim because there was no evidence that the defendants "excluded [the inmate] from recreational programs because of his depression"); Zaragoza v. Dallas County, 2009 U.S. Dist. LEXIS 59795  (N.D. Tx. 2009) (denying an ADA claim based on an inmate's suicide because there is no benefit or service that was denied to the inmate "on the basis of his disability"); Stiles v. Judes, 2013 U.S. Dist. LEXIS 124487 (M.D. Fla. 2013) (dismissing an inmate's ADA claim based on his placement in isolation, which allegedly exacerbated his disability, the use of restraints on the inmate, and transfer of the inmate off of suicide watch while he was in isolation because there are no allegations that these acts were done "due to his disability"); Spencer v. Courtier, 552 Fed. Appx. 121 (3rd Cir. 2014) (dismissing an inmate's ADA claim based on his placement in the SMU because the placement did not occur "on the basis of any mental health disability"); King v. Edgar, 1996 U.S. Dist. LEXIS 17999 * (N.D. Ill. Dec. 3, 1996) (dismissing a schizophrenic inmate's ADA claims where "[h]e alleges that he has been denied a benefit of prison educational programs (increased good time credit) . . .But [plaintiff] has not alleged that he has been denied participation *because of* his disability") (emphasis added).

For this same reason, Plaintiff necessarily falls short of the even higher standard imposed by the RA.  The RA provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in [this Act] shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance . . . . "  29 U.S.C. § 794(a) (emphasis

added).  The RA's sole-cause liability scheme provides Plaintiff no relief.  See McNely v. Ocala

Star-Banner Corp., 99 F.3d 1068, 1073-77 (11th Cir. 1996) (comparing statutory language of

Title II and RA and confirming RA's restrictive use of "solely") (citing Severino v. N. Fort

Myers Fire Control Dist., 935 F.2d 1179, 1182-83 (11th Cir. 1991) (affirming judgment in favor

of defendant on the RA claim because the plaintiff could not demonstrate that he was

discriminated against solely on the basis of his disability).  As noted above, Plaintiff does not

allege that Tavara was allegedly denied mental health treatment or safe housing by reason of his

disability, much less *solely* for that reason.  Plaintiff's claim under the RA therefore fails as a

matter of law and should, accordingly, be dismissed.

### 2.   ADA/RA claims cannot be based on the inadequate treatment of a disability

The law is clear that the ADA "prohibits discrimination because of disability, not

inadequate treatment for disability." Simmons v. Navajo County, 609 F.3d 1011 (9th Cir. 2010)

(holding that "to the extent that the [plaintiffs] argue that [the defendant] violated the ADA by

depriving Jasper of programs or activities to lessen his depression, such argument is not

actionable under the ADA" because the ADA "prohibits discrimination because of disability, not

inadequate treatment for disability"); Shaymus v. Tulare County, 2015 U.S. Dist. LEXIS 70828

(E.D. Ca. 2015).  Consequently, an ADA or RA claim cannot be based on medical treatment

decisions.  See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1294 (11th Cir. 2005)

(explaining that the ADA is "not [ ] violated by a prison's simply failing to attend to the medical

needs of its disabled prisoners"); Fitzgerald v. Correctional Corp. of America, 403 F.3d 1134,

1144 (10th Cir. 2005); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (ADA does not

create a remedy for medical malpractice); Hodnett v. Schwarzenegger, 2008 U.S. Dist. LEXIS 2783 (E.D. Ca. 2008); Shelton v. Ark. Dep't of Human Servs., 2011 U.S. Dist. LEXIS 3401 (E.D. Ark. 2011) (dismissing the plaintiff's ADA and RA claims because "they are premised on the medical decision to remove [her] from suicide watch"); Moore v. Kohl, No. 4:04CV3174, 2005 WL 2002084, *1 (D. Neb. Aug. 16, 2005) (neglecting to provide necessary medical attention is, at most, medical malpractice); Shaymus v. Tulare County, 2015 U.S. Dist. LEXIS 70828 (E.D. Ca. 2015) (holding that the failure to provide competent and appropriate mental health care to an inmate with depression and panic disorder "is insufficient to state a claim under the ADA"); Bryant v. Madigan, 84 F.3d 246 (7th Cir. 1996) (finding that, because the ADA does not create a remedy for the denial of medical treatment, a paraplegic inmate who sued a prison after he was denied guardrails for his bed and then broke his leg when he fell from the bed, had failed to state a claim). Thus, to the extent Plaintiff's ADA and RA claims stem from Defendants' alleged failure to provide Tavara with a psychiatric exam, mental health services, medical services, appropriate treatment for his depression, or a cell assignment specific to a medical need, those claims must be dismissed.  (Doc. 52, ¶¶ 55-57).

### 3. Plaintiff fails to allege a constitutional violation in connection with GDOC's placement of Tavara in an allegedly unsafe cell and negligence during the suicide

Title II of the ADA effects a limited abrogation of sovereign immunity. See 42 U.S.C. § 12202.  This abrogation of sovereign immunity, however, applies only to conduct that violates the U.S. Constitution.  Goodman v. Georgia, 546 U.S. 151 (2006) (explaining that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity"); Redding, 557 Fed. Appx. at 845 ("allegations did not show that the [prison officials'] conduct

violated [prisoner's] constitutional rights, so they were entitled to Eleventh Amendment immunity against his ADA claims"); Pruitt v. Emmanuel County, No. CV612-021, 2012 U.S. Dist. LEXIS 49687, at *3 (S.D. Ga. Apr. 9, 2012) ("complained of conduct [in prisoner's ADA Title II claim] must also violate the Eighth Amendment, as incorporated by the Fourteenth Amendment").

Here, to the extent Plaintiff's ADA Title II claim is premised on GDOC's placement of Tavara in an allegedly unsafe cell; the officers' alleged negligence in responding to the suicide; and the prison's failure to have a "suicide tool" (Doc. 51, ¶¶ 55-57), Plaintiff cannot show that these acts actually violate the Constitution.  Accordingly, Plaintiff's ADA Title II claim is barred by the Eleventh Amendment.  See, e.g., Redding, 557 Fed. Appx. at 845; Pruitt, 2012 U.S. Dist. LEXIS 49687, at *3.

For all of the foregoing reasons, Plaintiff's ADA and RA claims should be dismissed.

## C.     Plaintiff Fails to State a Supervisory Liability Claim Against Defendant Williams

Section 1983 claims cannot be based upon *respondeat superior* or vicarious liability.  See Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987); Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).  Without some degree of personal participation in the alleged deprivation of the plaintiff's rights by the defendant, no liability exists.  Id.  To state a claim against a supervisory official, a plaintiff must allege that the supervisor personally participated in the alleged unconstitutional conduct or that there is a "causal connection" between the actions of the supervisor and the alleged constitutional deprivation.  See Simpson v. Stewart, 386 Fed. Appx. 859, 860 (11th Cir. 2010).  A causal connection may be shown by establishing that the supervisor: (i) was on notice of a "history of widespread abuse" of constitutional rights but failed

to take corrective action; (ii) *established or put in place* a policy that condoned the alleged

constitutional deprivation; or (iii) directed subordinates to act unlawfully or knew that

subordinates would act unlawfully and failed to stop them from doing so.  See Mathews v.

Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007); accord Zatler, 802 F.2d at 401 ("An official may

also be liable where a policy or custom that he established or utilized results in deliberate

indifference to an inmate's constitutional rights."); Dale v. White Cnty., 238 Fed. Appx. 481,

484 (11th Cir. 2007) ("a plaintiff can show a supervisor imposed an improper custom or policy

that constituted deliberate indifference to constitutional rights").

In the case at bar, Plaintiff is suing Defendant Williams in his supervisory capacity based

on the theory that, while he was the Warden of Smith State Prison, he allegedly "maintained" an

unconstitutional policy that directly resulted in Tavara's death.  (Doc. 52, ¶ 48).  More

specifically, Plaintiff alleges that Defendant Williams maintained a policy that "officers were not

to enter a cell without first obtaining the permission of an officer with the rank of lieutenant or

higher" and that Officer Calhoun and Defendants Shelby and Dickson were following this policy

when they "delayed entering [Tavara's] cell."  (Id. at ¶ 35).

Significantly, nothing in the Second Amended Complaint establishes that Defendant

Williams *actually created* a custom or policy that condoned an alleged constitutional

deprivation.  Although the Second Amended Complaint generally asserts that Defendant

Williams had knowledge of the purported unconstitutional policy and practice of delaying entry

into an inmate's cell and "maintained" this policy/practice, these assertions are not legally

sufficient.  (Doc. 52, ¶ 35).  In order for supervisor liability to attach based on a policy or

custom, it must be alleged, and ultimately proved, that it was the supervisor's *own* policy or

custom that caused the alleged constitutional deprivation.  See Zatler, 802 F.2d at 401.

Plaintiff's allegation that Defendant Williams "maintained" this policy/practice is no more than

an allegation of negligence – i.e., the suggestion is that he failed to act in relation to someone

else's alleged policy or custom, rather than that he actually established or imposed the policy or

custom as the law requires in order to show deliberate indifference.  Negligence is not the same

as deliberate indifference and is not a basis for a section 1983 claim.  See Goodman v.

Kimborough, 718 F. 3d 1325, 1332 (11th Cir. 2013).

    "The standard by which a supervisor is held liable . . . for the actions of a subordinate is

extremely rigorous."  Brady v. Florida Dep't of Labor & Employment Sec., 133 F.3d 797, 802

(11th Cir.1998).  Because Plaintiff merely "tenders naked assertions devoid of further factual

enhancement" and seeks to rely solely on "legal conclusions cast in the form of factual

allegations," her allegations are wholly insufficient to establish the requisite causal connection

and to support a claim for supervisory liability against Defendant Williams.  Iqbal, 556 U.S. at

678; see also Keith, discussed infra, (finding claims of risk factors at jail insufficient to impose

supervisory liability when there was no demonstration that the purported policies could "be

traced to" the supervisory defendant); Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)

(factual allegations in the complaint must support an inference that the supervisor acted so as to

establish the requisite causal connection between the supervisor and the alleged unconstitutional

conduct).

**D.    Plaintiff Fails to State a § 1983 Failure to Train Claim Against Defendant Williams**

    Plaintiff also appears to be asserting a failure-to-train claim against Defendant Williams

by asserting that Defendant Williams:

> [F]ailed to train his subordinates that they have a constitutional duty to protect inmates from suicide. As such, [Defendant] Williams was deliberately indifferent to a likely violation of constitutional rights that would recur in the prison.

(Doc. 34, ¶ 40). However, a supervisory official is not liable under § 1983 for his alleged failure to train subordinates unless his "failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact" and the failure actually caused the injury of which the plaintiff complains. Belcher v. City of Foley, 30 F.3d 1390 (11th Cir. 1994) (citing Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir.1990)). A supervisor cannot be held liable for failure to train or supervise "without notice of a need to train or supervise in a particular area," which requires awareness of a pattern of "similar" constitutional violations. Gold v. City of Miami, 151 F. 3d 1346, 1351 (11th Cir. 1998); see also Connick v. Thompson, 563 U.S. 51, 62 (2011) (explaining that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train"). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick, 563 U.S. at 62.

For example, in Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003), the plaintiffs sought to hold supervisory officials responsible for the death of an inmate, and specifically, for the failure of their subordinates to monitor jail cells for violent behavior of inmates toward other inmates. The Court addressed the plaintiffs' failure to train claim as follows:

> [P]laintiffs do not allege any specific facts at all connecting the supervisors to [the subordinate guards'] failure to monitor the inmates in Unit 1. There is no allegation that supervisors directed the subordinate guards not to monitor inmates or to act unlawfully. The amended complaint also does not make any allegations that the supervisors had any knowledge of [the subordinate guards'] failure to monitor inmates or that [the subordinate guards] had any past history, or even one

> prior incident, of failing to monitor inmates or of watching computer games.  The supervisors were not on any notice of [the subordinate guards'] unconstitutional conduct so as to put the supervisors on notice of the need to correct or to stop the conduct of [the subordinate guards] by further training or supervision.

Id. at 1361-1362 (citing Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003)).  Based on the absence of factual allegations supporting the failure to train claim, the Court upheld the dismissal of the plaintiffs' failure to train claims against the supervisory officials.  Id.

The Second Amended Complaint in this case similarly fails to allege facts to support Plaintiff's failure to train claim.  Specifically, it lacks any supporting factual content that would plausibly suggest that Tavara's suicide was part of a wider history or pattern of suicide.  Nor does the Second Amended Complaint suggest that there was even one prior incident of suicide that would have placed Defendant Williams on notice of a need for additional or better training.  Moreover, the Second Amended Complaint is devoid of any non-conclusory allegations indicating that Defendant Williams was deliberately indifferent to the alleged need to train his subordinates.  See Connick v. Thompson, 563 U.S. 51, 59 (2011).  Absent factual enhancement of this kind, the Second Amended Complaint fails to state a failure-to-train claim.  See, e.g., Cooper v. City of Starke, 2011 U.S. Dist. LEXIS 30183, at *21-25 (M.D. Fla. 2011) (dismissing allegations against a supervisor for failure to train and supervise and implementation of certain policy because the allegations were conclusory and lacked the factual enhancement required by Iqbal).  Plaintiff's failure-to-train claim against Defendant Williams should, accordingly, be dismissed.

**E.**     **Qualified Immunity Bars Plaintiff's Claims Against Defendant Williams[5]**

Defendant Williams is entitled to qualified immunity as "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Crawford-El v. Britton, 523 U.S. 574, 588 (1998) (citation omitted).  The test for qualified immunity is two pronged:  (1) was the government official acting within the scope of his discretionary authority; and (2) did the official's conduct violate "clearly established law."  Maggio v. Sipple, 211 F. 3d 1346, 1350 (11th Cir. 2000). "Once the defendant establishes that []he was acting within h[is] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  Lee v. Ferraro, 284 F. 3d 1188, 1194 (11th Cir. 2002).  To carry that burden, the plaintiff must show that the constitutional right asserted was clearly established at the time the alleged violation occurred. See Hope v. Pelzer, 536 U.S. 730, 739 (2002).

In determining whether a governmental employee was acting within his discretionary authority, the question is whether he was performing a legitimate job-related function through means that were within his power to utilize.  See Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).  Here, the Second Amended Complaint alleges that Defendant Williams was acting at all relevant times within his duties as the Warden at Smith State Prison.  (Doc. 52, ¶ 6). Thus, he was acting within the scope of his discretionary authority.  The burden is, therefore, on Plaintiff to show that qualified immunity is not appropriate.  Plaintiff cannot make this showing

---

[5] Defendants contend that Defendant Shelby and Defendant Dickson are also entitled to qualified immunity.  However, a showing of qualified immunity for these officers will necessitate the presentation of evidence and thus will be raised at a later stage in the litigation.

because, as discussed above, case law shows that Defendant Williams did not violate Tavara's constitutional rights.  Regardless, there is no clearly established law holding that a policy such as this one is unconstitutional.  No law from the Supreme Court or this Court would have notified Defendant Williams warden that, in order to comport with the constitution, he should create a prison policy in which officers are required to enter an inmate's cell alone or without enough backup present when an inmate *might* be trying to hurt himself or another.

Moreover, it is undeniable that a legitimate safety concern exists any time officers enter an inmate's cell. See, e.g., Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003) (inmate plotted a fake hanging); Montano v. Orange County, 2015 U.S. Dist. LEXIS 179378 (E.D. Tx. 2015) (testifying that officers "do not enter the infirmary observation cell alone because on a previous occasion, an inmate pretended not to be breathing and attacked" an officer); McCoy v. Tex. Dep't of Crim. Justice, 2006 U.S. Dist. LEXIS 63996 (S.D. Tx. 2006) (testifying that "it is a common occurrence for inmates in administrative segregation to fake an illness or medical condition in order to lure guards into letting them out of their cells"); Cox v. Davis, 2014 U.S. Dist. LEXIS 46891 (S.C. Dt. Ct. 2014) (testifying that "[e]ven though [the inmate] appeared to be unresponsive, officers had to make sure he would not attack them if they entered his cell while unrestrained . . . . Inmates will fake unresponsiveness to lure officers into their cell and assault them"); Coleman v. Dane County Sheriffs, 2013 U.S. Dist. LEXIS 145573 (W.D. Wisc. 2013) (inmate faked an asthma attack, was taken out of his cell, and then attacked the plaintiff).

The novel theory that Plaintiff advances in this case is that Defendant Williams should have ignored legitimate safety concerns and placed his officers into potential peril by having a different policy, but there is no clearly established law holding this.  Accordingly, it is not

"clearly established" that requiring an officer to delay entering an inmate's cell until additional officers are present violates the Constitution.  As the Eleventh Circuit has explained, qualified immunity represents "the rule, rather than the exception."  GJR Invs. v. County of Escambia, 132 F.3d 1359, 1366 (11th Cir. 1998).  "Because qualified immunity shields government actors in all but exceptional cases," this Court should "think long and hard before stripping [Defendant Williams] of immunity" for allegedly maintaining a policy that protects prison officers and other inmates, especially when there is an absence of controlling case law on the issue.  Id.

**G.     Plaintiff's State Law Tort Claims are Barred by Sovereign Immunity and Should be Dismissed for Lack of Subject Matter Jurisdiction**

GDOC and BOR/GCHC are entitled to sovereign immunity on the tort claims asserted by Plaintiff under the Georgia Tort Claims Act ("GTCA").  A brief history of the GTCA, as well as a short summary of basic sovereign immunity principles is set forth below, followed by an explanation of why Plaintiff's tort claims are barred by sovereign immunity.

**1.     Legal Background to the GTCA**

**a.     The GTCA Provides for a Limited Waiver of Sovereign Immunity**

The Georgia Constitution expressly preserves the State's sovereign immunity and makes it clear that such immunity "can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is waived and the extent of such waiver."  Ga. Const. of 1983, Art. I, Sec. II, ¶ IX (e).  In the State of Georgia, "sovereign immunity has constitutional status and cannot be abrogated by the judiciary."  Dollar v. Dalton Pub. Schs., 233 Ga. App. 827, 830 (1998).  Moreover, as the Georgia Supreme Court has held, "[a] waiver of sovereign immunity is a mere privilege, not a right, and the extension of that privilege is solely a matter of legislative grace."  Riddle v. Ashe, 269 Ga. 65, 67 (1998) (citation omitted).

In 1992, the General Assembly passed the GTCA, which provides for a limited waiver of sovereign immunity in certain situations. O.C.G.A. § 50-21-20.  In passing the GTCA, the General Assembly recognized the "inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity." O.C.G.A. § 50-21-21(a).  It also recognized that, due to the unique nature of the government, "[t]he exposure to the state treasury to tort liability must therefore be limited." Id.  Thus, the General Assembly declared as a matter of public policy that "the state shall only be liable in tort actions within the limitations of this article and in accordance with the fair and uniform principles established in this article." O.C.G.A. § 50-21-21(a).  For this reason, "the State Tort Claims Act, by its own terms, must be strictly construed." Howard v. State, 226 Ga. App. 543, 543 (1997).

### b. Sovereign Immunity is a Threshold Issue

Georgia courts have repeatedly held that sovereign immunity is a threshold issue. Murray v. Dep't of Transp., 240 Ga. App. 285 (1999).  Jurisdiction of a court to afford the relief sought, i.e., subject matter jurisdiction, is a matter that should be decided preliminarily. See Dep't of Transp. v. Dupree, 256 Ga. App. 668, 671 (2002); Whitlock v. Barrett, 158 Ga. App. 100, 103 (1981).  Questions of waiver of sovereign immunity are, therefore, appropriately considered in the context of a motion to dismiss for lack of subject matter jurisdiction. O.C.G.A. § 9-11-12(b)(1); see also Patterson v. Ellerbe, 268 Ga. App. 826, 828 n.2 (2004) (noting that if a "trial court has no subject matter jurisdiction over a case, it must consider that matter first, whether raised in a motion to dismiss or sua sponte"); Harris, 243 Ga. App. at 510 ("[T]he lack of subject matter jurisdiction, such as a failure to comply with the ante litem notice provisions of the GTCA, is a matter in abatement, not a motion designed to test the merits of the claim.").

### c. Plaintiff Bears the Burden of Demonstrating a Waiver of Sovereign Immunity

Sovereign immunity is not an affirmative defense.  The party seeking to benefit from the waiver of sovereign immunity, i.e., the plaintiff, bears the burden of proving that sovereign immunity has been waived for the claims presented.  Sherin v. Dep't. of Human Res., 229 Ga. App. 621, 625 (1997).  Thus, it is Plaintiff's burden to establish a waiver of sovereign immunity in order to proceed with her state law tort claims.  Nonetheless, GDOC and BOR have set forth below an explanation of why sovereign immunity has not been waived for Plaintiff's tort claims in this case.

### 2. Plaintiff's Tort Claims are Barred by the "Law Enforcement" Exception in O.C.G.A. § 50-21-24 of the GTCA

In addition to providing for a limited waiver of the State's sovereign immunity when it passed the GTCA in 1992, the General Assembly also set forth thirteen exceptions to this limited waiver as stated in O.C.G.A. § 50-21-24.  One such exception, the "law enforcement exception," protects the State from liability for "the failure to provide, or the method of providing law enforcement, police, or fire protection."  See O.C.G.A. § 50-21-24(6).  In Ga. Forestry Comm.v. Canady, the Georgia Supreme Court construed the law enforcement exception as applying to "the making of policy decisions by state employees and officers including those relating to the amount, disbursement, and use of equipment and personnel to provide law enforcement, police or fire protection services, and to the acts and omissions of state employees and officers executing and implementing those policies."  280 Ga. 825, 830 (2006).  Three years later, in Georgia Department of Public Safety v. Davis, 285 Ga. 203 (2009), the Georgia Supreme Court held that it protects both the *making* of a law enforcement policy and its *implementation*.  Thus,

the law enforcement exception applies to decisions based on "professional standards, expertise, and training, [that] set forth methods of providing the police, law enforcement, or fire protection services in response to immediate needs." Canady, 280 Ga. at 828. Quite simply:

> [P]olicy decisions will not be "put on trial" in an action for damages either by a direct attack on the making of the policy or by an indirect attack via a lawsuit brought against a state governmental entity based on the alleged negligence of a state employee providing police, law enforcement, or fire protection pursuant to policy.

Id. at 830.

Here, Plaintiff's Second Amended Complaint states that Tavara's death was "directly and proximately" caused by the officers' adherence to a *policy* that instructed them to delay entering an inmate's cell. (Doc. 52, ¶ 31). Plaintiff contends that if the officers had declined to follow this policy and entered the cell sooner Tavara would not have died. (Id.). As these allegations make clear, Plaintiff is attempting to hold GDOC liable for the maintenance and execution of a policy regarding the provision of law enforcement and/or police services at Smith State Prison— i.e., a policy that protects GDOC officers and other inmates by making sure enough officers are present before they enter an inmate's cell.[6] As such, Plaintiff's tort claims against GDOC fall squarely within O.C.G.A. § 50-21-24(6), with the result that they are barred by sovereign immunity.

### 3. Plaintiff's Ante Litem Notice is Deficient

Prior to filing a tort lawsuit under the GTCA, claimants must provide ante litem notice to the Risk Management Division of the Georgia Department of Administrative Services within 12

---

[6] The same is true for Plaintiff's claim that the prison should have had a "suicide tool" and perfectly functioning radios – both of these alleged failures fall within, and are barred by, the law enforcement exception.

months of their loss, **and** send a copy of the ante litem notice to the state government entity at issue.  Specifically, the statute provides:

> (a)  No person having a tort claim against the state under this article shall bring any action against the state upon such claim without first giving notice of the claim as follows: . . . .
>
>> (2)  Notice of a claim shall be given in writing and shall be mailed by certified mail or statutory overnight delivery, return receipt requested, or delivered personally to and a receipt obtained from the Risk Management Division of the Department of Administrative Services.  ***In addition, a copy shall be delivered personally to or mailed by first class mail to the state government entity***, the act or omissions of which are asserted as the basis of the claim.

See O.C.G.A. § 50-21-26(a)(2) (emphasis added).  Additionally, the ante litem notice must contain the following six components, which are set forth in O.C.G.A. § 50-21-26(a)(5):

(A) the name of the state government entity;

(B) the time of the transaction or occurrence;

(C) the place of the transaction or occurrence;

(D) the nature of the loss suffered;

(E) the amount of loss claimed; and

(F) ***the acts or omissions that caused the loss***.

Claimants must strictly comply with these ante litem notice requirements; mere substantial compliance is insufficient.  Cummings v. Georgia Department of Juvenile Justice, 282 Ga. 822, 824 (2007), citing Williams v. Georgia Department of Human Resources, 272 Ga. 624, 624 (2000); see also DeFloria v. Walker, 317 Ga. App. 578 (2012); Dempsey v. Board of Regents of the University System of Georgia, 256 Ga. App. 291 (2002); Kim v. Department of Transportation, 235 Ga. App. 480, 481 (1998); McGee v. State of Ga., 227 Ga. App. 107, 108-09 (1997); Howard v. State of Ga., 226 Ga. App. 543, 545 (1997).

Here, Plaintiff's tort claims essentially boil down to two distinct claims that happened during two distinct time periods and involved two distinct State entities: (1) medical negligence that occurred prior to the suicide (i.e., an alleged failure to provide Tavara with adequate mental health care during his incarceration), which involved solely BOR/GCHC employees, and (2) officers' negligence in responding to the suicide as it unfolded the night of December 7, 2014, which involved solely GDOC employees.  (Doc. 52-1).  Plaintiff was, therefore, required to provide ante litem notice to *both* State entities *and* provide the entities with notice of their respective alleged "acts or omissions" that led to Tavara's death.  As discussed below, Plaintiff failed to do so.

### a.   Plaintiff did not provide ante litem notice to BOR/GCHC

As mentioned above, an ante litem notice must set forth "the name of the state government entity" and must also be sent to that entity.  O.C.G.A. § 50-21-26(a)(5), With regards to BOR/GCHC and its alleged failure to provide Tavara with adequate mental health services, Plaintiff failed to fulfill both requirements.  More specifically, the ante litem notice provided by Plaintiff's prior counsel identifies the "Parties Against Whom Claim Made" as follows:  "Georgia Department of Corrections, Brian Owens, Commissioner of the GDC, Stanley Williams, or current Warden of SSP, and correction officers at Smith State Prison."  (Doc. 52-1 at 2).  Additionally, the ante litem notice indicates that it was sent only to the following entities and individuals: (1) the Risk Management Division of DOAS, (2) the Consul General of Mexico, (3) Plaintiff, and (4) the Warden of Smith State Prison.  (Id. at 3).  Plaintiff's ante litem notice, therefore, fails to identify, or even mention, BOR/GCHC as one of the agencies her tort claims are against, nor did she provide BOR/GCHC with a copy of the ante litem notice.  O.C.G.A. §§

50-21-26(a)(2) and (5).  As a result, Plaintiff has failed to provide ante litem notice of the tort claims against BOR/GCHC, with the result that those claims should be dismissed.  See, e.g., Camp v. Coweta County, 271 Ga. App. 349, 354-55 (2005) (holding that the plaintiff failed to provide ante litem notice to GDOC because, "[i]n addition to the fact that DOC is not named in the body of the letter sent to Phillips State Prison, nothing in the record demonstrates that DOC was mailed such a letter").

### b.  Plaintiff's Ante Litem Notice Failed to Provide GDOC with Adequate Notice of its Employees' Alleged Acts or Omissions

As to GDOC, even though Plaintiff identified GDOC as a State entity against whom her claims were asserted and sent a copy of the ante litem notice to GDOC, she failed to inform GDOC of "the acts or omissions [of GDOC's employees] which caused the loss."  See O.C.G.A. 50-21-26(a)(5).  In particular, Plaintiff's ante litem notice is devoid of any mention of the negligence that allegedly occurred while GDOC officers were responding to Tavara's suicide. (Doc. 52-1).  In fact, the ante litem notice does not mention the officers or even that Tavara committed suicide, much less that there were issues with how the suicide, as it unfolded, was handled.  (Id.).

The purpose of the GTCA's ante litem notice requirements is to "ensure that the state receives adequate notice of the claim to facilitate settlement before the filing of a lawsuit." Williams, 272 Ga. at 625; Driscoll v. Bd. of Regents of the Univ. Sys. Of Ga., 326 Ga. App. 315 (2014).  While claimants with imperfect or mistaken information may still be deemed compliant with the GTCA if they included the information that they had (or could practically obtain under the circumstances), that is not what happened here.  To the contrary, here, Plaintiff's former lawyer sent an open records request for, and received, the incident report on Tavara's suicide.

24

(Doc. 36-1).  That incident report sets forth a narrative of Tavara's suicide, as it unfolded, and set forth many of the allegedly negligent acts that the officers engaged in while the suicide unfolded. Id.  Plaintiff, therefore, could have, and should have, notified the Risk Management Division of DOAS of her intent to pursue a claim based on the allegedly negligent response.[7]  See, e.g., Williams v. Wilcox State Prison, 341 Ga. App. 290, 293 (2017) (finding that an ante litem notice failed to sufficiently identify the "acts or omissions that cause her alleged loss," because the ante litem notice stated that the plaintiff fell on water on the floor, whereas the lawsuit stated that the plaintiff fell due to uneven flooring).  Although Plaintiff was not required to describe the officers' acts in detail in her ante litem notice, she was required to at least *inform* DOAS and GDOC that her claims against the State included alleged negligence in responding and reacting to Tavara's suicide.  Without any mention of same, the purpose of the ante litem notice provisions (i.e., to enable the Risk Management Division of DOAS to investigate and settle claims) was necessarily impeded.

## IV.   CONCLUSION

For each of the foregoing reasons, Defendants request that this Court grant their Motion to Dismiss Plaintiff's Second Amended Complaint.

Respectfully submitted,

CHRISTOPHER M. CARR                 112505
Attorney General

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

---

[7] While Plaintiff's counsel did not receive the incident report until after the initial ante litem notice had been sent, it is undisputed that Plaintiff's deadline for providing notice did not expire for another three and a half months.  Plaintiff should have, accordingly, given the State notice of this integral part of her claim.

KATHLEEN M. PACIOUS                     558555
Deputy Attorney General

LORETTA L. PINKSTON-POPE                580385
Senior Assistant Attorney General

ROGER CHALMERS                          118720
Senior Assistant Attorney General

/s/ Ron Boyter
RON BOYTER                              073553
Assistant Attorney General

/s/ Ellen Cusimano
ELLEN CUSIMANO                          844964
Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:

ELLEN CUSIMANO
Assistant Attorney General
40 Capitol Square, SW
Atlanta, Georgia  30334-1300
Telephone:  (404) 657-4355
Email: ecusimano@law.ga.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have, on this day, served the foregoing **AMENDED BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Brent Carter
Carter Franklin, LLP
P.O. Box 27
Metter, GA 30439

Jeff Edwards
Scott Medlock
The Edwards Law Firm
The Haehnel Building
1101 E. 11th Street
Austin, TX 78702

This 4th day of August, 2017.

*/s/ Ellen Cusimano*
ELLEN CUSIMANO          844964
Assistant Attorney General