IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| MARIA ARENAS, individually | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action File |
| | § | 4:16-cv-00320-WTM-GRS |
| GEORGIA DEPARTMENT OF | § | |
| CORRECTIONS, et al. | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT**

Plaintiff Maria Arenas files this response to Defendants' amended motion to

dismiss her second amended complaint (Doc. 52) pursuant to Federal Rule of Civil

Procedure 12(b)(6). Because Ms. Arenas has more than adequately alleged Defendants

violated her son's civil rights, causing his death, the motion must be denied in its entirety.

I.    SUMMARY OF THE RESPONSE – MS. ARENAS STATES CLAIMS FOR RELIEF

Defendants' motion to dismiss Plaintiff's 42 U.S.C. § 1983, Americans with

Disabilities Act/Rehabilitation Act, and Georgia Tort Claims Act claims should be denied

for four reasons:

First, Ms. Arenas' complaint states a claim against the individual Defendants for

violating her son, Richard Tavera's, Eighth Amendment rights, causing his suicide death.

Defendants Shelby and Dickson concede dismissing claims against them is improper at

this time. Doc. 54, p. 16, n. 5. Shelby and Dickson, however, were following Defendant

Warden Williams' orders at the Georgia Department of Corrections' Smith State Prison.

Thus, their failure to intervene when they were told Tavera was actively hanging himself

in his cell, and failure to timely summon medical attention for him though they knew he was asphyxiating, was due to Williams' practice and instructions, creating supervisory liability. This was not an isolated incident, but Warden Williams' established practice at the Smith State Prison. Thus, he also violated Tavara's Eighth Amendment rights.

Second, Williams is not entitled to qualified immunity because it is clearly established in the Eleventh Circuit that ignoring an inmate's ongoing suicide violates an inmate's constitutional rights. *See*, *e.g.*, *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990); *Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005). A policy requiring subordinates to do the same is no different. As such, Defendant Williams is not entitled to qualified immunity.

Third, Ms. Arenas has alleged sufficient facts to show that GDOC and the Georgia Board of Regents/Georgia Correctional Health Care (GCHC) officials discriminated against her 24-year-old, mentally-ill son by intentionally denying him reasonable accommodations for his mental illness, resulting in his death by suicide. In particular, they purposefully denied him a mental health evaluation and life-saving aid. Under the Americans with Disabilities Act and Rehabilitation Act, failing to provide reasonable accommodations is intentional discrimination on the basis of disability. Thus, Ms. Arenas' ADA and Rehabilitation Act claims cannot be dismissed.

Finally, Plaintiff complied with the notice provisions of the Georgia Tort Claims Act, which waives Defendants' immunity from suits where inmates are denied adequate medical care. Defendants violated the duty of ordinary care owed to Tavera by failing to provide him medical care during his entire incarceration, and failing to intervene to stop his suicide.

## II.  FACTS – DEFENDANTS WATCHED RICHARD TAVERA'S SUICIDE AND DID NOTHING

Suicide is a leading cause of death in prisons for people with mental illnesses. As a consequence, all prisons must have policies in place to protect inmates at risk of suicide – especially mentally-ill inmates known to have made previous attempts. Despite this, Defendants' stood by and watched while Ms. Arenas' 24-year-old son, Richard Tavera, took his own life inside the Georgia Department of Corrections' Smith State Prison.

Despite his young age, Tavera had a long history of serious mental illness and suicide attempts. Doc. 52, ¶¶ 14-18. Tavera was also slight, standing just 5' 6" tall, and weighing only approximately 142 lbs. *Id*. at ¶ 24. GDOC and GCHC knew Tavera had previously been admitted to inpatient psychiatric facilities, had attempted suicide, and had been diagnosed with bipolar disorder. *Id*. at ¶ 17. Though he was prescribed psychiatric medications for his disability in the past, none were provided to him during his incarceration in GDOC facilities. *Id*.

Instead, despite knowing of his serious mental disabilities and previous suicide attempts, GDOC and GCHC provided him no mental health care, and made no accommodations for his serious disability. *Id*. at ¶ 18. GDOC and GCHC assigned Tavera to a cell with a known "tie off point" (a fire extinguisher sprinkler) that they knew a ligature could be secured from. *Id*., at ¶¶ 39-40. GDOC and GCHC housed Tavera in a single cell, though they knew such cells are dangerous for suicidal inmates (who are far less likely to take their own lives in the presence of others). *Id*., at ¶ 42. Moreover, GDOC practice at the prison prohibited officers from entering an inmate's cell, even in circumstances where the inmate was committing suicide and there was little to no risk to

the officer. *Id*. at ¶ 34. These conditions and practices put Tavera at extreme risk of suicide.

Tragically, this risk was realized when Defendants' officers failed to interrupt Tavera's ongoing suicide attempt. At 10:50 pm on December 7, 2014, a GDOC correctional officer at the prison, John Calhoun, found Tavera in his cell, attempting to hang himself. *Id*., at ¶ 21.[1] "He had tied a bedsheet to the fire extinguisher sprinkler on the ceiling of his cell, and was wrapping it around his neck to hang himself, but was not yet suspended by the ligature when Calhoun first found him." *Id*. Though he literally saw Tavera preparing to die, Calhoun did nothing to intervene. Rather, he called his supervisors, Defendants Sgt. Shelby and Lt. Dickson and told them he was watching a man kill himself. *Id*. ¶¶ 22-24. Shockingly, despite this, neither supervisor instructed Calhoun to intervene or do anything at all to help Tavera, essentially sentencing Tavara to death. *Id*. at ¶ 25. Instead of helping Tavara, Defendants Shelby and Dickson simply joined Calhoun outside the cell. Shelby and Dickson did not call an ambulance (or any other medical provider), direct Calhoun to save Tavera, direct others to assist Calhoun, hurry to the cell, or do anything else, though they knew Tavera was going to asphyxiate within minutes during the suicide attempt. *Id*., at ¶ 25.

Incredibly, no help arrived for eight minutes after Calhoun's initial call. When, Shelby finally arrived at Tavera's cell, "Shelby saw Tavera hanging … and saw Calhoun standing by, doing nothing. But instead of entering the cell with Calhoun to save Tavera,

---

[1] Calhoun is not a party to this case. After the events of this case, Calhoun moved to San Antonio, Texas. He has been sued in a separate proceeding currently pending before the Western District of Texas. *See Arenas v. Calhoun*, 5:16-cv-1203 (W.D. Tex.). Calhoun's motion to dismiss the Western District of Texas case was denied (Doc. 18), and discovery is proceeding.

Shelby did nothing" except yell  "hay, hay" at Tavera. *Id*. In fact, Shelby and Calhoun stood together outside the cell and watched Tavera hang for another two minutes. *Id*.

Even when a third officer arrived shortly thereafter, nothing was done to help Tavara. All three officers continued to wait for Lt. Dickson rather than enter the cell as Tavara died in front of them. *Id*. at ¶ 27.

Lt. Dickson, the ranking officer at the prison, finally arrived at the cell another two minutes later – a total of ten minutes after he was told Tavera was actually hanging himself. Even then, Dickson, Shelby, Calhoun, and the other officer did not enter the cell – they began making a video recording of Tavara hanging, and continued filming for a minute before opening the cell door. *Id*. at ¶ 29.

When they finally entered the cell, rather than lift Tavara's body up to remove pressure from the ligature, officers pulled his body back while lifting it, putting more pressure on the ligature. *Id*. at ¶ 30. Nor did they have a "suicide tool" or "cut down knife" – a standard piece of prison equipment any competent prison administrator would provide to rescue prisoners from suicide. *Id*. at ¶ 31.[2]

Moreover, Shelby and Dickson did not call 911, or any other medical providers, for another five minutes – a full fifteen minutes after Calhoun first reported Tavera hanging. *Id*. ¶ 33. Thus, EMS did not arrive until over half an hour after Calhoun found Tavera beginning to hang himself. *Id*. By that time, any hope of reviving Tavera had long expired.

Incredibly, Calhoun, Shelby, and Dickson were acting according to the dangerous practice of the Smith State Prison, enforced by Defendant Warden Williams. Williams'

---

[2] A "suicide tool" is "a small, curved blade that can be used to quickly cut through a ligature to remove pressure on the neck." Doc. 52, ¶ 31.

practice was that no officer could enter an inmate's cell, under any circumstances, without "first obtaining the permission of an officer with the rank of lieutenant or higher," even when necessary to save a prisoner's life. *Id.*, at ¶ 35. As such, Williams' practices endangered suicidal inmates like Tavara. *Id.* at ¶ 36.

And while suicide is an obvious and recurring problem in prisons, and is well known to competent prison administrators, Williams did not train his officers about their duty to intervene to stop a suicide in progress or otherwise take steps to prevent inmate suicide. *Id.*

Thus, while Calhoun, Shelby, and Dickson's conduct unquestionably violated Tavara's rights, they were acting also pursuant to Williams' instructions and practices. *Id.* at ¶ 28.

## III.   PROCEDURAL POSTURE

This case was filed in the Savannah Division on November 29, 2016, alleging 42 U.S.C. § 1983 claims against Defendants Shelby, Dickson, and Williams (the "Savannah Case"). A companion case was filed against the Georgia Department of Corrections and Georgia Correctional Health Care in Tattnall County, Georgia, alleging Georgia Tort Claims Act and Americans with Disabilities Act/Rehabilitation Act claims (the "Tattnall County case"). The Tattnall County case was removed to federal court in the Statesboro Division, then transferred to this Court for consolidation with the Savannah Case. Doc. 31.[3] At the direction of the Court, Plaintiff filed an amended, consolidated complaint (Doc. 34). Defendants moved to dismiss this amended complaint before any formal

---

[3] A third case, *Arenas v. Calhoun*, as noted above, at n. 1, is currently pending before the Western District of Texas against Calhoun only.

discovery had taken place. Plaintiff objected discovery was required to fully state her claims, and some documents were produced. Plaintiff then filed her second amended complaint (Doc. 52), which Defendants Williams, GDOC, and GCHC now move to dismiss in part. (Shelby and Dickson no longer move to dismiss the claims against them).

## IV.   STANDARD OF REVIEW

Motions to dismiss are "viewed with disfavor and rarely granted." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). *See also Guarantee Ins. Co. v. Merchants Employer Benefits, Inc.*, 2008 WL 2559436, *1 (M.D. Ga. June 23, 2008). All facts alleged in the complaint must be viewed in the light most favorable to the plaintiff. *Belcher v. City of Foley, Ala.*, 30 F.d 1390, 1392 (11th Cir. 1994).

A claim is correctly pleaded when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations," it only "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

Likewise, to overcome qualified immunity, "the complaint must allege sufficient facts for the court to determine whether the alleged constitutional violation was clearly established at the time of the incident." *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1179 (11th Cir. 2009). The Plaintiff "need only plead some factual detail from which the court may determine whether [d]efendants' alleged actions violated a clearly established constitutional right." *Id.* at 1180 (internal citations omitted). Even a "concededly sparse" complaint can satisfy this standard. *Id.*

V.    **ARGUMENT AND AUTHORITIES**

Plaintiff Arenas has adequately alleged her 42 U.S.C. § 1983, ADA/Rehabilitation Act, and Georgia Tort Claims Act claims.

A.    **Eighth Amendment Claims: Williams Implemented Unconstitutional Practices that Caused Tavara's Death**

The entire supervisory chain of command at the prison – Sgt. Shelby, Lt. Dickson, and Warden Williams – violated Tavera's rights by failing to provide him medical care. Calhoun, Shelby, and Dickson – who do not move to dismiss – were implementing the practices, directives, and training Williams gave them when they violated Tavara's constitutional rights.

"A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." *Marsh v. Butler Co., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001). An inmate's rights are violated when "a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not reasonably respond to the risk." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). It is clearly established in the Eleventh Circuit that allowing a prisoner to commit suicide and delaying his access to medical care violates the prisoner's constitutional rights. *See Jackson v. West*, 787 F.3d 1345, 1358 (11th Cir. 2015); *Wallace v. Jackson*, 667 F.Supp.2d 1267, 1272 (M.D. Ala. 2009) ("failing to call for medical assistance ... after discovering [an inmate] hanging in his cell" is "distinct claim"), *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986).[4]

---

[4] It is simply not true that failure to intervene claims are only "clearly established" for excessive force claims. *See Heflin v. Miami-Dade County*, 393 Fed. Appx. 658, 660 (11th

Supervisors, like Warden Williams, are liable for violations of inmates' Eighth Amendment rights when either (1) "the supervisor personally participates in the alleged constitutional violation" or (2) "when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Amnesty Int'l*, 559 F.3d at 1180-81. "[F]acts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so" satisfy these requirements. *Id*. at 1180. *See also Cottone*, 326 F.3d at 1360. A plaintiff can allege the necessary causal connection through "facts that support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cooper v. City of Starke, Fla.*, 2011 WL 1100142, *5 (M.D. Fla. Mar. 23, 2011).

A supervisor can be liable for implementing an unconstitutional policy, or failing to provide training necessary for the protection of constitutional rights. In a prison suicide case, the Eleventh Circuit set forth when a warden can be liable for a suicide death: "(1) whether, in failing adequately to train and supervise subordinates, he was deliberately indifferent to an inmate's mental health care needs; (2) whether a reasonable person in the supervisor's position would know that his failure to train and supervise reflected deliberate indifference; and (3) whether his conduct was causally related to the constitutional infringement by his subordinate." *Greason v. Kemp*, 891 F.2d 829, 836-37 (11th Cir. 1990). As Plaintiff's amended complaint satisfies these elements, Williams' motion should be denied.

---

Cir. 2010) (per curiam) (reversing order granting motion to dismiss in false arrest *and* excessive force case).

1. Williams' Unconstitutional Practice

First, Plaintiff alleges practices Williams implemented at the Smith State Prison were unconstitutional and caused Tavara's death. The Eleventh Circuit's opinion in *Greason*, a prison suicide case, is instructive. There, the Circuit upheld a district court order denying qualified immunity to a warden. Like Plaintiff alleges here, the *Greason* warden (1) "failed to take adequate measure to cure the serious problems of which he was aware," (2) "a reasonable person in [the warden's] position would have known this conduct constituted deliberate indifference," and (3) "because [the warden] was in a position to rectify … most of these serious problems, his failure to do so was casually related to the violation of [the deceased's] [E]ighth [A]mendment rights." *Greason*, 891 F.2d at 840. Like this case, in *Greason* a young man with a long history of mental illness and past suicide attempts took his own life when prison administrators failed to provide him psychiatric treatment and hung himself in his cell. *Id*. But here the facts are more egregious – the Greasons' son was found dead, not found alive and allowed to die. *Id*.

First, Williams would know suicide is a leading cause of death and well-recognized danger in prisons and jails. *See, e.g.*, Doc. 52, ¶ 36; *Wallace*, 667 F.Supp.2d, at 1274; Margaret Noonan et al., U.S. DEP'T OF JUSTICE, MORTALITY IN LOCAL JAILS AND STATE PRISONS, Table 16 (2015), available at http://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf (Bureau of Justice Statistics report, suicide leading cause of death in jails and prisons). The consequence of this common tragedy is obvious – a speedy rescue is necessary to save prisoners' lives. Instead of adopting policies or training to address this obvious and recurring problem, Williams instead implemented a practice he knew endanger inmates and result in deaths just like

Tavera's. Williams' practice, forcing officers to wait after finding a prisoner in the act of committing suicide, multiplies the risk of death.

Second, any reasonable warden would know this practice was indifferent to inmates' constitutional rights. The Eleventh Circuit specifically held wardens can be liable when "guards lack[] training in suicide prevention." *Greason*, 891 F.2d at 840, n. 21. Directing officers to delay action during an emergency denied Tavara his right to necessary medical care and protection from suicide. *See Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) ("A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes."); *Arenas v. Calhoun*, 2017 WL 1052618 (W.D. Tex. March 20, 2017) (companion case).

Third, Williams' failure to rectify this obvious problem proximately caused Tavara's death. Williams directed his subordinates (Shelby, Dickson, and Calhoun) to act unlawfully by delaying provision of medical care until a lieutenant approved entering a cell. Doc. 52, ¶¶ 35-36. In these circumstances – an inmate beginning to hang himself – there is an obvious "causal connection" between a supervisor instructing a subordinate to sit on his hands and the denial of emergency medical care or officer assistance to save Tavera's life. *See*, *e.g.*, *Wallace*, 667 F.Supp.2d, at 1274; *Greason*, 891 F.2d at 840 (denying warden's motion for summary judgment in prisoner suicide case). In *Bozeman*, the Circuit denied qualified immunity to correctional officers when they intentionally delayed fourteen minutes – less time than at issue here – in checking an inmate's condition, calling for medical assistance, administering CPR, or doing "anything else to

11

help." 422 F.3d, at 1273. Any reasonable warden would know his officers would act unlawfully under these circumstances, with this training.

Had Williams not had a practice prohibiting Calhoun, Shelby, and Dickson from entering a cell before a lieutenant arrived, one of them would have entered the cell and rescued Tavera in time. Doc. 52, ¶¶ 35, 37. This specific policy therefore proximately caused the violation of Tavera's Eighth Amendment rights.

2.      Williams' Dangerous Training – Delay Emergency Intervention

Moreover, Warden Williams unconstitutionally trained his subordinates – Calhoun, Shelby, and Dickson – to delay providing emergency medical care to prisoners engaged in suicide. It is well-settled, a supervisor is liable for a failing to train his subordinates when "his failure to train amounts to deliberate indifference to the rights of person with whom the subordinates come into contact and the failure has actually caused the injury." *Belcher*, 30 F.3d at 1397. "Failure to train can amount to deliberate indifference when the need for more or different training is obvious" because "the failure to train is likely to result in the violation of a constitutional right." *Id*. at 1397-98. A risk that is "obvious in the abstract" will satisfy the requirements of a failure to train claim. *Gold v. City of Miami, Fla.*, 151 F.3d 1346, 1352 (11th Cir. 1998) (citing *Brown v. Bryan Co., Okla.*, 520 U.S. 397, 409 (1997)).

Here, Plaintiff alleges Williams failed to train his officers to protect inmates from suicide, and actually did train them to delay providing necessary emergency medical care. Doc. 52, ¶¶ 36-38. These are risks "obvious in the abstract" which correctional officers are highly likely to confront. *See supra* at § V.A. (risk of suicide in prisons); *Greason*, 891 F.2d at 840, n. 21 (need for suicide prevention training in prisons). The need for

contrary training – to immediately intervene to stop a suicide or assist an inmate, or to get a second officer to the scene in less than a minute, before it is too late, and how to properly rescue an inmate – is also obvious. Yet Williams had his subordinates do the exact opposite. As a consequence, a death became inevitable.

Thus, Plaintiff has successfully alleged Warden Williams' practices and training decisions violated her son's constitutional rights.

### B.      Qualified Immunity: Williams is Not Entitled to Qualified Immunity

Qualified immunity does not protect governmental employees when "the officials violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McBride v. Houston County Health Care Author.*, 658 Fed. Appx. 991, 996 (11th Cir. Sept. 30, 2016). Likewise, qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. ____, 136 S.Ct. 305, slip op. at 5 (2015). To overcome qualified immunity, the plaintiff need only show "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *McBride*, 658 Fed. Appx. at 996. Because Tavera's rights to access medical care and be protected from suicide were clearly established, and the conduct is, at best, incompetent and likely illegal, Williams is not entitled to qualified immunity.

In determining if a right is clearly established, "the dispositive inquiry … is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Hernandez v. Mesa*, 137 S.Ct. 2003, 2007 (2017). In the Eleventh Circuit, constitutional rights are "clearly established" by a decision of the Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where

the injury occurred. *Amnesty Int'l*, 559 F.3d at 1184. Prior cases "need not be 'materially similar' to the present circumstances so long as the right is 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*. (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "A prior case wherein the very action in question has previously been held unlawful" is unnecessary. *Id*. Prior caselaw need only provide officers "fair warning" their conduct is illegal. *Id*. An official can "lose qualified immunity even if there is no reported case 'directly on point.'" *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1866 (2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Inmates, like Tavara, have a clearly established right to be "protected from self-inflicted injuries, including suicide." *Belcher*, 30 F.3d at 1396. "Prison guards who display deliberate indifference to the serious medical and psychiatric needs of a prisoner, or deliberate indifference to a strong likelihood that a prisoner will take his own life" violate inmates' constitutional rights. *Id*. "Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason*, 891 F.2d 829, 836 (11th Cir. 1990). Though deliberate indifference requires more than negligence, the standard does not require "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

The Eleventh Circuit has reversed denial of summary judgment against a jailer where "a jury could find that [the jailer] subjectively believed that there was a strong risk that [the inmate] would attempt suicide and deliberately did not take any action to prevent [the inmate's] suicide." *Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1270 (11th Cir.

14

2005). In applying the qualified immunity analysis, the Eleventh Circuit held that "it was clearly established that an officer's deliberate indifference to the risk of serious harm to a detainee is a violation of the Fourteenth Amendment." *Id*.

Though there is no Eleventh Circuit case dealing directly with a suicide in progress, the Circuit's many opinions discussing suicide prevention generally, and the *Bozeman* opinion discussing the need for immediate care when an inmate has "asphyxiated," provided ample warning to the Defendants their conduct was unlawful. *See*, *e.g.*, *Greason*, 891 F.2d at 836; *Bozeman*, 422 F.3d at 1274. With this "stark and simple" fact pattern – officers knowing an inmate has stopped breathing yet doing nothing – officers are not entitled to qualified immunity. *Bozeman*, 422 F.3d at 1274. Williams cannot be entitled to immunity for authorizing conduct that leads to the same result. "General statements" of the law can provide "fair and clear warning" to officials when "in light of the pre-existing law the unlawfulness [of the conduct] is apparent." *White v. Pauly*, 580 U.S. ____, 2017 WL 69170, slip op. at 7 (2017). "A core principle of our Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *Benson v. Gordon County, Ga.*, 479 Fed. Appx. 315, 318 (11th Cir. 2012) (denying qualified immunity to jail nurse). As the district court in the companion case against Calhoun noted, "[i]t is difficult to imagine [in a prison suicide case] how a plaintiff could state a claim for deliberate indifference where a guard leaves an inmate unsupervised, but not make out a similar claim for exercising deliberate indifference while actively (but inadequately) supervising that same inmate." *Arenas v.*

15

*Calhoun*, 2017 WL 1052618, *6 (W.D. Tex. March 20, 2017) (companion case, denying qualified immunity to Calhoun). Here, Williams implemented the practice that caused the result. Denying qualified immunity to Calhoun, but granting the protection to Williams who gave the order, would be an inapposite result.

Thus, because Tavera's rights were clearly established in the Eleventh Circuit, Shelby, Dickson, and Williams are not entitled to qualified immunity.

### C.   ADA/Rehabilitation Act Claims: GDOC and GCHC Intentionally Discriminated Against Tavera

Plaintiff also alleges facts sufficient to state a claim that GDOC and GCHC's failure to provide reasonable accommodations discriminated against Tavera and caused his suicide death.

To state a claim under the ADA, a plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated [against] by such entity; (3) by reason of such disability." *Schotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). Plaintiff easily satisfies these requirements. To state a Rehabilitation Act claim, a plaintiff need only also allege the defendant accepts federal funding.[5]

Plaintiff easily satisfies these standards.

First, Plaintiff alleges Tavera suffered from severe mental illnesses (including bipolar disorder) and thus qualifies as a person with a disability. Defendants do not

---

[5] The complaint alleges GDOC and GCHC accept federal funding. Doc. 52, ¶¶ 7-8. After resolving the federal funding requirement, courts treat the ADA and Rehabilitation Act identically, and apply the same standards in interpreting them. *Cash v. Smith*, 231 F.3d 1301, 1305 n. 2 (11th Cir. 2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice versa.").

contest these allegations are sufficient to state a claim. Doc. 52, ¶¶ 15-18; Doc. 56, p. 6. Mental illnesses qualify as disabilities under the ADA and Rehabilitation Act. *See*, *e.g.*, *Bishop v. Ga. Dep't of Family and Children Svcs.*, 2006 WL 572031, *3-4 (11th Cir. Mar. 10, 2006) (affirming denial of dispositive motion, identifying bipolar disorder as "disability"). Defendants do not argue the complaint fails to allege this element.

Second, confinement in a jail or prison itself is a program or service for ADA/Rehabilitation Act purposes. *Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs.'") (Scalia, J.). *See also U.S. v. Georgia*, 546 U.S. 151 (2006). Thus, safe confinement in the Smith State Prison during his incarceration was a "service" or "program" such that GDOC and GCHC were required to accommodate Tavera. *Id*. Defendants appropriately also do not contest that Plaintiff satisfies this element.

Finally, GDOC and GCHC denied Tavera access to its programs by failing to reasonably accommodate his serious mental illness – this is "[denial] of the benefits of the services … by reason of [his] disability." *Schotz*, 256 F.3d at 1079. When there is no dispute about the first two elements, the focus should lay on "whether [the plaintiff] was excluded from participation in, or denied the benefit of, some services, programs, or activities of [the defendant] by reason of his disability *or* was subjected to discrimination by [the defendant] by reason of his disability." *Bircoll v. Miami-Dade Co., Fla.*, 480 F.3d 1072, 1083 (11th Cir. 2007) (emphasis in original). Plaintiffs can satisfy this element by alleging "the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people." *Pruitt v. Emmanuel Co.,*

*Ga.,* 2012 WL 1161612, *1 (S.D. Ga. Apr. 9, 2012) (Smith, Maj. J.) adopted at 2012 WL1458012 (S.D. Ga. Apr. 26, 2012) (citing *Culvahouse v. City of LaPorte*, 679 F.Supp.2d 931, 937 (N.D. Ind. 2009)).

Here, Plaintiffs' allegations survive under either approach. GDOC and GCHC discriminated against Tavera by failing to reasonably accommodate his mental illness by (1) housing him in a cell with a "tie off" point (Doc. 52, ¶¶ 39-40), (2) not housing him with a cellmate (Doc. 52, ¶ 42), (3) not providing him any mental health treatment during his incarceration (Doc. 52, ¶ 18), and (4) its officers intentionally delaying his rescue when he was found beginning to hang himself in his cell (Doc. 52, ¶¶ 25-34). Likewise, GDOC failed to train its officers about the necessity of immediately rescuing inmates in the process of taking their own lives, and maintained practices that prohibited officers from doing so. Doc. 52, ¶¶ 35-36.

These failures to accommodate Tavera discriminated against him by denying him benefits and services. If not for his disability, Tavera would have been able to access GDOC and GCHC's programs and services like any other able-bodied prisoner. Unlike other anti-discrimination statutes, the ADA and Rehabilitation Act create an "affirmative obligation" that requires public entities, like GDOC and GCHC, to provide accommodations to people with disabilities – *not* simply treat people with disabilities the same as able-bodied people. *See*, *e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 533 (2004).

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility.

*Id.*, at 531; *see* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary

to avoid discrimination on the basis of disability"). Title II places an affirmative "duty to accommodate" on GDOC and GCHC. *See Lane*, 541 U.S. at 532. "[A] plaintiff may establish discrimination by showing that the public entity refused to provide a reasonable accommodation for a disabled person." *Wolfe v. Fla. Dep't of Corrections*, 2012 WL 4052334, *4 (M.D. Fla. Sept. 14, 2012). Instead, GDOC and GCHC "outright excluded" Tavera from programs and services at the prison by failing to accommodate his disabilities, tragically causing his death.

Like the inmate in *U.S. v. Georgia*, Tavera could not safely access any program or service in the prison without an accommodation from GDOC and GCHC. In *Georgia*, a paraplegic inmate was "denied . . . access to virtually all prison programs and services on account of his disability." 546 U.S. 151, 155 (2006) (Scalia, J.). The *Georgia* inmate required accommodations for his inability to walk. Without accommodations, he could not leave his cell to access the prison's other programs and services. There were no allegations the Georgia prison's failure to provide accommodations was motived by discriminatory animus against paraplegics: the prison simply failed to accommodate his needs. Indeed, the Supreme Court has expressly noted "discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). "[M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult, if not impossible to reach were the Act construed to proscribe only conduct fueled by discriminatory intent." *Id.*, at 296-97. Like the *Georgia* inmate, Tavera could not safely access any programs or services at the prison without reasonable accommodations to protect him from his deadly mental illness

and suicidal tendencies. In fact, instead of accommodating him, GDOC and GCHC increased his risk of suicide by housing him, alone, in a cell with an obvious "tie off" point, and instead of saving him, watched him die.

Other federal district courts in the Eleventh Circuit have denied dispositive motions in similar cases. In *Wolfe v. Florida Department of Corrections*, 2012 WL4052334 (M.D. Fla. Sept. 14, 2012), the plaintiff alleged the Florida prisons failed to accommodate her son, who died of an asthma attack. There, the Florida prison housed the asthmatic prisoner in a cell without an emergency call button. When he suffered a serious asthma attack, he was locked in his cell, could not summon help, and died. The court determined a jury could find, due to his known history of asthma attacks, that the prison discriminated against him by failing to house him in a cell that accommodated his disability. *See id.*, at **4-5. This failure to accommodate the inmate was "deliberately indifferent to [the inmate']s need for a reasonable accommodation, both through their actions and their policies." *Id. See also Kruger v. Jenne*, 164 F.Supp.2d 1330, 1337-38 (S.D. Fla. 2000). Like the prisoner in *Wolfe*, Tavera was locked in a cell made dangerous by his disability – and he died as a result.

The question is not, as the Defendants pose, whether "GDOC and GCHC's failure to provide [Tavera] with mental health treatment or safe housing … [was] by reason of his disability," Doc. 55, p. 6-7, but whether Tavera was "excluded from participation in or denied the benefits of services, programs, or activities … by reason of his disability." *See, e.g.*, *Bircoll*, 480 F.3d at 1083. Defendants construction of the statute and elements of the claim is wrong. Plaintiff, conversely, alleges the correct elements: GDOC and GCHC knew Tavera needed accommodations – mental health care and protection from

suicide – "because of" his mental illness to "participate" in incarceration, and GDOC and GCHC failed to provide them. *See, e.g., U.S. v. Georgia*, 546 U.S. at 153-54. Failure to provide these accommodations is denial of a benefit, service, or program "because of" Tavera's mental illnesses.

Defendants' proposed construction is not only without legal support, it would also require Plaintiffs to prove animus against people with disabilities to recover damages. That is far more than the statutes require. Under the ADA and Rehabilitation Acts' architectural barrier provisions a plaintiff does not need to show that a ramp was not installed into a building because the owner hates people using wheelchairs, instead of just "because of" the costs attendant building a ramp. Just like the wheelchair user who cannot enter a building with steps, Tavera could not access the services and programs of the Smith State Prison without an accommodation.

Though the Rehabilitation Act also has a "sole causation" requirement, that standard is inapplicable here because the complaint alleges a failure to accommodate Tavera's disabilities. The Northern District of Georgia rejected Defendants' argument in a failure to accommodate case. "The only material difference between … [the ADA and Rehabilitation Act] lay in their respective causation requirements, but … this difference was immaterial where the plaintiffs' claims were based on a failure to make reasonable accommodations for disabled individuals." *Gaylor v. Ga. Dep't of Natural Resources*, 2013 WL 4790158, *3 (N.D. Ga. Sept. 6, 2013) (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005)). *See also Martone v. Livingston*, 2014 WL 3534696, *15 n. 6 (S.D. Tex. July 16, 2014) (denying motion to dismiss prison Rehabilitation Act wrongful death claims). Defendants rely on ADA/Rehabilitation Act

employment decisions, where "mixed motive" terminations do not violate the Rehabilitation Act. *Compare McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1074-75 (11th Cir. 1991) (discussing mixed motive termination) *with Martone*, 2014 WL 3534696, *15 (prison failure to accommodate case). Unlike a mixed-motive termination case (where illegal discrimination is only one factor leading to an adverse employment decision), here, the denial of the accommodations to Tavera were the "sole" cause of his death.

This is not a case where Plaintiff attempts to cloak a medical malpractice claim as a disability discrimination claim, as Defendants allege. *See* Doc. 56, p. 9-10. GDOC and GCHC did not provide Tavera incorrect or negligent medical care – they did not provide him any mental health care *at all*. Doc. 52, ¶ 18. Moreover, the accommodations GDOC and GCHC failed to provide Tavera – provide *any* mental health treatment, housing with a cellmate, in a cell with no tie-off ptoins, and emergency rescue and medical care – are not "medical malpractice" as defined by Georgia law. *See* O.C.G.A. § 9-9-60 (defining "medical malpractice").[6] Courts routinely distinguish between negligently provided medical care (classic medical malpractice) and a total failure to provide care required by a disability.[7]

---

[6] Of course, to the extent GDOC or GCHC merely provided negligent medical care – as opposed to completely failing to provide care necessitated by Tavera's disability – that malpractice would fall within the GTCA waiver of immunity, as discussed below.

[7] While *zero* medical care is certainly below the standard of care, and also may give rise to a medical malpractice claim, a complete failure to provide any medical care is also a failure to accommodate a disabled inmate's physical or mental impairment. *See, e.g.*, *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 287 (1st Cir. 2006) (prescription medication for ALS patient); *Rouse v. Plantier*, 997 F.Supp. 575, 582 (D. N.J. 1998) (insulin for diabetics) (reversed on other grounds); *McNally v. Prison Health Services*, 46 F.Supp.2d 49 (D. Me. Apr. 27, 1999) (anti-retroviral drugs to treat HIV-positive

Indeed, many other district courts in other circuits denied similar dispositive motions in prisoner disability cases, including suicide wrongful death actions. *See, e.g., Wright v. Tex. Dep't Crim. Justice*, 2013 WL 6578994 (N.D. Tex. Dec. 16, 2013) (O'Connor, J.) (denying motion to dismiss ADA claims when prison officials watch inmate commit suicide).[8] "[F]ailure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *Id.* (citing *McCoy*, 2006 WL 2331055, at *22). Tavera undoubtedly suffered more than non-disabled prisoners when his disability led him to commit suicide as Defendants stood back and watched.

Finally, GDOC and GCHC's arguments that they are entitled to Eleventh Amendment immunity from the ADA and Rehabilitation Act claims are meritless. First, the Rehabilitation Act undisputedly abrogates both entities immunities because GDOC and GCHC both accept federal funding. Doc. 52, ¶¶ 7-8. By accepting federal funds, the State waives its immunity. *Garrett v. Univ. of Alabama – Birmingham Bd. of Trustees*,

---

patients); *Payne v. Arizona*, 2012 WL 1151957, *7 (D. Ariz. Apr. 5, 2012) (diabetic denied various accommodations); *Paine v. Bergland*, 2012 WL 6727243, *11 (N.D. Ill. Dec. 28, 2012) (denying summary judgment to jail that failed to provide mental health evaluation before releasing mentally ill woman in dangerous part of Chicago).

[8] *See also Romero v. Bd. of County Comm'ns for County of Curry, N.M.*, --- F.Supp.2d ----, 2016 WL 4483867, *27-28 (D. N.M. Aug. 15, 2016); *Cleveland v. Gautreaux*, ---F.Supp.2d ----, 2016 WL 4107702, *17-18 (M.D. La. Aug. 1, 2016); *Hacker v. Cain*, 2016 WL 3167176, *13 (M.D. La. June 6, 2016); *Martone v. Livingston*, No. 4:13-CV-3369, 2014 WL 3534696, at *16 (S.D. Tex. July 16, 2014); *McCoy v. Tex. Dep't of Crim. Justice*, C.A. No. C-05-370, 2006 WL 2331055, *22 (S.D. Tex. 2006) (Jack, J.); *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532, 538 (N.D. Tex. 2011); *Hinojosa v. Livingston*, 994 F.Supp.2d 840 (S.D. Tex. 2014); *Borum v. Swisher Co.*, 2015 WL 327508 (N.D. Tex. Jan. 26, 2015) ($1,000,000 jury verdict where jail failed to accommodate disabled inmate suffering alcohol withdrawal).

344 F.3d 1288, 1293 (11th Cir. 2003). Even if GDOC and GCHC are immune under the ADA – though they are not – Plaintiff's Rehabilitation Act claims remain.

Second, because the ADA and Rehabilitation Act are essentially identical, *see supra* n. 6, the State's Eleventh Amendment immunity from ADA claims is "a purely academic question." *Gaylord v. Ga. Dep't of Natural Resources*, 2013 WL 4790158, *3 (N.D. Ga. Sept. 6, 2013) (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 449 (5th Cir. 2005)). Because the "rights and remedies" under both the Rehabilitation Act and ADA are identical, and because there is no question the Rehabilitation Act vitiates the State's immunity from suit, there is no need for the Court to address whether the ADA abrogates the immunity as well. *Id*. If, however, the Court wishes to address the immunity from the ADA, Plaintiff overcomes this hurdle as she alleges GDOC and GCHC's agents also violated Tavera's constitutional rights. *See supra* at pp. 7-15; *Greason*, 891 F.2d at 835-40 (denying summary judgment to medical and corrections officials in prison suicide case). The Supreme Court made it clear that Congress successfully abrogated the entities' immunities under the congressional power to enforce the Fourteenth Amendment by passing the ADA. *See U.S. v. Georgia*, 546 U.S. at 158-59 ("This enforcement power includes the power to abrogate state sovereign immunity by authorizing private suits for damages against the States. Thus, insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.") (internal citations omitted).

Finally, Plaintiff initially filed her ADA and Rehabilitation Act claims in state court. Defendants removed the claims to federal court. As such, Defendants waived any

possible entitlement to immunity. *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613 (2002) (unanimous opinion).

Thus, the complaint alleges sufficient facts to establish GDOC and GCHC discriminated against Tavera by denying him reasonable accommodations, resulting in his death, and Plaintiff's ADA and Rehabilitation Act claims cannot be dismissed.

**D.     Plaintiff Alleges a Valid Georgia Tort Claims Act Claim**

Under the GCTA, Plaintiff has alleged a claim for negligence for which GDOC and GCHC are not immune, and provided the State proper notice.

1.     *Plaintiff's Ante-Litem Notice was Valid.*

First, there is no dispute that GDOC received an ante-litem notice of Plaintiff's claims. *See* Doc. 52-1; O.C.G.A. § 50-21-26(a)(5). The motion to dismiss only alleges GCHC did not receive notice.

Second, the ante-litem notice to GDOC provides adequate notice of Plaintiff's claims. The notice provision's purpose is to "ensure that the state receives adequate notice of the claim to facilitate settlement before the filing of a lawsuit." *Cummings v. Ga. Dep't of Juvenile Justice*, 653 S.E.2d 729, 731 (Ga. 2007).

Here, Plaintiff provided sufficient notice to GDOC of the "acts or omissions that caused the loss," based on Ms. Arenas' "knowledge and belief … as … practicable under the circumstances." O.C.G.A. § 50-21-26(a)(5)(F). The notice to GDOC specifically alleges Tavera "was not given adequate medical attention for his severe mental disorder," and "a lack of training and lack of policies and procedures towards the protection of inmates from inmate self-inflicted injuries" caused Tavera's death. Doc. 52-1, p. 2. The notice plainly states GDOC's decision to "[hold] [Tavera] in the segregation or lockdown

unit" – i.e. in a single-person cell, without a cellmate (Doc. 52, ¶ 33) – while failing to provide him "adequate medical attention" caused his death.[9] *Id*. The notice identifies "Georgia Department of Corrections, … Stanley Williams, … and correction officers at Smith State Prison who failed to protect [Tavera]." *Id*. These are the same claims brought in this lawsuit – that GDOC negligently failed to provide Tavera medical care (both before, during, and after his suicide attempt) and that negligent practices and training resulted in Tavera's death. The ante litem notice clearly identifies "correction officers" (whose names were unknown to Plaintiff but certainly known to GDOC), providing the Department of Administrative Services ample opportunity to review the officers' own statements after receipt of the notice letter.[10] The GTCA's notice provisions simply do not require the Defendants' proposed "hyper-technical construction that would not measurably advance the purpose of the ante litem notice provisions." *Bd. of Regents of Univ. Sys. of Ga. v. Myers*, 764 S.E.2d 543, 546 (Ga. 2014).

Third, the notice to GDOC was effective as to GCHC. GCHC is a contractor for GDOC. Doc. 34-8. That Plaintiff later learned GCHC was involved in providing – or here, not providing – medical care to GDOC inmates does not make the notice defective. In fact, the Georgia Supreme Court held in a similar case, where the plaintiff did not

---

[9] At its core, constitutional claims related to protections from suicide are derived from inmates' entitlement to medical care. *Greason*, 891 F.2d at 834.

[10] To the extent the notice is allegedly defective – though it is not – the notice statute only requires a description "to the extent of the claimant's knowledge and belief and as may be practicable under the circumstances." *See Driscoll v. Bd. of Regents of Univ. Sys. of Ga.*, 757 S.E.2d 138, 140 (Ga. App. 2014). Plaintiff is the mother of a deceased, mentally-ill, prison inmate, with virtually no access to facts particularly within the prison's control, until discovery. It would be particularly unjust to require her to provide a more detailed description of defendants' tortious conduct when she was not present, and her son's death occurred behind the closed walls of a prison and on videotape possessed only by Defendants.

know the identity of the responsible agency, that the notice was sufficient because the notice provided Plaintiff's best "knowledge and belief" at the time notice was given. *Cummings v. Ga. Dep't of Juvenile Justice*, 653 S.E.2d 729, 732 (Ga. 2007) (plaintiff provided timely notice to incorrect agency). Simply put, "the plain language of the statute requires the identification of the agency *asserted* to be responsible, rather than identification of the agency *actually* responsible." *Id.* (emphasis in original).

Finally, GCHC has not suffered any prejudice because Plaintiff's ante litem notice was sent only to GDOC and DOAS. Because the notice to GDOC clearly alleged Tavera was "not given adequate medical attention," it put GDOC and its contractor on notice of Plaintiff's denial of medical care claims. In *Cummings*, where a wholly different agency received notice of the claim, the Georgia Supreme Court still determined "there is no evidence that the State suffered any prejudice therefrom" when the agency had the opportunity to investigate the claim before suit was filed. 653 S.E.2d at 734.

> ## 2.   *GDOC's Conduct Does Not Fall Within An Exception to the General Waiver*

GDOC's negligence also does not fall within any exception to the GTCA's waiver of immunity. GDOC contends Georgia exempts all "law enforcement" activity from the GTCA's waiver. *See* O.C.GA. § 50-21-24(6). But GDOC cites no authority that operation of a prison (or any other correctional facility) falls within this exception.

Indeed, the text of the exception suggests corrections does not fall within the "providing law enforcement" exception. The statute provides "[t]he state shall have no liability for losses resulting from … [c]ivil disturbance, riot, insurrection, or rebellion or the failure to provide, or the method of providing, law enforcement, police, or fire protection." *Id.* The plain text of the exception states immunity is not waived only in

cases where the plaintiff alleges a "failure to provide … law enforcement" – such as a case where the state fails to protect a citizen from crime. *See*, *e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) (town not liable harm resulting from failure to enforce domestic violence restraining order).

The leading Georgia Supreme Court case interpreting the exception does not suggest or imply that corrections falls within the exception. *See Georgia Forestry Com'n v. Canady*, 632 S.E.2d 105, 109 (Ga. 2006) (purpose of waiver is to protect state coffers from claims involving "decisions made by state employees and officers with regard to the amount, type, and disbursement of equipment and personnel *in response* to a need for the immediate provision of police, law enforcement, or fire protection services") (emphasis in original). Likewise, reported decisions allowed plaintiffs' claims against GDOC to proceed. *See*, *e.g.*, *Romano v. Ga. Dep't of Corrections*, 693 S.E.2d 521 (Ga. App. 2010) (reversing grant of motion to dismiss where inmate alleged officers converted his personal property).

Though the GTCA does not define "law enforcement," other Georgia statutes do draw this distinction between police and prison guards. Georgia's criminal law on "obstructing officers" distinguishes between a "law enforcement officer," and a "prison guard" or "correctional officer." O.C.G.A. § 16-10-24(b). So does Georgia's compensation scheme for officers injured in the line of duty. O.C.G.A. § 20-3-451(4) & (6) (separate definitions of "law enforcement officer" and "prison guard"). Georgia law defines a "law enforcement unit" to include GDOC but only as to "personnel who are authorized to exercise the power of arrest" – which would not include correctional officers working in a prison. O.C.G.A. § 35-8-2(7)(C). Title 35 of the Georgia Code,

which governs "Law Enforcement Officers and Agencies," does not govern the GDOC. (Instead, Title 42 governs "Penal Institutions," including GDOC.) The Eleventh Circuit, interpreting a similar Florida statute, also supports this distinction. *Pierre v. City of Miramar, Fla.*, 537 Fed. Appx. 821, 825 (11th Cir. 2013) (describing distinction between "law enforcement" and "correctional" officer). "Law enforcement" and "corrections" (especially as the field relates to providing medical care or safe housing) are simply different.

Moreover, even if the exception did broadly apply to corrections (though it does not), the exception does not even apply to *all* law enforcement activities, but only "the failure to provide or method of providing law enforcement." The "provision" of law enforcement is particularly inapplicable to the facts of this case. None of the GDOC officers were "providing law enforcement" at the time they let Tavera die. They were not arresting him, detaining him, or charging him (or anyone else) with any violation of the law.

Indeed, the GDOC performs several functions distinct from "providing law enforcement," including incarcerating convicted inmates safely and providing them medical care. *See* O.C.G.A. § 42-2-11(c) (GDOC's board responsible for "assignment, housing, working, feeding, clothing, treatment, discipline, rehabilitation, training, and hospitalization of all inmates coming under its custody"). Safe housing and medical care are simply not "law enforcement" functions of GDOC. Providing medical treatment to inmates is plainly not a "law enforcement" function similar to any of the applications of the exception discussed in the case law. *See*, *e.g.*, *Ga. Dep't of Public Safety v. Davis*, 676 S.E.2d 1, 207 (Ga. 2009) (denying application of exception where police officer rear-

ended plaintiff); *James v. Ga. Dep't of Public Safety*, 789 S.E.2d 236, 243 (Ga. App. 2016) (applying exception where police officer followed policy during high-speed chase); *Dixon v. Ga. Dep't of Public Safety*, 135 F.Supp.3d 1362, 1371 (S.D. Ga. 2015) (denying application of exception where SWAT officer disregarded policy when shooting plaintiffs' decedent). Plaintiff's complaint alleges GDOC negligently (as well as deliberately) failed to provide Tavera medical care – both during his entire incarceration (Doc. 34, ¶ 18) and when he needed it most (when Calhoun found him about to hang himself) (Doc. 34, ¶¶ 19-26). Provision of medical or mental health care, or safe housing, to inmates is not "providing … law enforcement" under the exception.

Finally, if the "law enforcement" exception applies to a failure to provide medical care or safe housing to Tavera, the exception is not nearly as broad as GDOC suggests. *Canady* makes it clear the exception only applies to "making of policy decisions by state employees and officers including those relating to the amount, disbursement, and use of equipment and personnel to provide law enforcement, police or fire protection services, and to the acts and omissions of state employees and officers executing and implementing those policies." 632 S.E.2d at 110. There was no official policy to deny Tavera medical care or safe housing during the period leading up to his suicide attempt.[11] Thus, the exception to the waiver cannot apply to that claim. If the exception does apply

---

[11] Likewise, Plaintiff believes discovery will also reveal other negligence unrelated to Williams' policy regarding entering the cells. For example, during a hearing in the related case, counsel for defendants suggested Calhoun's two-way radio prevented him from communicating with Shelby and Dickson. Failing to maintain the radio, negligent use of the radio by Calhoun (or others), or to failing provide officers an alternative method of communication, would obviously be negligent in a prison, and unrelated to any GDOC policy. But Plaintiff requires discovery to flesh out this allegation.

to the decision not to enter Tavera's cell – though it does not – it can only immunize Georgia officials for "making" or "implementing" a law enforcement policy.

To the extent the Second Amended Complaint alleges the correctional officers were acting pursuant to Warden Williams' official policy when they failed to rescue Tavera, Plaintiff is entitled to plead in the alternative, that if there was no official policy, that the officers acted negligently. *See* FED. R. CIV. PROC. 8(d)(2). It would be grossly unfair to dismiss Plaintiff's GTCA negligence claims now, when little discovery has taken place, if dismissal would allow Defendants to argue later that their conduct was "merely" negligent, not pursuant to an official policy, and not deliberately indifferent. At most, the Court should allow discovery to either confirm or deny Plaintiffs claims. In Defendants' construction, the two claims are mutually exclusive – either Calhoun was following Williams' policy (where Williams would be liable but the State immune) or Calhoun acted absent an official policy (where Williams may escape liability but the State would not). The Court should thus defer deciding this issue until discovery is complete.

**VI.    CONCLUSION**

Plaintiff Maria Arenas has adequately stated claims under the Americans with Disabilities Act, Rehabilitation Act, GTCA, and violations of Tavera's Eighth Amendment rights. As such, Defendants' motion to dismiss should be denied.

Carter Franklin. LLP
Post Office Box 27
Metter, Georgia 30439

brent@carterfranklin.com
          Tel.     912-685-5500

Fax.      912-685-5030

/s/ Brent Carter
 BRENT CARTER
 State Bar No.: 153082


Edwards Law
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
        Tel.     512-623-7727
        Fax.    512-623-7729

By: /s/ Jeff Edwards
        JEFF EDWARDS
        TX State Bar No. 24014406
        *Pro Hac Vice Pending*
        Scott Medlock
        TX State Bar No. 24044783
        *Pro Hac Vice Pending*

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing all attorneys of record.

*/s/ Scott Medlock* _____
Scott Medlock