IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| MARIA ARENAS, Individually and in her capacity as heir of and representative of the Estate of RICHARD TAVERA,<br><br>        Plaintiff,<br><br>v.<br><br>GEORGIA DEPARTMENT OF CORRECTIONS, GEORGIA CORRECTIONAL HEALTH CARE and MARK SHELBY, STANLEY WILLIAMS, and MARVIN DICKSON in their individual capacities.<br><br>        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br>Civil Action No.:<br>4:16-cv-00320 |

## PLAINTIFF'S RESPONSE TO DEFENDANTS SHELBY AND DICKSON'S MOTIONS FOR SUMMARY JUDGMENT

Defendants Mark Shelby and Marvin Dickson's motions for summary judgment should be denied as multiple material fact disputes preclude judgment as a matter of law.

### I. SUMMARY OF THE RESPONSE

Defendants Sgt. Mark Shelby and Lt. Marvin Dickson's motion for summary judgment should be denied for three reasons.

First, a jury must resolve material disputed facts – such as what policies and practices governed the Defendants' actions, were Shelby and Dickson truly "running" as "fast as they could" to rescue Plaintiff's son, and were they subjectively aware he was on the verge of death. As the parties present different versions of these facts, a jury must decide between them.

Second, though arising from the same tragedy, the legal issues confronting this court are entirely different from the companion Fifth Circuit lawsuit, *Arenas v. Calhoun*,

922 F.3d 616 (5th Cir. 2019). While on his own, Officer Calhoun's response was "reasonable" because the Fifth Circuit would not require him to enter a "one-on-one" situation "alone" *before Shelby and Dickson arrived*. While a fact dispute also exists as to whether one officer could reasonably enter a cell by himself to stop a suicide in progress, here, there is no dispute that the prison's policies and informal practices said two (or soon three) officers could. The fact the Fifth Circuit opinion turned on is absent here.

Third, Shelby and Dickson are not entitled to qualified immunity. The Eleventh Circuit recognizes inmates have an Eighth Amendment entitlement to protection from suicide, and that when a prisoner is asphyxiating a response must be measured in merely "a few minutes." *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005). Prior Eleventh Circuit opinions gave Shelby and Dickson "fair warning" their conduct was unlawful.

## II. FACTS – SHELBY AND DICKSON'S DELAY EVIDENCED DELIBERATE INDIFFERENCE IN RESPONDING TO TAVERA'S SUICIDE

### A. *Tavera Dies While Shelby and Dickson Delay*

When Sgt. Shelby and Lt. Dickson learned from a "frantic" radio call that Plaintiff's son, Richard Tavera, was beginning a suicide attempt,[1] they interminably delayed responding to assist the single officer present at Tavera's cell. Then, even after Shelby assembled at Tavera's cell with two other officers, he still did nothing to rescue Tavera. Another minute later, when Dickson arrived, he further delayed the rescue attempt. As a result, eight minutes elapsed from when Tavera's suicide attempt began and when Shelby and Dickson finally lowered Tavera's body to the ground.[2]

---

[1] Plaintiffs' Appendix is filed as Doc. 123 Ex. 29, Deposition of Haas, 56:6-25 & 57:14-17, Appx. 423-424.

[2] Ex. 8, Declaration of Dr. William Spangler, M.D. p. 3, Appx. 31.

Tavera was a non-violent inmate, just months away from completing a three-year sentence for "robbery by intimidation."[3] Prison staff found him "nervous, but polite and receptive," with a "good attitude."[4] He was eligible for parole, not a gang member, and in the process of completing a re-entry program.[5] When he entered the prison system, the Georgia Department of Corrections classified him as a "potential victim,"[6] likely in part due to his small stature – he was just 5'5" tall and weighed only 150 pounds at autopsy.[7] During his only mental health screening exam, Tavera told a counselor and a psychologist that he suffered from bipolar disorder,[8] was previously prescribed psychiatric medication,[9] and had attempted suicide before.[10] Nonetheless, the psychologist misdiagnosed him as a patient with no mental illness at all, and Tavera was tragically assigned to a prison completely lacking any mental health services.[11]

Thus, Tavera was locked in the J-1 solitary confinement cellblock at the GDOC's Smith State Prison on the night of December 7, 2014. The day before, after an emergency medical examination for chest pains,[12] Tavera had refused to return to his cell in the notorious "Thunder Dorm" dominated by gang members, and was placed instead in

---

[3] Ex. 15, "Record Review" for R. Tavera Suicide, p. 1, Appx. 135.

[4] Ex. 6, Case Notes: R. Tavera, p. 1-3, Appx. 20-22.

[5] Id, p. 1, Appx. 20 ("[Parole eligibility] date of 8/21/2013").

[6] Id, p. 1 & 5, Appx. 20, 24.

[7] Ex. 1, Autopsy of R. Tavera, p. 1, Appx. 4.

[8] Ex. 26, Deposition of GDOC (through J. Jackson), 26:11-17, Appx. 301; Ex. 31, Deposition of Oliga, 52:8-11, Appx. 488.

[9] Ex. 14, GDOC, Mental Health Data Entry Worksheet (R. Tavera), p. 2, Appx. 124; Ex. 31, Deposition of Oliga, 54:22-55:10, Appx. 490-491.

[10] Ex. 31, Deposition of Oliga, 56:9-16, Appx. 492, *See also* Ex. 38, Austin Travis County Mental Health Records (R. Tavera) (excerpts), pp. 10 & 45, Appx. 630, 632.

[11] *See* Ex. 14, GDOC, Mental Health Data Entry Worksheet (R. Tavera), p. 4, Appx. 126 & Ex. 23, Deposition of Dickson, 100:16-19, Appx. 224.

[12] Ex. 7, R. Tavera GCHC Medical Record (Dec. 6, 2014), p. 2, Appx. 27; Ex. 15, "Record Review" for R. Tavera Suicide, p. 1, Appx. 135.

solitary confinement "pending investigation."[13] Before placing him alone in his solitary confinement cell, officers thoroughly searched Tavera's person and property, finding nothing of consequence.[14] A memo on Tavera's cell door noted that he was in solitary confinement only "pending investigation," and not in "disciplinary isolation" – the type of solitary confinement reserved for inmates who were a threat to prison security.[15] As such, despite being housed in solitary confinement, Tavera was "not more dangerous than anybody else in the prison." [16] Unlike other prison systems, Georgia's solitary confinement is not exclusively for the "worst of the worst,"[17] and some solitary confinement inmates (like Tavera) are "completely compliant."[18]

The officers at the prison that night were each armed with pepper spray, significantly larger than Tavera,[19] and wearing protective "stab proof" vests.[20]

---

[13] *See, e.g.*, Ex. 15, "Record Review" for R. Tavera Suicide, p. 2, Appx. 136; Ex. 29, Deposition of Haas, 29:14-23, Appx. 417 ("where the worst of the inmates are … housed at"). *See also* Ex. 30, Deposition of Warden Ron McAndrew (ret.), 73:10-18, Appx. 459 ("gangs are running" a "Thunder Dorm" – a term common "all over the country"). A detailed description of Tavera's placement in solitary confinement can be found in Plaintiff's Response to Defendants' Georgia Department of Corrections and Georgia Correctional Health Care's Motion for Summary Judgment, Doc. 122, pp. 9-13.

[14] Ex. 25 Deposition of GDOC (through K. Campbell), 56:20-57:5, Appx. 259-260 (prisoners strip searched and property searched).

[15] *Id.*, at 37:15-23, Appx. 257. *See also Id.*, 144:16-20, Appx. 271; Ex. 28, Deposition of GDOC (through R. Toole), 65:21-24 & 67:12-16, Appx. 365-366; Ex. 35, Deposition of Williams, 110:23-111:10, Appx. 595-596; Ex. 34, Deposition of Vasquez, 66:3-11, Appx. 570; Ex. 40, GDOC, Standard Operating Procedure: Administrative Segregation, p. 1, Appx. 638.

[16] Ex. 34, Deposition of Vasquez, 68:1-8, Appx. 571.

[17] Ex. 25, Deposition of GDOC (through K. Campbell), 30:18-23, Appx. 254.

[18] *See Id.*, at 31:6-13, Appx. 255.

[19] Calhoun was 5'11" tall, weighing 190 lbs (Ex. 22, Deposition of Calhoun, 16:20-23, Appx. 180); Haas was 6' tall, weighing 145 lbs (Ex. 29, Deposition of Haas, 20:3-7, Appx. 413); Dickson was 5'9" tall, weighing 219 lbs (Ex. 23, Deposition of GDOC (through K. Campbell), 129:1-11, Appx. 270); Shelby was 6'1" tall (Ex. 33, Deposition of Shelby, 68:17-18, Appx. 546).

At 9:49:03 pm,[21] Off. Calhoun, the sole officer supervising Tavera's cell block, found him *beginning* a suicide attempt. In his report written that night, Calhoun wrote:

> I observed Inmate Tavera … attempting to hang himself by wrapping his bed sheet around the water sprinkler above his bed and the [other] end wrapped around his neck.[22]

Calhoun "instructed [Tavera] to stop, but he ignored me."[23] Calhoun immediately saw Tavera's body become "limp" and "dangling," and noted the ligature was "tight."[24] Calhoun believed the Tavera was not "faking" – he was actually "killing himself" and, as he hanged in his cell, "wasn't a danger to anybody" (other than himself).[25] There were no visible weapons, and Tavera did not have a cellmate.[26] Had the officers simply looked through the food slot in the cell door, they could have seen Tavera's feet – and known he wasn't secretly standing on a stack of books or lying in wait.[27]

Seeing Tavera dying before his eyes, Calhoun immediately called for help. Calhoun made four radio calls "the second he spotted Mr. Tavera" to summon assistance[28] – telling fellow officers "I [have] an attempted suicide."[29] Within fifteen

---

[20] Ex. 41, Smith State Prison Post Orders: Disciplinary and Transient Housing, p. 10, Appx. 658; Ex. 23, Deposition of GDOC (through K. Campbell), 49:15-25, Appx. 258; Ex. 29, Deposition of Haas, 21:19-23, 22:23-25 & 27:5-16, Appx. 414-415. *See also* Ex. 33, Deposition of Shelby, 81:9-17, Appx. 551.

[21] Ex. 17, Surveillance Video, Appx. 143 (timestamp 21:49:03). Tavera's cell is the fourth door from the left side of the frame on the bottom row.

[22] Ex. 2, Incident Report, Death of R. Tavera, p. 2, Appx. 10; Ex. 3, Sworn Statement of J. Calhoun, Appx. 14.

[23] Ex. 20, Calhoun Internal Investigation (audio), Appx. 146.

[24] *Id.*; Ex. 22, Deposition of Calhoun, 116:20-117:4, Appx. 193-194; Ex. 29, Deposition of Haas, 68:3-5, Appx. 427.

[25] Ex. 22, Deposition of Calhoun, 53:17-22 & 121:22-24, Appx. 186, 195.

[26] *Id.*; Ex. 20, Calhoun Internal Investigation (audio), Appx. 146; Ex. 33, Deposition of Shelby, 57:4-22, Appx. 545.

[27] *See* Ex. 33, Deposition of Shelby, 87:17-88:6, Appx. 552-553; Ex. 29, Deposition of Haas, 104:11-23, Appx. 440.

[28] Ex. 22, Deposition of Calhoun, 45:12-15, Appx. 185.

seconds, officers responded over the radio that they were on their way.[30] Off. Haas, responding from the building adjacent Tavera's cellblock, distinctly heard Calhoun "frantic[ally]" call "attempted suicide" on the radio.[31] Off. Roach, operating the control room adjacent the cellblock, also heard Calhoun report, "inmate hanging himself."[32]

Sgt. Shelby was "making rounds in H-2 dorm," a cellblock in the building adjacent to Tavera's J-1,[33] when he heard "radio traffic from J-1 dorm officer stating it was an attempted suicide."[34] From the "inflexion [sic] in the guy's voice," Shelby knew "it was an emergency."[35] Shelby testified he "ran" from H-2 to Tavera's cell,[36] "as fast as humanly possible," because he knew "somebody's life was on the line."[37] If Shelby were at the furthest point in H-2 from J-1, he was no more than 400 feet away.[38] During Plaintiff's inspection of the prison, Plaintiff's 40-year-old counsel jogged the distance between H-2 and J-1 in 42 seconds (even stopping to wait for officers to open the gates and doors), and Plaintiff's 81-year-old expert walked the distance in approximately two minutes (also waiting for doors and gates to open).[39] Shelby, however, did not arrive at

---

[29] Ex. 2, Incident Report, Death of R. Tavera, p. 2, Appx. 10.
[30] *See* Ex. 22, Deposition of Calhoun, 68:11-17 & 82:11-18, Appx. 190, 192.
[31] Ex. 29, Deposition of Haas, 56:6-25 & 57:14-17, Appx. 423-424.
[32] Ex. 2, Incident Report, Death of R. Tavera, p. 3, Appx. 11.
[33] *Id.*, at p. 4, Appx. 12; Ex. 11, Supplemental Report of McAndrew, p. 2, Appx. 50; Ex. 33, Deposition of Shelby, 30:5-11, Appx. 541.
[34] Ex. 2, Incident Report, Death of R. Tavera, p. 4, Appx. 12; Ex. 5, Sworn Statement of Shelby, Appx. 18; Ex. 33, Deposition of Shelby, 31:2 & 31:11-16, Appx. 542.
[35] *Id.*, at 30:14-18, Appx. 541.
[36] *Id.*, at 32:4-9, Appx. 543.
[37] Ex. 33, Deposition of Shelby, 31:19-24 & 48:1-5, Appx. 542, 544.
[38] Ex. 11, Supplemental Report of McAndrew, p. 2, Appx. 50.
[39] *Id.*

the cellblock until 9:54:00, when the surveillance video shows him slowly stroll up to Tavera's cell door – almost *five minutes* after Calhoun first called for help.[40]

Less than twenty seconds later, Haas arrived.[41] At this time, three officers – Calhoun, Shelby, and Haas – were assembled outside Tavera's cell.[42] Even Defendants' motion recognizes three officers is a safe number to enter a cell. (Doc. 95-1, p. 7). Nonetheless, the three assembled officers still did nothing to assist Tavera – even though it was obvious to them that "seconds count[ed]," and they could see Tavera dying.[43]

Meanwhile, Lt. Dickson was doing paperwork in the prison's "security" office (in a building neighboring J-1 on the side opposite H-2), when he was "notified via radio that [Calhoun] had an inmate attempting to hang himself."[44] Dickson also immediately understood this was an "emergency" and he needed to "come right away."[45] Thus, Dickson testified he also ran from "security" to J-1.[46] Dickson was approximately 700 feet from Tavera's cell when he heard the radio call – a distance Plaintiff's 81-year-old expert covered in approximately 4 minutes walking normally, and Plaintiff's 40-year-old counsel jogged in less than a minute and twenty seconds.[47] Dickson, however, instead of rushing to save Tavera's life, delayed by stopping at the "main control" office to retrieve two hand-held video cameras and an additional canister of pepper spray (though each

---

[40] Ex. 17, Surveillance Video, Appx. 143 at 21:54:00. *See also* Ex. 29, Deposition of Haas, 93:13-18, Appx. 435.

[41] Ex. 17, Surveillance Video, Appx. 143 at 21:54:19. *See also* Ex. 29, Deposition of Haas, 94:4-9, Appx. 436.

[42] *Id.*, at 69:12-15, Appx. 428; Ex. 17, Surveillance Video, Appx. 143 at 21:54:19.

[43] Ex. 29, Deposition of Haas, 70:25-71:4, Appx. 429

[44] Ex. 23, Deposition of Dickson, 17:12-18 & 49:15-25, Appx. 207, 212; Ex. 2, Incident Report, Death of R. Tavera, p. 1, Appx. 9; Ex. 4, Sworn Statement of Dickson, Appx. 16.

[45] Ex. 23, Deposition of Dickson, 15:11-24, Appx. 205.

[46] Ex. 23, Deposition of Dickson, 52:18-53:2, Appx. 215-216.

[47] Ex. 11, Supplemental Expert Report of McAndrew, p. 2, Appx. 50.

officer already had their own individual canister).[48] Dickson considered getting the video cameras "as important as saving somebody's life."[49] When the video shows Dickson finally arrive at the cell almost six minutes later, he is not running at all, but leisurely walking.[50]

While standing outside the cell, Haas and Calhoun begin video recording Tavera's death – the cameras show Tavera's face has a purple pallor, his eyes are closed, and his mouth has lolled open, while the ligature pulls tight into his neck.[51] (GDOC considered "change in color" a factor officers should consider in immediately rescuing a prisoner.)[52]

Even with Dickson's arrival, the officers still did not immediately try to rescue Tavera. Dickson does not order "open her up" until another 30 seconds had elapsed from when the video cameras began recording.[53] The cell door does not actually open for almost another minute.[54] Then, even when Dickson finally ordered the door opened, he tasks both Calhoun and Haas with video recording the rescue – instead of having them actually *assist* in the rescue.[55] As a result, Dickson and Shelby struggled alone to lower Tavera's hanging body for nineteen more seconds before Haas began assisting them, and yet another fifteen seconds pass before Calhoun is waved in to help.[56] Thus, Tavera's

---

[48] Ex. 2, Incident Report, Death of R. Tavera, p. 1, Appx. 9; Ex. 23, Deposition of Dickson, 49:12-25, Appx. 212.

[49] Ex. 23, Deposition of Dickson, 55:4-9, Appx. 218. *Contra* Ex. 25, Deposition of GDOC (through K. Campbell), 113:1-23 & 114:7-12, Appx. 268-269.

[50] Ex. 17, Surveillance Video, Appx. 143 at 21:55:57. *See also* Ex. 29, Deposition of Haas, 96:7-15, Appx. 437.

[51] Ex. 18, Handheld Video #1, Appx. 144 at 0:04 & 3:13.

[52] Ex. 25, Deposition of GDOC (through K. Campbell), 150:25-151:10, Appx. 272-273.

[53] *See* Ex. 18, Handheld Video #1, Appx. 144 at 0:30.

[54] Ex. 17, Surveillance Video, Appx. 143 at 21:56:09.

[55] *See, e.g.*, Ex. 18, Handheld Video #1, at 1:13. *See also* Ex. 29, Deposition of Haas, 101:19-102:3, Appx. 437-439.

[56] Ex. 18, Handheld Video #1, Appx. 144 at 1:05-1:37.

body is finally lowered to the floor only after another minute passes from when the cell door opened – a stunning *eight total minutes* elapsed after Calhoun first discovered Tavera beginning the suicide attempt.[57]

Tavera died of asphyxia by hanging.[58]

This was obviously a "life or death situation."[59] "It is well known in correctional circles that any delay in rescuing a hanging inmate markedly increases that inmate's risk of death."[60] All GDOC officers were trained that, during a suicide attempt, they needed to respond as soon as possible.[61] Dickson testified he knew a hanging inmate could not survive longer than three to four minutes – significantly less time than it took him to even arrive at the scene.[62] Though inmates may occasionally stage a suicide attempt, those instances are exceptionally rare – GDOC's mental health director knew of only two in his twenty years of experience with the agency,[63] and, according to GDOC's corporate representatives, actual suicide attempts are far more common than "fakes."[64] Thus, even Defendants' expert, a former warden at California's San Quentin prison, testified if the officers "just walked" and "delayed a significant period of time" that would be "inappropriate"[65] – as the evidence in the light most favorable to the Plaintiff shows.

---

[57] *Id.*, at 2:13.

[58] Ex. 1, Autopsy of R. Tavera, p. 4, Appx. 7; Ex. 8, Decl. of Spangler, p. 2, Appx. 30.

[59] Ex. 22, Deposition of Calhoun, 9:20-24, Appx. 179; Ex. 29, Deposition of Haas, 58:4-59:5, Appx. 425-426.

[60] Ex. 10, Declaration of Warden Ron McAndrew (Ret.), p. 8, Appx. 43.

[61] Ex. 25, Deposition of GDOC (through K. Campbell), 113:6-10, Appx. 268.

[62] Ex. 23, Deposition of Dickson, 36:11-18, 44:12-45:4, Appx. 208, 210-211.

[63] Ex. 26, Deposition of GDOC (through J. Jackson), 105:5-22 & 23:18-20, Appx. 325, 299.

[64] *Id.*, 24:6-8, Appx. 300. *See also* Ex. 28, Deposition of GDOC (through R. Toole), 23:3-7, Appx. 364.

[65] Ex. 34, Deposition of Vasquez, 51:7-16, Appx. 567.

**B.**     ***Shelby and Dickson Violated GDOC and the Smith State Prison's Policies and Practices on Responding to Suicide Attempts***

Shelby and Dickson violated the written policies, and unwritten (but well-established) practices at the Smith State Prison by delaying rescuing Tavera.

*1.     GDOC's Written Standard Operating Procedures*

GDOC's corporate representative testified the Standard Operating Procedure on "Physical Health: Suicide Prevention and Management of Potentially Suicidal" inmates applied at the Smith State Prison.[66] The policy commands that:

> When an inmate … is discovered hanging … staff will **immediately** initiate appropriate first aid measures including … cutting the apparatus that is choking the inmate, initiating CPR and calling for assistance.[67]

GDOC also testified another, similar policy applied at the prison in situations where there was an ongoing suicide attempt.[68] In such cases, the policy required:

> When an inmate … is discovered hanging … **staff will immediately initiate appropriate first-aid measures**. … If any apparatus is choking the inmate … staff will immediately remove such apparatus. … In the even that any inmate … is found hanging, the correctional officer will call for backup by radio … and then **immediately cut down the hanging inmate** … and initiate CPR procedures.[69]

---

[66] *See* Ex. 36, GDOC Standard Operating Procedure, Physical Health: Suicide Prevention and Management of the Potentially Suicidal Inmate, p. 1, Appx. 604 ("Applicability: The policy is applicable to all State and County Prisons…"); Ex. 26, Deposition of GDOC (through J. Jackson), 49:8-19, 54:23-56:9, & Ex. 4 to Deposition of Jackson, Appx. 308, 313-315, 327-331; Ex. 35, Deposition of Williams, 65:17-66:8 & Ex. 5, Appx. 588-589, 596-602; Ex. 29, Deposition of Haas, 74:12-24, 75:11-22, & Ex. 2, Appx. 432-433, 447-451.

[67] Ex. 36, GDOC Standard Operating Procedure, Physical Health: Suicide Prevention and Management of the Potentially Suicidal Inmate, pp. 4-5, Appx. 607-608 (emphasis added).

[68] Ex. 37, GDOC Standard Operating Procedure, Mental Health: Suicide Prevention and Management of the Potentially Suicidal Inmate, p. 12, Appx. 621; Ex. 26, Deposition of GDOC (through J. Jackson), 50:12-51:2, 52:1-6, 53:3-10 & Ex. 5 to Deposition of Jackson, Appx. 309-312, 332-344.

[69] Ex. 37, GDOC Standard Operating Procedure, Mental Health: Suicide Prevention and Management of the Potentially Suicidal Inmate, p. 12, Appx. 621 (emphasis added).

Thus, Shelby and Dickson both agreed the written policy at Smith State Prison required them to "immediately" cut down a hanging inmate – "when he begins hanging … [we've] got to go in and help."[70] GDOC's corporate representative testified there was no contrary written policy requiring officers to wait for additional backup before rescuing a dying inmate.[71] Even for inmates in solitary confinement, there is no written policy requiring two officers (much less three or four) be present before beginning a suicide rescue.[72]

GDOC's representative testified reasonable officers must follow written policies at all times.[73] Dickson and Shelby agreed reasonable officers follow written prison policies "100 times out of 100."[74] Plaintiff's corrections expert, the former warden of the Florida State Prison and Orange County (Florida) Jail, agrees the policy is a reasonable practice to prevent suicides – the procedure is "reasonable and appropriate," and "any officer who fails to follow this policy … is acting unreasonably."[75]

---

Though Defendants argue that this policy did not apply at the Smith State Prison as the prison was not a designated "mental health unit," the policy actually specifically addresses procedures for providing mental health care to prisoners at "non mental health units." *See id.*, p. 4, Appx. 613.

[70] Ex. 33, Deposition of Shelby, 71:22-73:17, Appx. 547-549; Ex. 23, Deposition of Dickson, 83:12-85:25, Appx. 220-222.

[71] Ex. 26, Deposition of GDOC (through J. Jackson), 60:3-10, Appx. 316. *See also* Ex. 33, Deposition of Shelby, 15:13-16:4, Appx. 539-540.

[72] Ex. 25, Deposition of GDOC (through K. Campbell), 35:9-16, Appx. 256.

[73] Id., 23:11-14, Appx. 250; Ex. 35, Deposition of Williams, 23:1-4, Appx. 581. *See also* Ex. 29, Deposition of Haas, 15:11-14, Appx. 411; Ex. 33, Deposition of Shelby, 14:20-15:2, Appx. 538-539.

[74] Ex. 23, Deposition of Dickson, 82:13-16, Appx. 219; Ex. 33, Deposition of Shelby, 112:4-9, Appx. 554.

[75] Ex. 10, Declaration of McAndrew, p. 8, Appx. 43.

2. *Smith State Prison's Written Post Orders*

The written "post orders" – detailed instructions for officers prepared by the warden[76] – also allowed Shelby (and, by extension, Dickson) to initiate a rescue as soon as they arrived (and for Shelby, certainly after Haas joined him and Calhoun).

The post order for solitary confinement at the Smith State prison required just "two (2) officers must be present in the celldoor" before it could be opened.[77] GDOC's corporate representative agreed only two officers were required before entering a cell.[78]

Notably, however, if there is a conflict between the post order and a "standard operating procedure" (*see supra* at pp. 10-11, § II(B)(1)), GDOC officers are still required to follow the "standard operating procedure"[79] – which here required "immediately cut[ting] down the hanging inmate."[80]

3. *Smith State Prison's Unwritten Practices*

The unwritten, but well-established, practice at the Smith State Prison also allowed Shelby, Calhoun, and Haas (and certainly later, Dickson) to enter the cell. The officers testified three officers could enter a cell, provided one was a supervisor (like Shelby, and later Dickson).[81] Haas testified a supervisor was not actually required.[82]

---

[76] Ex. 25, Deposition of GDOC (through K. Campbell), 25:22-26:1, Appx. 252-253; Ex. 35, Deposition of Williams, 72:12-22, Appx. 593. The post orders are designed "communicat[e] policy to line staff" to "assure compliance with the laws, court orders, policies and standards applicable to specific institutions." Ex. 41, Smith State Prison Post Orders: Disciplinary and Transient Housing, p. 1, Appx. 649.

[77] Ex. 41, Smith State Prison Post Orders: Disciplinary and Transient Housing, p. 9, Appx. 657.

[78] *See also* Ex. 28, Deposition of GDOC (through R. Toole), 99:12-21, Appx. 371.

[79] Ex. 25, Deposition of GDOC (through K. Campbell), 24:19-23, Appx. 251.

[80] Ex. 37, GDOC Standard Operating Procedure, Mental Health: Suicide Prevention and Management of the Potentially Suicidal Inmate, p. 12, Appx. 621 (emphasis added).

[81] Ex. 29, Deposition of Haas, 78:12-23, Appx. 434. *See also* Doc. 95.8.

[82] Ex. 29, Deposition of Haas, 70:10-15, Appx. 429.

The prison's warden, Stanley Williams, however, testified a mere two officers could enter a cell during a suicide attempt to "get that person to safety."[83] After his retirement from GDOC, Williams now operates a Georgia county jail, where the practice is also that two officers can enter a cell to stop a suicide attempt.[84]

### III. ARGUMENT AND AUTHORITIES – MATERIAL FACT DISPUTES PRECLUDE SUMMARY JUDGMENT

#### A. Standard of Review

Summary judgment is authorized only when "there are no genuine issue[s] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citing FED. R. CIV. P. 56(c)). In deciding a motion for summary judgment, a court must "accept Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." *Bozeman v. Orum*, 422 F.3d 1265, 1267 (11th Cir. 2005). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Stewart*, 232 F.3d at 848. Thus, "all reasonable doubts about the facts" must be resolved in Plaintiff's favor. *Id.*

#### B. Disputed Material Facts

1. Did Shelby and Dickson know they were called to respond to a suicide attempt in progress?

2. Did Shelby and Dickson run to respond to the emergency?

3. Was Dickson required to obtain video cameras and pepper spray while responding to a suicide attempt?

4. Was Tavera a danger to the officers when they observed him "dangling" from a "tight" noose, and turning purple?

---

[83] Ex. 35, Deposition of Williams, 69:20-70:5, Appx. 590-591.
[84] *Id.*, at 108:5-21, Appx. 594.

5. Did Shelby and Dickson subjectively believe that Tavera was actually hanging (rather than "faking")?

6. Did written GDOC policies require Shelby and Dickson to "immediately" "cut down" Tavera?

7. Did the written post orders allow Shelby and Dickson to rescue Tavera when two officers were present?

8. Did the unwritten practice of the Smith State Prison allow Shelby and Dickson to rescue Tavera when three officers were present?

9. Were four officers necessary to enter the cell, when Dickson assigned two officers to video record the cell entry?

### C.    *Shelby and Dickson were Deliberately Indifferent*

"A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." *Marsh v. Butler Co., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001). To demonstrate deliberate indifference, a plaintiff must show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). "Acting with deliberate indifference to a serious medical need is a separate claim from acting with deliberate indifference to a known risk of suicide." *Jackson v. West*, 787 F.3d 1345, 1358 (11th Cir. 2015). Plaintiff alleges that Shelby and Dickson ignored the serious medical need of impending death from asphyxiation during Tavera's suicide attempt. "[S]erious-medical-need claims have to do with the length of delay in providing medical attention depending on the nature of the medical need and the reason for the delay." *Id*. (internal citations omitted).

Here, there is no reasonable dispute Shelby and Dickson knew of a "substantial risk of serious harm" to Tavera. Imminent asphyxiation – where one's "breathing [is]

impaired and [one] bec[omes] unconscious" – is obviously a "substantial risk of serious harm." *See*, *e.g.*, *Bozeman*, 422 F.3d at 1272. A jury could infer Shelby and Dickson quickly knew Tavera was attempting suicide by hanging from the radio calls, and that Tavera would die in a matter of minutes if they did not intervene "as fast as [they] possibly can."[85] Though Shelby and Dickson appear to dispute their initial subjective knowledge of the severity of Tavera's plight due to purportedly "garbled" radio transmissions (Doc. 95.1, p. 3), that is, at best, a material fact dispute. A jury could certainly believe they heard "attempted suicide" and "hanging" on the radio – Off. Haas (who was located near Sgt. Shelby) heard a "frantic" report of "attempted suicide" on his radio, Off. Roach heard "inmate hanging himself" on hers, and even Shelby and Dickson's contemporaneous written reports state they heard "attempted suicide"[86] and "hanging."[87]

Likewise, a jury could conclude Shelby and Dickson knew Tavera was actually on the verge of death, and not "faking," when they arrived at the cell. The noose was "tight," and Tavera's body was "dangling" and turning purple. A jury could certainly disbelieve Shelby's claim he "did not see Tavera hanging" (as the video of the entry shows otherwise), and Shelby's contemporaneous report reads "I looked through the cell window and I saw [Tavera] … hanging from the sprinkler knob."[88] As Calhoun[89] and

---

[85] Ex. 23, Deposition of Dickson, 53:5-8 & 54:14-20, Appx. 216-217.

[86] Ex. 2, Incident Report, Death of R. Tavera, p. 4, Appx. 12; Ex. 5, Sworn Statement of Shelby, Appx. 18; Ex. 33, Deposition of Shelby, 31:2 & 31:11-16, Appx. 542.

[87] Ex. 23, Deposition of Dickson, 17:12-18, Appx. 207 & Ex. 2, Incident Report, Death of R. Tavera, p. 1, Appx. 9; Ex. 4, Sworn Statement of Dickson, Appx. 16.

[88] Ex. 18, Handheld Video #1, Appx. 144 & Ex. 2, Incident Report, Death of R. Tavera, p. 4, Appx. 12.

[89] Ex. 22, Deposition of Calhoun, 53:17-22, Appx. 186.

Haas[90] believed the attempt was genuine, a reasonable jury could believe Shelby and Dickson did too. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

Likewise, there is a fact issue as to whether Shelby and Dickson's response was unreasonable. First, Defendants' expert agreed that it is "off the charts unreasonable" for two supervisors to take four to five minutes to respond to a reported ongoing suicide attempt.[91] Though both officers testified they were obligated to "run" as fast as they could to the scene, there is significant evidence that did not happen. Most importantly, the surveillance video shows Shelby and Dickson moving at a far slower pace.[92] Likewise, Plaintiff's 81-year-old expert walked the relevant distances twice as fast as Shelby and Dickson allegedly ran – and her 40-year-old counsel jogged the distances in a fraction of the time Shelby and Dickson took. GDOC's fitness standards required supervisors – like Shelby and Dickson – must be able to run a mile in sixteen minutes.[93] At a sixteen-minute-mile pace, Shelby should have arrived at Tavera's cell in 73 seconds and Dickson in 128 seconds – as compared to the approximately five and six minutes it actually took them.[94] A jury could conclude the officers were dawdling slower than an

---

[90] Ex. 29, Deposition of Haas, 68:22-25, Appx. 427.

[91] Ex. 34, Deposition of Vasquez, 128:4-8 & 129:4-13, Appx. 574-575; Ex. 33, Deposition of Shelby, 31:19-24 & 48:1-5, Appx. 542, 544.

[92] *See* Ex. 17, Surveillance Video, Appx. 143 at 21:53:59 (Shelby arrives) & 21:54:57 (Dickson arrives).

[93] Ex. 25, Deposition of GDOC (through K. Campbell), 114:13-21, Appx. 269.

[94] One miles per sixteen minute equals 5,280 feet every 16 x 60 seconds, or 5,280 feet in 960 seconds. 5,280 divided by 960 is 5.5, meaning that a sixteen-minute-mile pace is equal to a speed of 5.5 feet per second. Shelby was, at most, 400 feet from the cell. 400 feet divided by 5.5 feet per second equals 72.73 seconds that Shelby should have taken to

81-year-old man, and certainly not running "as fast as they can." Anything less was unreasonable.

A jury could also conclude it was unreasonable for Dickson to stop for the pepper spray and video cameras along the way, delaying his arrival time. Each officer at the scene already had pepper spray – obtaining an additional canister served no point,[95] and, officers were not required to obtain more pepper spray to respond to a suicide attempt.[96] Likewise, the video cameras added nothing to a rescue. GDOC's representative testified that, to the contrary, officers do not need – and are not trained they needed – to obtain video cameras before responding to a suicide.[97] Preserving human life is simply more important than documenting events (though Dickson disagreed).[98]

Moreover, when Shelby actually finally arrived, his response was indifferent and unreasonable. Once Shelby entered the cellblock, two officers – him and Calhoun – were present. Even ignoring the written standard operating procedure that required officers to "immediately" rescue a hanging inmate, the generic post orders allowed just two officers to enter an inmate's cell.[99] Given that Tavera was "dangling" from a "tight" noose, turning purple, in solitary confinement only "pending investigation," and substantially smaller than both Calhoun and Shelby, there would be little risk to the two officers armed with pepper spray in entering the cell.[100] Indeed, during other suicide attempts at the

---

arrive. Dickson was about 700 feet from the cell. 700 feet divided by 5.5 feet per second equals 127.273 seconds that Dickson should have taken to arrive.

[95] *See* Ex. 11, Declaration of McAndrew, p. 3, Appx. 38.

[96] *See* Ex. 25, Deposition of GDOC (through K. Campbell), 114:7-12, Appx. 269.

[97] *Id.*, at 112:2-8 & 113:1-10, Appx. 267-268.

[98] Ex. 23, Deposition of Dickson, 55:4-20, Appx. 218.

[99] Ex. 41, Smith State Prison Post Orders: Disciplinary and Transient Housing, p. 9, Appx. 657.

[100] *See* Ex. 10, Declaration of McAndrew, p. 8, Appx. 43.

prison, two officers often intervened to save hanging prisoners – and did so even in riskier situations in solitary confinement (such as where the hanging inmate had a cellmate, or was a gang member).[101] Tellingly, Defendants' expert, and even Warden Williams, agreed two officers was a sufficient number here.[102]

And just nineteen seconds after Shelby arrived, Off. Haas followed him onto the scene, but the celldoor still remained shut. GDOC's representative testified that three officers are certainly permitted to enter a cell during a suicide attempt – as was the unwritten practice at the prison. Even Haas agreed when "you've got three officers on one prisoner," "that's about as safe as you are going to get."[103] Unsurprisingly, three

---

[101] *See*, *e.g.*, Ex. 43, Smith State Prison Suicide Attempt Incident Reports (2009-2015), p. 170-172, Appx. 834-836 (Attempted Suicide G.R., 4/25/12) (two officers open shower to save inmate G.R. beginning suicide attempt in solitary confinement) & Ex. 28, Deposition of GDOC (through R. Toole), 157:21-158:6 & Ex. 4, Appx. 381-383, 398-400 (rescue of G.R. reasonable); Ex. 43, Smith State Prison Suicide Attempt Incident Reports (2009-2015), p. 44-45, Appx. 708-709 (Attempted Suicide H.W., 3/26/10) (inmate H.W. found in solitary confinement "sitting on the floor with a state sheet tied around his neck [with] the other end … tied around the window flap", two officers remove H.W. from cell, despite H.W. being "disruptive and combative"); Id., p. 90-91, Appx. 754-755 (Attempted Suicide J.T., 11/28/10) (Inmate J.T. found "with a sheet tied around his neck attempting to tie the other end … around the window flap." J.T. stated "I'm tired and I'm going to hang myself," two officers enter to rescue) & Ex. 28, Deposition of GDOC (through R. Toole), 154:9-155:2 & Ex. 3, Appx. 379-380, 395-397 (response to J.T.'s suicide attempt reasonable); Ex. 43, Suicide Incident Reports, p. 95-96, Appx. 759-760 (Attempted Suicide C.B., 9/17/10) (in solitary confinement, inmate C.B. found "with one end of a shoestring attached to the sprinkler head and the other end … attached to a sheet tied around his neck attempting to hang himself," two officers enter despite presence of two inmates); Id., p. 157-58, Appx. 821-822 (Attempted Suicide L.C., 3/6/11) (in solitary, inmate L.C. found "with one end of a sheet tied around the bed post and the other end tied around his neck while sitting on the floor", cellmate unties the sheet, two officers enter despite presence of two inmates).

[102] Ex. 34, Deposition of Vasquez, 40:15-41:2, Appx. 565-566 & Ex. 35, Deposition of Williams, 71:9-24, Appx. 592.

[103] Ex. 29, Deposition of Haas, 70:16-20, Appx. 429.

officers had also saved hanging prisoners at the prison on prior occasions.[104] Indeed, the next year, Shelby entered a cell with the help of just two other officers to save a dying inmate – even though that hanging inmate had a cellmate, and both inmates were violent gang members.[105] Thus, even Haas was "not sure" why Shelby refused to rescue Tavera with three officers present.[106] Haas testified that if it was his decision, he would have entered the cell to save Tavera as soon as he arrived.[107]

Of course, upon Dickson's arrival, four officers were assembled to rescue Tavera. But Tavera's cell door still remained shut for almost another minute. Though a portion of this delay is due to Calhoun's negligence in obtaining the wrong key, *at least* thirty seconds recorded on the video (and likely more that were not) elapsed from when Dickson arrived and when he orders "open her up."[108]

---

[104] Ex. 43, Smith State Prison Suicide Attempt Incident Reports (2009-2015), p. 55-57, Appx. 720-722 (Attempted Suicide J.B., 2/15/10) (in solitary, inmate J.G. "observed … with a sheet tied around his neck in a knot and the other end … attached to the top rail of his bed" while "bent at the knees bringing his body weight down on the sheet causing the sheet to become tighter around his neck," three officers enter to rescue); Ex. 43, Id., p. 186-87, Appx. 848-849 (Attempted Suicide T.O., 6/25/14) (in solitary, inmate T.O. found with "sheet wrapped around his neck with the other end … tied to the light fixture", though T.O. was "agitated and making verbal threats", three officers enter the cell: "warden's comments: incident handled appropriately").

[105] Id., p. 312-15, Appx. 976-979 (Attempted Suicide J.B., 8/11/15) (inmate J.B. discovered with "homemade noose" around his neck, despite cellmate's presence, three officers enter to "untie[]" the noose – "warden's comments: staff action appropriate") & Ex. 28, Deposition of GDOC (through R. Toole), 159:14-161:10 & Ex. 5, Appx. 383-385, 401-404 (appropriate for three officers to enter cell).

[106] Ex. 29, Deposition of Haas, 69:16-22, Appx. 428.

[107] Id., at 71:24-72:15, Appx. 430-431.

[108] See Ex. 18, Handheld Video #1, Appx. 144 at 0:30. It is unclear how long after Dickson arrived that the camera was activated, but a minute and eleven seconds elapse from when Dickson arrives on the surveillance video to when the cell door opens. See Ex. 17, Surveillance Video, Appx. 143 at 21:54:57-21:56:08. At 21:55:42, Calhoun leaves the scene to obtain the correct key, returning at 21:56:01 – a delay of nineteen seconds. The cell door opens at 21:56:08.

Eleventh Circuit precedent with very similar facts holds officers cannot stand back and wait while a prisoner asphyxiates. In *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005), the Circuit affirmed denying qualified immunity to correctional officers when they intentionally delayed in checking an inmate's condition, calling for medical assistance, administering CPR, or doing "anything else to help" after a prisoner became unconscious and stopped breathing. "A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *Id*. In *Bozeman*, officers used excessive force on a severely mentally-ill inmate, holding his head "face down on the bed … impairing [his] ability to breathe." *Id.* at 1270.[109] As a result, the inmate was "carried from his cell," "unconscious," and "appeared to be lifeless." *Id*. at 1269-70. After several minutes, the officers finally summoned a nurse who immediately began CPR. *Id*. at 1270. "[A]sphyxia was the cause of death." *Id*. Under these facts, "the trier of fact may infer deliberate indifference" from the officers' purposeful delay. *Id*. at 1273. Here, where the written "standard operating procedure" commanded a single officer to "immediately" enter the cell, the "post order" allowed two officers to enter the cell, and the unwritten practice permitted three officers to enter the cell, a jury could conclude Shelby and Dickson were deliberately indifferent to Tavera's rapidly impending death.

Other Circuits have denied summary judgment to officers confronted with similar facts. *Heflin v. Stewart Cnty., Tenn.*, 958 F.2d 709, 711 (6th Cir. 1992) (denying qualified

---

[109] While *Bozeman* is not a suicide case, the Eleventh Circuit has long specifically noted "jail suicides are analogous to failure to provide medical care" – the allegation in *Bozeman*. *Popham v. City of Talladega, Ala.*, 908 F.2d 1561, 1563 (11th Cir. 1990). And, like *Bozeman*, the true allegation here is that Shelby and Dickson denied Tavera emergency medical care while they knew he was asphyxiating.

immunity to single officer who entered cell, but left body hanging); *Ellis v. Washington Cnty., Tenn.*, 198 F.3d 225, 228 (6th Cir. 1999) (denying summary judgment to officer who saw prisoner tie noose, but failed to begin a rescue); *Estate of Miller v. Tobiasz*, 680 F.3d 984, 991 (7th Cir. 2012) (denying motion to dismiss where officers "waited to assemble an entry team" before removing ligature on inmate's neck); *Olson v. Bloomberg*, 339 F.3d 730, 734 (8th Cir. 2003) (denying summary judgment to officer who found inmate preparing a noose, then left to summon additional officers); *Lemire v. Calif. Dep't of Corr. & Rehab.*, 726 F.3d 1026, 1082 (9th Cir. 2013) (denying summary judgment to officers who "waited five minutes" after finding inmate hanging before providing assistance). The companion Texas case, on the other hand, where the Fifth Circuit affirmed entry of summary judgment for Calhoun, is readily distinguishable from the facts here. The Fifth Circuit's decision turns on the judgment that "entering the [cell] *alone* would have jeopardized Calhoun's personal safety," due to the "one-on-one" dynamic no longer present once Shelby (then Haas, then Dickson) arrived. *See Arenas v. Calhoun*, 922 F.3d 616, 621-22 (5th Cir. 2019) ("Calhoun acted reasonably in refusing to enter the segregation [cell] *alone*") (emphasis added). Indeed, the Fifth Circuit noted that, "Once Shelby appeared, Calhoun properly deferred to the supervising officer to direct when it was safe to open the door." *Id*. at 625.

District courts in the Eleventh Circuit have also found conduct virtually identical to Shelby and Dickson's violates inmates' constitutional rights. In *Wallace v. Jackson*, 667 F.Supp.2d 1267, 1274 (M.D. Ala. 2009), an officer found an inmate hanging in his cell – and failed to "check his condition, call for medical assistance, administer CPR or do anything else to help" despite knowing the inmate had been seen alive less than four

minutes earlier. This conduct "disregarded the risk facing [the inmate] in a way that exceeded gross negligence." *Id*. (citing *Bozeman*, 422 F.3d at 1273). *See also Herin v. Treon*, 459 F.Supp.2d 525, 540 (N.D. Tex. 2006) (denying summary judgment to officers who "refus[ed] to enter his cell immediately to save him … when [the prisoner's] life-threatening situation became apparent").

The Eleventh Circuit has denied summary judgment to jailers whose conduct was far less egregious, and far more tenuously connected to a suicidal inmate's death. In *Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1270 (11th Cir. 2005), a jailer who "did not communicate any information regarding his belief that [the inmate] was suicidal to anyone else at the jail" before leaving at the end of his shift failed to act reasonably. *See also Allen v. Freeman*, No. CV-110-022, 2013 WL 3356040, *12 (S.D. Ga. July 3, 2013) (officers failed to confiscate bedsheet inmate was "tying … around the shower door support bar," later used in suicide); *Murphy v. Allen*, No. 6:18-cv-81, 2019 WL 4694992, *5 (S.D. Ga. Aug. 22, 2019) (denying motion to dismiss where prisoner alleged he cut his arm, told officer he was going to commit suicide, and officers did not respond timely); *Anderson v. Lee Cnty., Ala.*, No. 3:08-cv-1022-WKW, 2010 WL 550995, *5 (M.D. Ala. Feb. 11, 2010) (denying qualified immunity motion to dismiss to officers who unduly delayed during inmate's suicide attempt, despite other prisoners calling for help); *Johnson v. Conner*, No. 2:12cv392-WHA, 2012 WL 3962012, *8 (N.D. Ala. Sept. 10, 2012) (denying qualified immunity motion to dismiss to officer who "placed [inmate] in a cell by himself, in a cell that was difficult to monitor, with bed linens, and without being regularly given his medication").

**D.      Shelby and Dickson are Not Entitled to Qualified Immunity**

Qualified immunity does not protect governmental employees when "the officials violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McBride v. Houston County Health Care Author.*, 658 Fed. Appx. 991, 996 (11th Cir. Sept. 30, 2016). Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. ____, 136 S.Ct. 305, slip op. at 5 (2015). To overcome qualified immunity, the plaintiff need only show "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *McBride*, 658 Fed. Appx. at 996. Because Tavara's rights to access medical care and be protected from suicide were clearly established, Shelby, Dickson, and Williams are not entitled to qualified immunity.

In the Eleventh Circuit, constitutional rights are "clearly established" by a decision of the Supreme Court, Eleventh Circuit, or the highest court of the state where the injury occurred. *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009). A "robust consensus" of other authority can also "clearly establish" a constitutional right. *See Plumhoff v. Rickard*, 572 U.S. 765, 780 (11th Cir. 2014). *See also Glasscox v. Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018). Prior cases "need not be 'materially similar' to the present circumstances so long as the right is 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Amnesty Int'l*, 559 F.3d at 1184 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "A prior case wherein the very action in question has previously been held unlawful" is unnecessary. *Id*. Prior caselaw need only provide officers "fair warning" their conduct is illegal. *Id*.

Inmates have a clearly established right to be "protected from self-inflicted injuries, including suicide." *Belcher*, 30 F.3d at 1396. "Prison guards who display deliberate indifference to the serious medical and psychiatric needs of a prisoner, or deliberate indifference to a strong likelihood that a prisoner will take his own life" violate inmates' clearly established rights. *Belcher*, 30 F.3d at 1396. "Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir. 1990). Though deliberate indifference requires more than negligence, the standard does not require "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

The Eleventh Circuit has reversed denial of summary judgment against a jailer where "a jury could find that [the jailer] subjectively believed that there was a strong risk that [the inmate] would attempt suicide and deliberately did not take any action to prevent [the inmate's] suicide." *Snow*, 420 F.3d at 1270. In applying the qualified immunity analysis, the Eleventh Circuit held that "it was clearly established that an officer's deliberate indifference to the risk of serious harm to a detainee is a violation" of the prisoner's constitutional rights. *Id*.

Though there is no Eleventh Circuit case dealing directly with a suicide in progress, the Circuit's many opinions discussing suicide prevention generally, and the *Bozeman* opinion discussing the need for immediate care when an inmate has "asphyxiated," provided ample warning to the Defendants their conduct was unlawful. *See, e.g.*, *Greason*, 891 F.2d at 836; *Bozeman*, 422 F.3d at 1274. With this "stark and

simple" fact pattern – officers knowing an inmate has stopped breathing and has asphyxiated and needs immediate medical care – officers are not entitled to qualified immunity. *Bozeman*, 422 F.3d at 1274. "General statements" of the law can provide "fair and clear warning" to officials when "in light of the pre-existing law the unlawfulness [of the conduct] is apparent." *White v. Pauly*, 580 U.S. ____, 2017 WL 69170, slip op. at 7 (2017). "A core principle of our Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *Benson v. Gordon County, Ga.*, 479 Fed. Appx. 315, 318 (11th Cir. 2012) (denying qualified immunity to jail nurse). *See also supra* at p. 22.

By delaying Tavera's rescue, when a jury could determine he was obviously hanging and nearing death, Shelby and Dickson violated Tavera's clearly established constitutional rights. They are not entitled to the protection of immunity.

## IV. CONCLUSION

Shelby and Dickson's motion for summary judgment should be denied.

Date: October 11, 2019.

Edwards Law
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
Tel.    512-623-7727
Fax.    512-623-7729

By: /s/ Jeff Edwards____.
JEFF EDWARDS
TX State Bar No. 24014406
*Admitted Pro Hac Vice*
Scott Medlock
TX State Bar No. 24044783
*Admitted Pro Hac Vice*

Carter Franklin. LLP
Post Office Box 27
Metter, Georgia 30439
brent@carterfranklin.com
Tel.    912-685-5500
Fax.    912-685-5030

 /s/ Brent Carter____.
BRENT CARTER
State Bar No.: 153082


ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing all attorneys of record.

*/s/ Scott Medlock*_____
Scott Medlock