IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| MARIA ARENAS, Individually and in her capacity as heir of and representative of the Estate of RICHARD TAVERA,<br>                              Plaintiff,<br><br>v.<br><br>GEORGIA DEPARTMENT OF CORRECTIONS, GEORGIA CORRECTIONAL HEALTH CARE and MARK SHELBY, STANLEY WILLIAMS, and MARVIN DICKSON in their individual capacities.<br><br>                              Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.:<br>4:16-cv-00320 |

## PLAINTIFF'S RESPONSE TO DEFENDANTS GEORGIA DEPARTMENT OF CORRECTIONS AND GEORGIA CORRECTIONAL HEALTH CARE'S MOTIONS FOR SUMMARY JUDGMENT

Defendants Georgia Department of Corrections (GDOC) and Georgia Correctional Health Care's (GCHC) motions for summary judgment should be denied.

### I.    SUMMARY OF THE RESPONSE

Plaintiff's evidence satisfies the elements of her Georgia Tort Claims Act and Americans with Disabilities Act/Rehabilitation Act claims. The evidence shows GDOC and GCHC provided her son medical attention below the standard of care and denied him disability accommodations, proximately causing his death. Indeed, Defendants' motion does not even address several theories of GTCA liability, requiring the motion be denied.

Rather than negate the merits of Plaintiff's claims, Defendants' motion urges summary judgment due to three technicalities – none of which have any merit.

First, because the evidence is overwhelming that the psychologist who misdiagnosed Plaintiff's son failed to comply with the standard of care, GDOC instead argues it is not responsible for his malpractice because he is an "independent contractor," not GDOC's "employee." But the evidence demonstrates that GDOC strictly controlled the psychologist's evaluation, and even required him to work under conditions that contributed to the malpractice. Under Georgia law, these facts would preclude summary judgment and allow a jury to find the psychologist was an "employee" for whom immunity is waived.

Second, rather than argue GCHC's doctor and nurse satisfied the standard of care when they failed to properly evaluate the symptoms Plaintiff's son was suffering the day before his suicide death, GCHC simply asserts that Plaintiff's eminently qualified expert cannot testify to the standard of care. But even if this were true (though it is not), GCHC and GDOC's physician corporate representatives both testified the doctor and nurse performed below the standard of care – evidence that overcomes summary judgment.

Finally, Defendants do not contest  - because they cannot – that Plaintiff's evidence satisfies all the elements of her Title II ADA/Rehabilitation Act claims. Instead, Defendants attempt to add another element that is unsupported by the text of the statute, the facts of this case, and the law. Title II, unlike Title I (the Act's employment provisions), does not require a plaintiff to request an accommodation – it merely requires the agency know of the plaintiff's disability. But even if Defendants were correct, the record here shows at least *three* instances where Plaintiff's son requested accommodations and was denied. Thus, even if Defendants were right about what the statutes require (though they are not), fact disputes still prevent summary judgment.

Thus, Defendants' summary judgment motions should be denied.

## II. FACTS – DEFENDANTS MISDIAGNOSED TAVERA, FAILED TO ACCOMMODATE HIS DISABILITIES, AND CAUSED HIS SUICIDE DEATH

As a result of Defendants' malpractice and disability discrimination, Plaintiff's son, Richard Tavera, tragically died by suicide while imprisoned in GDOC custody. Despite a lengthy history of bipolar disorder and suicide attempts, GDOC's psychologist, Raymond Oliga, ignored Tavera's condition and improperly classified him as having no mental illness. As a result, GDOC assigned Tavera to Smith State Prison – where GDOC did not provide *any accommodations at all* to mentally ill inmates. Then, on the day before his death, GCHC, the prison's medical provider, failed to screen Tavera for suicide risk before GDOC assigned him to a solitary confinement cell – despite the fact Defendants knew he was suffering an anxiety attack, knew of the high risk of suicide in solitary confinement, and knew of 41 suicide attempts at the prison (with 38 in solitary) occurring in the last five years. As a result, Tavera was placed in a cell that was patently unsafe for a patient with his history of serious mental illness and suicide attempts. The next day, he died of suicide.

### A. PRISONERS SUFFER HIGH RATES OF SUICIDE DEATH – ESPECIALLY IN SOLITARY CONFINEMENT

Prisoners suffer from suicide rates much higher than the general population.[1] Correctional officers are aware of an ever-present risk of suicide, and know they must be vigilant every day to protect the prisoners in their charge – suicide attempts occur on a

---

[1] Plaintiffs' Appendix is filed as Doc. 123. Ex. 26, Deposition of GDOC (through J. Jackson), 36:23-25, Appx. 306; Ex. 10, Declaration of Warden Ron McAndrew (ret.), p. 7, Appx. 42.

"regular basis" in prison.[2] Suicide is well-known as one of the leading causes of death for inmates, and has even tragically been "on the rise" in Georgia prisons.[3]

The Smith State Prison, in particular, suffers from a shocking number of suicide attempts – 41 in just the five years before Tavera's 2014 death, and another 21 attempts in 2015.[4] Even Defendants' expert, the former warden at California's San Quentin prison, testified this was a disturbingly "high" number of attempts.[5] Indeed, during his entire 36-year-career, he could only recall approximately ten suicide attempts.[6] GDOC's corporate representative acknowledged the obvious: forty suicide attempts in five years is "a lot of suicide attempts no matter how many years."[7]

This risk is even graver for people imprisoned in solitary confinement.[8] GDOC's own psychologist testified, "solitary confinement is a more dangerous environment as far as suicide."[9] In fact, at Smith State Prison, virtually all the suicide attempts – 38 of 41 – occurred in the solitary confinement cellblocks.[10] Despite this alarming pattern known to

---

[2] *See*, *e.g.*, Ex. 22, Deposition of Calhoun, 6:4-10 & 70:7-15, Appx. 178, 191; Ex. 33, Deposition of Shelby, 79:11-21, Appx. 550.

[3] *See*, *e.g.*, Ex. 31, Deposition of Oliga, 28:4-6 & 28:11-12, Appx. 477; Ex. 21, Deposition of Agharkar, 41:25-42:2, Appx. 160-161; Ex. 10, Decl. of McAndrew, p. 7, Appx. 42.

[4] Ex. 43, Smith State Prison Suicide Attempt Incident Reports (2009-2015), Appx. 664; Ex. 42, Summary of Smith State Prison Suicide Attempts, Appx. 660. *See also* Ex. 28, Deposition of GDOC (through R. Toole), 134:6-14, Appx. 374.

[5] Ex. 34, Deposition of Vasquez, 54:18-25, Appx. 568.

[6] *Id*. at 55:5-14, Appx. 569.

[7] Ex. 26, Deposition of GDOC (through J. Jackson), 77:15-19, Appx. 322.

[8] *See*, *e.g.*, Ex. 10, Declaration of McAndrew, p. 7, Appx. 42. *See also Davis v. Ayala*, 135 S.Ct. 2187, 2209 (2015) (Kennedy, J., concurring separately).

[9] Ex. 31, Deposition of Oliga, 34:18-21, Appx. 481. *See also* Ex. 23, Deposition of GDOC (through K. Campbell), 104:13-14, Appx. 265 ("Most of them are depressed in [solitary]"); Ex. 26, Deposition of GDOC (through J. Jackson), 68:24-69:21, Appx. 320-321.

[10] Ex. 28, Deposition of GDOC (through R. Toole), 135:3-25, Appx. 375; Ex. 10, Expert Declaration of McAndrew, p. 7, Appx. 42 & Ex. 43, Smith State Prison Suicide Attempt

GDOC and GCHC, the Defendants continued to recklessly place mentally-ill inmates in solitary confinement cells without any pre-segregation screening exam – an accommodation necessary to save the lives of inmates with mental disabilities.[11]

## B. TAVERA SUFFERED FROM BIPOLAR DISORDER CAUSING SUICIDE ATTEMPTS

Throughout his short 24 years of life, Tavera suffered from bipolar disorder. His mother, Plaintiff Maria Arenas, explained he would "often just stay in his room, refusing to talk with anyone. He often had trouble sleeping, had no appetite, and had trouble getting up to go to work. Sometimes his hygiene was poor and he would start to smell bad."[12] As a teenager, Tavera attempted suicide twice, and was hospitalized for a week to stabilize his mental illness.[13] He was diagnosed with bipolar disorder, and prescribed psychiatric medication.[14] As Dr. Shawn Agharkar, Plaintiff's expert psychiatrist, explained, "a typical Bipolar Disorder patient would have great difficulty functioning 'normally,'" and "Bipolar Disorder combined with past suicide attempts is a very serious mental disability."[15] Bipolar disorder is chronic, incurable, and requires treatment with

---

Incident Reports (2009-2015), Appx. 664. Buildings J and H are the solitary confinement cellblocks at Smith State Prison, where 38 of the 41 suicide attempts occurred. *See* Ex. 28, Deposition of GDOC (through R. Toole), 135:7-136:11, Appx. 375-376; Ex. 42, Summary of Smith State Prison Suicide Attempts, Appx. 660.

[11] *See also* Ex. 28, Deposition of GDOC (through R. Toole), 137:7-15, Appx. 377.

[12] Ex. 9, Declaration of M. Arenas, p. 1, Appx. 33.

[13] *See id.*, Appx. 33 & Ex. 38, Austin Travis County Mental Health Records (R. Tavera) (excerpts), pp. 10 & 45, Appx. 630, 632.

[14] *See* Ex. 9, Declaration of M. Arenas, p. 1, Appx. 33 & Ex. 38, Austin Travis County Mental Health Records (R. Tavera) (excerpts), pp. 8, 10, 33, 45, 69, 178, Appx. 629-634. *See also* Ex. 21, Deposition of Agharkar, 26:14-27:9, Appx. 153-154.

[15] Ex. 12, Declaration of Agharkar, p. 7, Appx. 59.

medication.[16] It is also linked to suicide risk.[17] Past suicide attempts place patients at even greater risk.[18]

### C. Oliga's Negligent Evaluation Violates the Standard of Care

GDOC divides its prisons into "mental health units" and "non-mental health units." Theoretically, prisoners with mental disabilities are sent to "Level II" "mental health units," while inmates without mental disabilities are in "non mental health units" ("Tier 1" prisons).[19] Though mental health units provide medication and psychotherapy, GDOC also trains and equips "mental health unit" officers to immediately respond to suicide attempts – accommodations absent from "non-mental health units." GDOC recognizes, however, that prisoners with mental disabilities are often still assigned to "non mental health units."[20]

GDOC took Tavera into custody at the Georgia Diagnostic and Classification Prison. During an initial meeting with a licensed mental health counselor, Tavera told her that he took psychiatric medications to treat his bipolar disorder, and had attempted suicide as a teenager.[21] This counselor recommended him for "outpatient services" at a

---

[16] Ex. 31, Deposition of Oliga, 49:18-23, Appx. 485; Ex. 26, Deposition of GDOC (through J. Jackson), 29:16-20, Appx. 302.

[17] Ex. 21, Deposition of Agharkar, 40:23-25, Appx. 159.

[18] Ex. 31, Deposition of Oliga, 30:23-31:10, Appx. 479-480.

[19] Ex. 26, Deposition of GDOC (through J. Jackson), 21:9-22:2, Appx. 297-298.

[20] *See* Ex. 25, Deposition of GDOC (through K. Campbell), 89:16-20 & 90:11-14, Appx. 261-262. *See also* Ex. 37, GDOC Standard Operating Procedures, "Mental Health – Managing Potentially Suicidal, Self-Injurious and Aggressive Behavior," p. 4, Appx. 613 (procedure "at non-mental health institutions" for identifying mentally-ill inmates).

[21] Ex. 14, GDOC, Mental Health Data Entry Worksheet (R. Tavera), pp. 2 and 7-8, Appx. 124, 129-130. *See also* Ex. 6, Case Notes: R. Tavera, pp 4-5, Appx. 23-24; Ex. 26, Deposition of GDOC (through J. Jackson), 26:11-17, Appx. 301.

"mental health unit."[22] GDOC's policies, however, also required a psychologist (here, Oliga) see the patient.[23]

Tavera again told Oliga about his bipolar disorder diagnosis, treatment with psychiatric medications, and history of multiple suicide attempts (including at least one week-long hospitalization).[24] Oliga knew Tavera was reporting current symptoms of bipolar disorder, including sleeping as few as two-to-three hours per night.[25] Despite all this, Oliga overruled the counselor, concluding Tavera did not have bipolar disorder, or any mental health problems. Thus, Oliga did not prescribe medication, psychotherapy, or assignment to a "mental health unit."[26] In violation of the standard of care, Oliga made these assessments without reviewing any of Tavera's prior medical records, or contacting any other sources – as Plaintiff's expert and even GDOC's representatives concede Oliga needed to in order to comply with the standard of care.[27] Based on Oliga's misdiagnosis, GDOC disregarded the counselor's recommendation, and assigned Tavera to a "Tier 1" prison, denying Tavera accommodations he needed for his mental disabilities.[28]

Per GDOC policy and practice, Oliga's assessment lasted only 20-25 minutes, and was just one of the 12-13 assessments GDOC required Oliga perform every day.[29] The standard of care for an assessment for bipolar disorder, however, is at least one hour, and

---

[22] *See* Ex. 14, GDOC, Mental Health Data Entry Worksheet (R. Tavera), p. 11, Appx. 133.
[23] *See id.*, at p. 3, Appx. 125; Ex. 31, Deposition of Oliga, 98:3-7, Appx. 498.
[24] Ex. 31, Deposition of Oliga, 52:8-11 & 54:22-55:10, Appx. 488, 490-491.
[25] *Id.*, 52:12-22 & 56:9-16, Appx. 488, 492; Ex. 14, GDOC, Mental Health Data Entry Worksheet (R. Tavera), p. 4, Appx. 126.
[26] *Id.*, pp. 1 & 4, Appx. 123, 126.
[27] Ex. 31, Deposition of Oliga, 52:23-53:21 & 53:22-54:10, Appx. 488-490; Ex. 26, Deposition of GDOC (through J. Jackson), 30:2-15, 31:4-8 & 31:17-20, Appx. 303-304. *See also* Ex. 12, Agharkar Declaration, p. 6, Appx. 58.
[28] *See* Ex. 26, Deposition of GDOC (through J. Jackson), 21:9-13, Appx. 297.
[29] Ex. 31, Deposition of Oliga, 39:11-24 & 41:7-12, Appx. 483-484.

requires additional follow-up evaluations.[30] Oliga testified that, due to GDOC practices, "We don't have an hour and a half to two hours to assess one inmate," and, as a result, he cannot actually assess a patient for any "personality disorder" (like bipolar disorder).[31] Oliga agreed that "[Tavera] very well might have [a personality disorder], but we can't make that determination on the 20 to 25 minutes we have."[32]

Plaintiff's expert testified this violates the standard of care because "persons with Bipolar Disorder live their lives mostly in depressive episodes rather than manic ones, and psychiatric symptoms wax and wane."[33] Thus, the standard of care to rule-out a reported diagnosis of bipolar disorder requires a thorough initial evaluation and several follow-up exams for the patient be seen periodically.[34] Even Oliga agreed bipolar disorder can "be in remission," and undetectable during one short evaluation – but GDOC had no policy to re-evaluate Tavera later (and Oliga never ordered one).[35]

The lack of a follow-up evaluation specifically denies accommodations to bipolar disorder patients, because the condition makes it unlikely they will seek treatment on their own – a hallmark of the disease is it is challenging to treat as patients rarely cooperate.[36]

---

[30] Ex. 21, Deposition of Agharkar, 46:9-22, Appx. 162. *See also* Ex. 12, Agharkar Declaration, p. 4, Appx. 56.
[31] Ex. 31, Deposition of Oliga, 57:12-23, Appx. 493.
[32] *Id*., at 57:25-58:3, Appx. 493-494.
[33] Ex. 12, Agharkar Declaration, p. 4, Appx. 56.
[34] *Id*., Appx. 56.
[35] Ex. 31, Deposition of Oliga, 51:12-13, Appx. 487. *See also* Ex. 27, Deposition of GDOC (through S. Lewis), 26:13-27:1, Appx. 351-352.
[36] *See* Ex. 12, Agharkar Declaration, p. 5, Appx. 57.

Due to Oliga's improper evaluation and GDOC's deficient policy, Tavera was not prescribed any medication, and not provided any other mental health treatment.[37] Tavera was instead assigned to a prison "not designed" for inmates with mental disabilities, where no accommodations or treatment were provided.[38] Officers testified, "we're not trained on mental health with inmates. None of the officers [here] are."[39] Dr. Agharkar was clear: had GDOC assigned Tavera to a "mental health unit" instead of a Tier 1 prison – where he was denied treatment of any kind – he would have lived.[40]

Even after Oliga misdiagnosed him, however, Tavera kept requesting treatment. Shortly after assignment to a "non mental health" prison, Tavera told a GDOC "general population counselor"[41] that he was diagnosed with bipolar disorder – but the "general population counselor" did not even refer Tavera for another evaluation.[42]

### D. NURSE PAULK AND DR. JEFFERSON ALSO VIOLATE THE STANDARD OF CARE AND PROXIMATELY CAUSE TAVERA'S DEATH

Thus, as of December 6, 2014, Tavera had not received any medication or other mental health treatment in almost two years.

That morning, Tavera was suffering chest pains, had his "arms and hands … drawn up into claws," and his "head was about to kill him."[43] A bodycamera recording –

---

[37] Ex. 27, Deposition of GDOC (through S. Lewis), 27:5-13, Appx. 352; Ex. 26, Deposition of GDOC (through J. Jackson), 29:11-15, Appx. 302.

[38] Ex. 23, Deposition of Dickson, 100:16-19, Appx. 224.

[39] *Id.*, at 95:2-3, Appx. 223.

[40] Ex. 12, Agharkar Declaration, p. 4-6, Appx. 56-58.

[41] Ex. 44, Deposition of GDOC (through J. Jackson) (addendum), 86:17-87:23, Appx. 981-82. In addition to the licensed mental health counselor who evaluated him at GDCP, Tavera periodically saw a "general population counselor" who functions as a caseworker at "non mental health" units. This "counselor" did not provide any mental health treatment to Tavera, and likely did not have any mental health credential. *Id.*

[42] Ex. 6, Case Notes, R. Tavera, pp. 5-6, Appx. 23-24.

[43] Ex. 15, "Record Review" for R. Tavera Suicide, p. 2, Appx. 136.

which was apparently lost or destroyed (*see* Doc. 85) – showed Tavera "clearly locked up and in pain from both the headache as well as the cramped muscles."[44] An officer needed a wheelchair to take Tavera to the prison's infirmary.[45]

In the infirmary, Tavera's muscles remained contracted, he complained of chest pains and that his head was "about to kill him," and said he took two unknown pills.[46]

As it was a Saturday morning, the only GCHC staff present in the infirmary was Frances Paulk, a licensed practical nurse.[47] As an LPN, Paulk's scope of practice was exceptionally limited – all her practice must be guided by a physician or registered nurse.[48] That morning, Paulk was supervised by an on-call doctor off-site, GCHC's Dr. Jefferson.[49] Paulk and Dr. Jefferson (over the phone) performed an EKG that was "borderline," but they performed no other assessment or treatments.[50] Tavera was not assessed for his headache,[51] nothing was done to determine if his chest pains were being caused by a mental health condition such as anxiety attacks (or any physical cause other than cardiac problems),[52] and nothing was done to address the two unknown pills he

---

[44] Ex. 15, "Record Review" for R. Tavera Suicide, p. 2, Appx. 136.

[45] Ex. 13, Tavera Medical Record, Dec. 6, 2014, p. 2, Appx. 66; Ex. 32, Deposition of Paulk, 21:4-6, Appx. 512.

[46] Ex. 15, "Record Review" for R. Tavera Suicide, pp. 1-2, Appx. 136-136; Ex. 13, Tavera Medical Record (Dec. 6, 2014), p. 2, Appx. 27; Ex. 32, Deposition of Paulk, 20:18-21 & 31:4-15, Appx. 511, 517.

[47] *See* Ex. 32, Deposition of Paulk, 11:2-6, Appx. 507.

[48] *See id.*, 11:7-12:20, Appx. 507.

[49] *See id.*, at 24:22-25:11 & 27:7-20, Appx. 513-515; Ex. 27, Deposition of GDOC (through S. Lewis), 45:4-7, Appx. 356.

[50] *See* Ex. 32, Deposition of Paulk, 28:14-22, Appx. 516.

[51] *See id.*, at 18:9-15, 18:25-19:4 & 24:22-25:16, Appx. 509-510, 513-514.

[52] Anxiety attacks can often manifest as "chest pains." *See* Ex. 26, Deposition of GDOC (through J. Jackson), 32:6-11, Appx. 305; Ex. 27 , Deposition of GDOC (through S. Lewis), 36:9-17, Appx. 353 ("could be" anxiety attack); Ex. 12, Agharkar Declaration, p. 3, Appx. 55 ("common symptom" of anxiety or panic attacks).

swallowed. Indeed, after the EKG, they did nothing to address Tavera's symptoms at all – though the symptoms continued.[53]

Paulk and Jefferson's assessment was below the standard of care, denied Tavera treatment he needed, and proximately caused his death.[54]

### E. GCHC AND GDOC FAIL TO SCREEN TAVERA FOR SUICIDE RISK

When the medical examination concluded, Tavera refused to return to his assigned dormitory. Tavera told officers it was a "Thunder Dorm" – a cellblock dominated by gang members.[55] Paulk described Tavera as "afraid or scared."[56]

As a result, the officers "cuffed [Tavera] and escorted [him] to the lockdown unit" – solitary confinement.[57] Despite his documented fear and anxiety, Tavera was placed in a cell with multiple "tie off" points, including a fire sprinkler that a noose could be secured from (as inmates had done before during prior suicide attempts at the prison).[58]

Before placing Tavera in solitary confinement, despite the known and obvious risks of suicide (41 attempts in the past five years, with 38 in solitary), no one – not the

---

[53] Though the medical records show Tavera declining to "go to the hospital," at her deposition, Nurse Paulk did not recall if she wanted to send him to the hospital or not. *See* Ex. 32, Deposition of Paulk, 32:19-34:3, Appx. 518-520 ("Q: Did [Dr. Jefferson] tell you anything else to do with Mr. Tavera [other than run the EKG]? A: No.").

[54] Ex. 12, Declaration of Agharkar, pp. 5-6, Appx. 57-58; Ex. 27, Deposition of GDOC (through S. Lewis), 39:4-11 & 45:10-20, Appx. 355-356 ; Ex. 24, Deposition of GCHC (through A. Gardner), 52:22-53:9, Appx. 240-241.

[55] *See, e.g.,* Ex. 13, "Record Review" for R. Tavera Suicide, p. 2, Appx. 136; Ex. 30, Deposition of Warden Ron McAndrew (ret.), 73:10-18, Appx. 459 ("gangs are running" a "Thunder Dorm").

[56] Ex. 32, Deposition of Paulk, 34:10-17, Appx. 520.

[57] Ex. 7, Tavera GCHC Medical Record (Dec. 6, 2014), p. 2, Appx. 27; Ex. 15, "Record Review" for R. Tavera Suicide, p. 2, Appx. 136.

[58] *See, e.g.,* Ex. 43, Smith State Prison Suicide Attempt Incident Reports (2009-2015), p. 95, Appx. 759 (inmate C.B. found "with a shoestring attached to the sprinkler head … attempting to hang himself" on September 17, 2010). *See also* Ex. 10, Declaration of McAndrew, p. 9, Appx. 44; Ex. 12, Agharkar Declaration, p. 6, Appx. 58.

nurse, not the doctor, nor the officers – assessed his mental health or suicide risk. Paulk completed a form to ensure Tavera continued to receive *medical* (but not psychiatric) care while in solitary, but she merely checked "no" on the line "is the patient receiving Mental Health Treatment," and "N/A" for the box instructing her to "notify mental health" – on both counts because Oliga and GDOC assigned Tavera to a "Tier 1" prison.[59] Indeed, Paulk did not even have access to Tavera's mental health records if she *wanted* to review them – if she did not ask, she had "no way to know [Tavera] had previously reported suicide attempts and being diagnosed with bipolar disorder."[60]

Had GCHC or GDOC instructed Paulk to ask Tavera simple screening questions – like "are you thinking about hurting yourself" – she would have.[61] Had there been any additional questions on the GDOC/GCHC screening form at all, she would have asked them.[62] Paulk agreed this would have been a simple task to perform, and would not have burdened her in the least.[63] But here, nothing was done to evaluate Tavera's mental health or suicide risk before he was placed in solitary confinement – despite GDOC and GCHC's knowledge of 38 recent prior suicide attempts in solitary confinement.[64]

Instead, stunningly, GCHC had no policies on suicide prevention *or* solitary confinement at all.[65] Despite this glaring deficit, GDOC relies on GCHC to ensure that

---

[59] *See* Ex. 16, Segregation Record Review and Flow Sheet (R. Tavera), Appx. 138; Ex. 32, Deposition of Paulk, 36:24-37:3 & 39:5-9, Appx. 521-523.

[60] Ex. 24, Deposition of GCHC (through A. Gardner), 23:3-12, 25:13-25 & 52:5-13, Appx. 233, 235, 240.

[61] Ex. 32, Deposition of Paulk, 41:18-21 & 50:25-51:13, Appx. 524, 526-527.

[62] *Id.*, at 44:23-25, 50:25-51:13 & 52:2-6, Appx. 525-528.

[63] *Id.*, at 53:7-14, Appx. 529.

[64] Ex. 26, Deposition of GDOC (through J. Jackson), 82:19-83:3, Appx. 323-324.

[65] Ex. 24, Deposition of GCHC (through A. Gardner), 31:2-4, 31:16-18 & 36:8-10, Appx. 236, 238.

prisoners' disabilities are accommodated when assigning housing – GCHC "insist[s]"
that GDOC comply with its recommendations to ensure disabilities are accommodated.[66]

### F. DENYING TAVERA REASONABLE ACCOMMODATIONS CAUSED HIS DEATH

GDOC officers found Tavera hanging in his solitary confinement cell the next
day.[67] The prison was "short staffed" that night, delaying officers' response to the
emergency.[68] It is well known in corrections that understaffing endangers inmates.[69]
Minimum safe staffing levels at the prison were 231 officers, but the prison was
operating with just 214 – including only one officer in the J-1 solitary confinement
cellblock Tavera was imprisoned in, where three officers were required.[70] Had these two
additional officers been available, there would have been no delay in rescuing Tavera.[71]

Likewise, the officers did not have a "suicide tool" – a, curved knife used to
quickly cut through a ligature – or any similar implement.[72] As a result, when the officers
finally opened Tavera's cell door, officers needed another long minute to untie the
ligature to lower Tavera to the ground – instead of rapidly slicing through it.[73] The tool
could have been easily (and safely) kept in the cellblock's "control room," along with the

---

[66] Ex. 24, Deposition of GCHC (through A. Gardner), 57:11-24, Appx. 242.

[67] For a detailed description of the events of Tavera's death, see Plaintiff's Response to
Defendants Shelby and Dickson's Motion for Summary Judgment, Doc. 121.

[68] Ex. 22, Deposition of Calhoun, 36:5-11, Appx. 182.

[69] *Id.*, at 38:13-17, Appx. 184; Ex. 34, Deposition of Vasquez, 79:15-21, Appx. 573. *See*
Ex. 29, Deposition of Haas, 33:3-16 & 38:1-10, Appx. 418-419; Ex. 35, Deposition of
Williams, 28:18-20, Appx. 587.

[70] *See also* Ex. 28, Deposition of GDOC (through R. Toole), 75:22-25, 81:2-11, 81:21-24,
& Ex. 1 to Deposition of Toole, Appx. 367-368, 389-394.

[71] *See id.*, at 93:13-15, 93:24-94:22, Appx. 369-370; Ex. 10, Expert Report of
McAndrew, p. 10, Appx. 45. *See also* Doc. 121 (Plaintiff's Response to Shelby and
Dickson's Motion for Summary Judgment, pp. 10-13, describing rescue procedures).

[72] Ex. 22, Deposition of Calhoun, 60:23-62:18, Appx. 187-189; Ex. 26, Deposition of
GDOC (through J. Jackson), 62:24-63:4, Appx. 318-319.

[73] *See* Ex. 18, Handheld Video #1, Appx. 144, 1:05-2:14; Ex. 26, Deposition of GDOC
(through J. Jackson), 61:6-13, Appx. 317 (the tool is a "necessary" item).

keys and other items secured away from inmates.[74] "Suicide tools" are yet another accommodation GDOC only provides at "mental health units," but not at the Smith State Prison.[75]

Even after 41 prior suicide attempts, Smith State Prison officers were not trained in suicide prevention.[76] Officers were not trained on how to remove a body from a ligature (as further evidenced here by the incompetent rescue here).[77] Officers weren't trained to consider how long a prisoner had been hanging when deciding to enter a cell.[78]

Because the officers delayed rescuing him, Tavera died.[79] Though the prison's written procedures and post orders, and unwritten practices, allowed officers to rescue Tavera more quickly, eight minutes elapsed from when officers found him beginning the suicide attempt to when his body was finally placed down on the floor.[80] Had Tavera been in a "mental health unit," he would have been rescued "immediately."[81]

### III.   ARGUMENT AND AUTHORITIES

#### A.  STANDARD OF REVIEW

Summary judgment is authorized only when "there are no genuine issue[s] as to any material fact and that the moving party is entitled to judgment as a matter of law."

---

[74] Ex. 34, Deposition of Vasquez, 78:2-18, Appx. 572.

[75] *See* Ex. 28, Deposition of GDOC (through R. Toole), 122:2-10, Appx. 372.

[76] Ex. 29, Deposition of Haas, 19:19-22 & 39:17-20, Appx. 412, 420.

[77] *Id*, at 54:9-12, Appx. 422; Ex. 25, Deposition of GDOC (through K. Campbell), 100:3-10, Appx. 263; Ex. 18, Handheld Video #1, *passim*.

[78] Ex. 25, Deposition of GDOC (through K. Campbell), 103:12-16, Appx. 264.

[79] *See* Ex. 1, Autopsy of R. Tavera, Appx. 3.

[80] *See* Doc. 121, Plaintiffs' Response to Defendants Shelby and Dickson's Motion for Summary Judgment, § II, pp. 2-14 (citing Ex. 36, GDOC Standard Operating Procedure, Physical Health: Suicide Prevention and Management of the Potentially Suicidal Inmate, pp. 4-5, Appx. 607-608; Ex. 41, Smith State Prison Post Orders: Disciplinary and Transient Housing, p. 9, Appx. 657; Ex. 29, Deposition of Haas, 78:12-23, Appx. 434).

[81] Ex. 37, GDOC Standard Operating Procedure, Mental Health: Suicide Prevention and Management of the Potentially Suicidal Inmate, p. 12, Appx. 621.

*Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11ᵗʰ Cir. 2000) (citing FED. R. CIV. P. 56(c)). In deciding a motion for summary judgment, a court must "accept Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." *Bozeman v. Orum*, 422 F.3d 1265, 1267 (11ᵗʰ Cir. 2005). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Stewart*, 232 F.3d at 848.

## B.  PROCEDURAL HISTORY

The Court dismissed Plaintiff's claims based on the negligence of GDOC's officers, but allowed GTCA claims "with respect to any negligence claim … for a failure to provide Tavera with treatment prior to his death" to proceed. Doc. 63, pp. 32-33. Likewise, the Court dismissed portions of the ADA/Rehabilitation Act claims "premised on a failure to provide medical treatment" to avoid transforming the ADA into a medical malpractice statute, but not claims "based on a failure to provide proper accommodations." *Id.*[82]

## C.  DISPUTED MATERIAL FACTS

Defendants properly do not contest the vast majority of the facts identified above. As to the aspects of Plaintiff's claims they do challenge, Defendants' incorrectly state the law (as described below). But even if they were correct on the law (though they are not), four material facts are still in dispute, and require denying summary judgment.

1.  Was Oliga an employee or "independent contractor"?

2.  Did Tavera request an accommodation when he told multiple GDOC employees he suffered from bipolar disorder and had attempted suicide in the past?

---

[82] If an accommodation Tavera was denied is more appropriately characterized as "medical treatment" under this rubric, summary judgment should be denied as to those allegations under the GTCA malpractice claims.

**3.** Was it "obvious" – with 41 suicide attempts over the past five years, with almost all occurring in solitary confinement – that GDOC and GCHC needed to screen prisoners for suicidal ideations before placing them in solitary confinement?

**4.** Was it "obvious" that, in light of the epidemic of suicide attempts at the prison, that accommodations like mental health services, additional staff, training, equipment and procedures were necessary to accommodate prisoners with disabilities, like Tavera?

### D. GTCA Claims: GDOC and GCHC Committed Malpractice and Proximately Caused Tavera's Suicide

The Georgia Tort Claims Act waives sovereign immunity for torts committed by Georgia employees. *See* O.C.G.A. § 50-21-23. To establish medical malpractice in Georgia, a plaintiff must show "a violation of the applicable medical standard of care and … that the purported violation of or deviation from the proper standard of care is the proximate cause of the injury sustained." *Porter v. Guill*, 681 S.E.2d 230, 235 (Ga. App. 2009) (citing *MCG Health, Inc. v. Barton*, 647 S.E.2d 81 (Ga. App. 2007)).[83] "[T]here can be more than one proximate cause of an injury" in a medical malpractice action. *Knight v. Roberts*, 730 S.E.2d 78, 86 (Ga. App. 2012).

Plaintiff's evidence establishes four ways Defendants violated the standard of care in providing medical treatment to Tavera: (1) GDOC procedures prevented adequate time for evaluating patients for bipolar disorder; (2) GDOC and GCHC policies did not require a pre-solitary suicide assessment; (3) Oliga's evaluation of Tavera was below the standard of care; and (4) Paulk and Jefferson's evaluation of Tavera was below the standard of care. Defendants do not address the first two claims, and only seek to dismiss the latter two claims on summary judgment.

---

[83] The standard of care for Georgia inmates is the same for patients in the "free world." Ex. 31, Deposition of Oliga, 25:24-26:25, Appx. 475-476.

### a. GDOC Required Bipolar Disorder Evaluations be Performed Below the Standard of Care, and Failed to Require Re-Evaluations

GDOC procedures required Oliga to evaluate 12-13 patients every day, and see them for just 20-25 minutes each. But the standard of care requires *at least* one hour to evaluate and diagnose bipolar disorder (and follow-up appointments as well).[84] GDOC's practice of requiring all its psychologists, including Oliga, to evaluate patients for bipolar disorder under these conditions violated the standard of care.[85] Oliga even agrees.[86] Thus, GDOC's own institutional negligence, stemming from the policies and procedures it required, not merely Oliga's negligent evaluation, breached the standard of care. *See, e.g., Gess v. U.S.*, 952 F.Supp. 1529, 1551-52 (M.D. Ala. 1996) (hospital owed patients a "general duty of care in the administration and operation of the hospital," regardless of the independent act of the hospital employee).

Had Tavera properly been evaluated and diagnosed with bipolar disorder, he would have continued receiving psychiatric treatment, and likely survived.[87]

Defendants do not address this negligence claim.

### b. GDOC and GCHC Do Not Evaluate Suicide Risk Before Placement in Solitary Confinement, in Violation of the Standard of Care

Likewise, despite the well-known risk of suicide in prison, the even higher risk in solitary confinement, and the shocking pattern of 41 suicide attempts (with 38 in solitary confinement), GDOC and GCHC had no procedure to screen prisoners for suicide risk

---

[84] *See, e.g.*, Ex. 21, Deposition of Agharkar, 49:9-22, Appx. 165.
[85] Ex. 12, Declaration of Agharkar, p. 6, Appx. 58.
[86] Ex. 31, Deposition of Oliga, 57:12-23, Appx. 493.
[87] Ex. 12, Declaration of Agharkar, pp. 5-7, Appx. 57-59.

before placing them in solitary confinement. This failure to screen patients was dangerous, below the standard of care, and proximately caused Tavera's death.[88]

Had Tavera been asked simple questions like "are you thinking about hurting yourself" the day before his death, more likely than not, he would not have died.[89]

Defendants also do not address this negligence claim.

### c. Even in the Time Allotted, Psychologist Oliga Committed Malpractice by Misdiagnosing Tavera as "No Diagnosis"

Oliga's exam and diagnosis for Tavera fell below the standard of care in at least four ways: 1) the examination was far too short, 2) Oliga failed to consult collateral sources (such as prior medical records or family members), 3) Oliga ignored that the medication Tavera reported being prescribed was "FDA indicated" for treatment of bipolar disorder, and 4) Oliga did not order any follow-up examinations to confirm his (lack of) diagnosis – a necessity when evaluating bipolar disorder.[90] Thus, Oliga committed malpractice.[91]

Oliga's failure to follow the standard of care proximately caused Tavera's death by denying him psychotherapy and medication, and assigning him to prisons with zero accommodations for prisoners with mental disabilities.[92]

As fact issues preclude GDOC from contesting the merits of Plaintiff's claim, GDOC instead argues Oliga was not its "employee," but an "independent contractor" for whom the GTCA does not waive sovereign immunity. This argument fails at summary

---

[88] Ex. 12, Agharkar Declaration, p. 6, Appx. 58; Ex. 30, Declaration of McAndrew, p. 5, Appx. 40.
[89] Ex. 12, Agharkar Declaration, p. 6, Appx. 58.
[90] Ex. 12, Agharkar Declaration, p. 6, Appx. 58; Ex. 21, Deposition of Agharkar, 47:1-48:17, Appx. 163-164.
[91] Ex. 12, Deposition of Agharkar, 48:18-49:2, Appx. 164-165.
[92] Ex. 12, Agharkar Declaration, p. 6-7, Appx. 58-59.

judgment as Georgia law uses a fact-intensive inquiry to determine whether a physician is an "employee" or "independent contractor" that, in cases like this, must be "submit[ed] to the jury." *Stewart v. Midani*, 525 F.Supp. 843, 850 (N.D. Ga. 1981).

Under Georgia law, the test for an independent contractor is "whether the employer, under the contract, … has the right to direct the time, the manner, the methods, and the means of the execution of the work … The right to control the manner and method means the right to tell the employee how he shall go about doing the job in every detail, including what tools he shall use and what procedures he shall follow." *Royal v. Georgia Farm Bureau Mut. Ins. Co.*, 777 S.E.2d 713, 715 (Ga. App. 2015). "[A]n employee's special skill is not determinative where an employer has control over the time, method and manner of the employment." *Royal*, 777 S.E.2d at 716 (citing *Southern Gen. Ins. Co. v. Boerste*, 394 S.E.2d 566 (1990)). "[L]abels ascribed by a contract" – the evidence GDOC relies upon – "are not determinative of the parties' legal relationship." *Lee v. Satilla Health Servs., Inc.*, 470 S.E.2d 461, 462 (Ga. App. 1996) (denying summary judgment on whether physician is employee, not independent contractor). Instead, Georgia courts in medical malpractice cases consider "the basis of pay, and the right of the employer to dictate the hours of work, rather than the employer's right to choose the scalpel to be used or the location of the incision." *Stewart*, 525 F.Supp. at 849.

The evidence demonstrates Oliga was GDOC's "employee," requiring summary judgment be denied. In particular, under the agreement between GDOC and Mental Health Management, GDOC controlled Oliga's "work schedules, job duties, and use of leave."[93] "Clinical conflicts" were resolved by GDOC authorities, not Oliga or MHM.[94]

---

[93] Ex. 13, GDOC/MHM Professional Services Agreement, p. 2, Appx. 66.

Oliga's direct supervisor was a GDOC employee.[95] GDOC controlled Oliga's hours: he was required to "sign in and out on the State approved GDOC time sheet."[96] Oliga was "subject to, and agree[d] to comply with, reasonable rules pertaining or related to safety and security, including spoken directives of [GDOC] facility staff."[97] Oliga's office was inside the GDOC prison.[98] Oliga's testimony could not be clearer:

> Q: The entire time that you were interacting with Mr. Tavera, you were working within the course and scope of your employment. Is that right?
>
> A: The Georgia Department of Corrections?
>
> Q: Yeah.
>
> A: Yes.[99]

Oliga even publicly holds himself out as a GDOC employee.[100]

Most significantly, Oliga's "evaluative and diagnostic services" – the tools he used to evaluate Tavera – were strictly controlled by GDOC "departmental policy."[101] The very forms Oliga used in assessing Tavera are all labelled "Georgia Department of Corrections," and the assessment Oliga was performing – whether to send a patient to a "Tier 1" or "Level II" facility – was entirely controlled by GDOC.[102] Oliga testified Tavera's assessment was conducted strictly according to GDOC's procedures:

---

[94] Ex. 13, GDOC/MHM Professional Services Agreement, p. 2, Appx. 66.
[95] Ex. 31, Deposition of Oliga, 25:3-17, Appx. 475.
[96] Ex. 13, GDOC/MHM Professional Services Agreement, p. 3, Appx. 67.
[97] *Id.*, p. 4, Appx. 68.
[98] Ex. 31, Deposition of Oliga, 23:1-5, Appx. 473.
[99] Ex. 31, Deposition of Oliga, 41:17-23, Appx. 484.
[100] *See* Ex. 39, Facebook: About Raymond Oliga, Appx. 635.
[101] Ex. 13, GDOC/MHM Professional Services Agreement, p. 13-14, Appx. 77-78.
[102] *See* Ex. 14, GDOC, Mental Health Data Entry Worksheet (R. Tavera), pp. 1-6, Appx. 123-128. *See also* Ex. 13, GDOC/MHM Professional Services Agreement, p. 13-14, Appx. 77-78 ("Psychologists will document according to [GDOC]'s policies and

[W]e typically don't use any kind of psychological testing at this facility … [because of] the Department of Correction's policy … [W]e follow that. … [T]he Department of Corrections just says interviews are required. So we don't have specific psychological testing instruments to administer.[103]

The GDOC policies and procedures direct Oliga's work, and he follows GDOC procedures when working.[104] Indeed, Oliga does not actually treat patients – he merely "interviews" them for placement pursuant to GDOC's policies.[105] In short, Oliga is far from working "independently" – his work is sternly controlled by GDOC.

Moreover, the root of the problem here was not merely Oliga's decision making and practice, but also GDOC's practice of requiring Oliga to evaluate 12-13 patients a day, taking no more than 20-25 minutes per patient. Even Oliga agreed bipolar disorder cannot be properly evaluated or diagnosed under these conditions.[106] Thus, though Oliga certainly was negligent in not consulting collateral sources, ignoring Tavera's prescription history, and not scheduling Tavera for follow-up exams, the malpractice also occurred because GDOC's separate negligence controlled the method and manner of Oliga's "interview." GDOC itself required Oliga to perform evaluations that would invariably be negligent for patients with bipolar disorder.

In light of these fact disputes, a reasonable jury could conclude Oliga was GDOC's "employee," and summary judgment should be denied.

---

procedures, utilizing the Department's forms and protocols for documentation and will be required to write legibly in all documentation.").
[103] Ex. 31, Deposition of Oliga, 83:21-85:3, Appx. 495-497.
[104] *Id.,* 23:6-22, Appx. 473.
[105] *Id*., 24:18-23, Appx. 474.
[106] Ex. 31, Deposition of Oliga, 57:12-23, Appx. 493. *See also* Ex. 12, Declaration of Agharkar, pp. 6-7, Appx. 58-59.

### d. Nurse Paulk and Dr. Jefferson Committed Malpractice by Misdiagnosing Tavera

Likewise, Dr. Jefferson and Nurse Paulk committed malpractice by failing to determine the cause of Tavera's chest pains – which, more likely than not, given Tavera's history, were caused by his psychiatric conditions.[107] Their treatment fell below the standard of care, which required continuing to assess Tavera if he was still experiencing chest pains.[108] Specifically, a doctor must consider anxiety attacks when evaluating chest pains with a normal EKG.[109] These failures also proximately caused Tavera's death.[110]

As fact disputes preclude GCHC from contesting the merits, Defendants incorrectly contend Plaintiff's expert, a forensic psychiatrist and medical doctor, cannot testify to the standard of care for Paulk and Dr. Jefferson. That is incorrect – a psychiatrist can evaluate the care provided by nurses and other physicians. *See* Doc. 113. But even if Dr. Agharkar, a medical doctor and one of the nation's leading forensic psychiatrists, could not testify on this issue, his testimony is not the only evidence that Paulk and Jefferson failed to comply with the standard of care. GCHC's corporate representative, Dr. Aleta Gardner, M.D. (Paulk and Jefferson's direct supervisor), and GDOC's corporate representative, Dr. Sharon Lewis, M.D. (the healthcare supervisor for the entire prison system), both testified Paulk and Jefferson's evaluation of Tavera was below the standard of care.[111]

---

[107] Ex. 12, Declaration of Agharkar, p. 5, Appx. 57.
[108] Ex. 24, Deposition of GCHC (through A. Gardner), 53:5-9, Appx. 241.
[109] Ex. 27, Deposition of GDOC (through S. Lewis), 36:20-24, Appx. 353.
[110] Ex. 12, Declaration of Agharkar, p. 5-7, Appx. 57-59.
[111] Ex. 27, Deposition of GDOC (through S. Lewis), 36:20-37:3, Appx. 353-354 & Ex. 24, Deposition of GCHC (through A. Gardner), 53:5-9, Appx. 241.

Dr. Lewis testified that, when evaluating a patient for chest pains, the standard of care required an evaluation for an anxiety attack.[112] Dr. Lewis testified, if she were presented with the available information about Tavera, and was unable to diagnose a physical cause of his ailments, she would "consult with a mental health provider" – as Dr. Jefferson and Paulk failed to do.[113] Thus, Dr. Lewis' testimony provides evidence that Dr. Jefferson and Paulk's assessment and evaluation fell below the standard of care.

Dr. Gardner agreed. If, after ruling out a cardiac cause, a patient was "still having chest pains," the standard of care required assessing potential mental health causes.[114] Here, after examining the "borderline" EKG, Dr. Jefferson and Paulk stopped treating Tavera altogether – treatment well below the standard of care.

Dr. Agharkar provides causation evidence – had Paulk and Jefferson considered Tavera's mental health, he would have lived.[115] Under Georgia law, in medical malpractice cases, "questions regarding causation are peculiarly questions for the jury except in a clear, plain, palpable, and undisputed case." *MCG Health*, 647 S.E.2d at 582.

Thus, fact disputes preclude summary judgment on the GTCA claims.

### E. ADA/REHABILITATION ACT CLAIMS: GDOC AND GCHC FAILED TO ACCOMMODATE TAVERA'S DISABILITIES

#### 1. Plaintiff's Evidence Satisfies the Elements of ADA/Rehabilitation Act Claims

To prove a claim under Title II of the ADA, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or ...

---

[112] Ex. 27, Deposition of GDOC (through S. Lewis), 36:6-37:3, Appx. 353-354.
[113] *See* Ex. 27, Deposition of GDOC (through S. Lewis), 39:4-11 & 45:10-20, Appx. 355-356.
[114] *See* Ex. 24, Deposition of GCHC (through A. Gardner), 52:22-53:9, Appx. 240-241.
[115] Ex. 12, Agharkar Declaration, pp. 6-7, Appx. 58-59.

denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated [against] by such entity; (3) by reason of such disability." *Schotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). To prove a Rehabilitation Act claim, a plaintiff must also show the defendant accepts federal funds.[116] Plaintiff satisfies these requirements.

First, Tavera suffered from a mental illness – bipolar disorder. Bipolar disorder is a disability under the Acts. *See, e.g., Bishop v. Ga. Dep't of Family and Children Svcs.*, No. 04-16695, 2006 WL 572031, *3-4 (11th Cir. Mar. 10, 2006) (denying dispositive motion; bipolar disorder is a "disability"). Defendants do not contend otherwise.

Second, confinement in a jail or prison is a program or service for ADA/Rehabilitation Act purposes. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs.'") (Scalia, J.). *See also U.S. v. Georgia*, 546 U.S. 151 (2006). Thus, safe confinement in the prison during Tavera's incarceration was a "service" or "program." *Id*. Defendants do not contest this element.

Finally, GDOC and GCHC denied Tavera access to programs and services by failing to reasonably accommodate his serious mental illness – this is "[denial] of the benefits of the services … by reason of [his] disability." *Schotz*, 256 F.3d at 1079. For this element, the focus should lay on "whether [the plaintiff] was excluded from participation in, or denied the benefit of, some services, programs, or activities of [the defendant] by reason of his disability." *Bircoll v. Miami-Dade Cnty., Fla.*, 480 F.3d 1072,

---

[116] Defendants admit they receive federal funds. Doc. 64, Defendants' Answer to Plaintiff's Second Amended Complaint, pp. 5-6, ¶¶ 7-8 and Doc. 49-2, p. 3, ¶¶ 7-8. After resolving the federal funding requirement, courts treat the ADA and Rehabilitation Act identically. *Cash v. Smith*, 231 F.3d 1301, 1305 n. 2 (11th Cir. 2000).

1083 (11th Cir. 2007). Plaintiff satisfies this element by demonstrating "the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people." *Pruitt v. Emmanuel Cnty., Ga.,* No. CV612-021, 2012 WL 1161612, *1 (S.D. Ga. Apr. 9, 2012) (Smith, Maj. J.) *adopted at* 2012 WL1458012 (Apr. 26, 2012).

Here, despite Defendants knowing of the disturbing pattern of suicide attempts in the prison's solitary confinement cells, their practices denied Tavera the following reasonable accommodations:[117]

1. **Pre-Solitary Suicide Screening –** GCHC and GDOC failed to provide a suicide risk assessment. This assessment is common in other prison systems, and designed to accommodate mental disabilities by preventing suicides.[118] Failing to screen inmates for suicide risk "disproportionately impacts disabled people" – and is unconscionable when almost forty suicide attempts occurred in solitary confinement in the past five years. *See, Pruitt,* 2012 WL 1161612, at *1.[119]

2. **Safe Cell Assignment –** GCHC and GDOC placed Tavera in a dangerous solitary confinement cell with "tie off" points to hang a noose from – like the sprinkler head Tavera used to secure the ligature from (and which prior prisoners attempting suicide had used before). *See, e.g., Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 396 (5th Cir. 2000).

3. **Referral for Mental Health Assessment** – Tavera told the "general population counselor" that he was diagnosed with bipolar disorder, but nothing was done. At a minimum, a reasonable accommodation would include

---

[117] Should the court conclude any of these accommodations are "medical treatment," Defendants were negligent under the GTCA for not providing them.

[118] Ex. 10, Declaration of McAndrew, p. 7, Appx. 42; Ex. 12, Declaration of Agharkar, p. 6, Appx. 58. *See also* Ex. 31, Deposition of Oliga, 34:7-25 & 36:12-20, Appx. 481-482 (agreeing suicide risk assessment before solitary confinement is a "good idea").

[119] For purposes of the ADA/Rehabilitation Act, this is not a complaint about the "adequacy" of medical care provided to Tavera (Doc. 63, p. 22) – such as if the screening existed but was performed negligently. A pre-solitary suicide screening is an accommodation that was not provided at all.

25

another mental health evaluation – especially as bipolar disorder typically requires multiple evaluations.[120]

4. **Properly Staffed Prison** – GDOC knew its non-mental health unit imprisoned people with mental disabilities at risk of suicide, but it still failed to adequately staff the prison. If there were three officers for Tavera's cellblock, officers would have been available immediately to rescue him. Instead, because the prison was "short staffed," the rescue was delayed while more officers arrived. This failure disproportionately impacts people with disabilities.

5. **Trained Officers** – GDOC failed to adequately train the Smith State Prison officers. The officers had no training on how to respond to a suicide.

6. **Suicide Prevention Tools** – GDOC failed to provide appropriate equipment to the officers. When the officers finally did enter Tavera's cell, they did not have a "suicide tool" to cut through the ligature and lower him to the ground. As such, additional precious time was lost while officers untied the ligature.[121]

7. **Officers Must Follow Procedures** – GDOC officers failed to comply with the prison's written procedures (and unwritten practices). Had the officers complied with these instructions, Tavera would have been saved.

8. **"Mental Health" Prisons** – GDOC assigned Tavera to a prison where there were no mental health services – despite his reported diagnosis of bipolar disorder.[122] Maintaining this two-tiered system is "problematic."[123] GDOC knew prisoners with mental illnesses were housed at the "non mental health units" – if only because of the 41 prior suicide attempts.[124]

9. **Proper Evaluations to Diagnose Bipolar Disorder** – GDOC imposed conditions on Oliga's evaluations – that he spend no more than 20-25 minutes with every patient, and see 12-13 patients every day – that precluded him from

---

[120] This accommodation is decidedly *not* mental health treatment – it is a request for a *referral* for mental health treatment. Had the evaluation been performed incorrectly (again), that would be malpractice, but the failure to refer Tavera for the evaluation denied him an accommodation.

[121] *See* Ex. 26, Deposition of GDOC (through J. Jackson), 62:1-5, Appx. 318.

[122] If, pursuant to the Court's prior rulings, this error is merely malpractice, it is another distinct malpractice claim actionable under the GTCA.

[123] Ex. 12, Declaration of Agharkar, pp. 4-5, Appx. 56-57.

[124] *See, e.g.*, Declaration of McAndrew, pp. 7, Appx. 42; Ex. 28, Deposition of GDOC (through R. Toole), p. 181:20-182:3 (recognizing some mentally ill inmates will be assigned to "non mental health units") Appx. 386-387. Indeed, some prisoners at Smith State Prison had even made multiple attempts. *See* Ex. 28, Deposition of GDOC (through R. Toole), p. 142:2-17, Appx. 378.

assessing bipolar disorder specifically.[125] Though these evaluations might be reasonable for all other mental disabilities, not so for bipolar disorder.[126] The structure of the assessment itself, rather than Oliga's poor execution of it, failed to accommodate patients with bipolar disorder (like Tavera).

Defendants do not contest, for purposes of summary judgment, that these accommodations were reasonable. In fact, whether an accommodation is reasonable is an issue for the jury. *See, e.g., Cox v. Ala. State Bar*, 392 F.Supp.2d 1295, 1301-02 (M.D. Ala. 2005); *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, *9 (S.D. Tex. Aug. 9, 2006) ("[T]he reasonableness of an accommodation [for a disability] is generally a question of fact inappropriate for resolution on summary judgment").

These failures to accommodate Tavera discriminated against him by denying him benefits and services. If not for his disability, Tavera would have been able to safely access Defendants' programs and services and been safely housed like any other prisoner.

> [C]orrectional facilities are unique facilities under Title II. Inmates cannot leave the facilities and must have their needs met by the corrections system, including needs relating to a disability. … It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities.

28 C.F.R. § 35.152, Appx. A. Unlike other anti-discrimination statutes, the ADA and Rehabilitation Act create an "affirmative obligation" that public entities, like GDOC and GCHC, affirmatively provide accommodations – *not* simply treat people with disabilities

---

[125] For purposes of the ADA/Rehabilitation Act claims, Plaintiff does not claim that Oliga's incorrect *diagnosis* was a denial of a reasonable accommodation – that is an allegation regarding the "adequacy" of the medical treatment Tavera received. *See* Doc. 63, p. 22. Instead, Plaintiff claims that GDOC's policies regarding *how* the "interviews" were conducted denied Tavera (and other patients with bipolar disorder) a reasonable accommodation. That GDOC required Oliga see 12-13 patients a day and spend only 20-25 minutes with them was the denial of a reasonable accommodation for bipolar disorder patients. *See, e.g.*, Ex. 12, Declaration of Agharkar, p. 6, Appx. 58. The GDOC practice, not Oliga's incorrect diagnosis, denied Tavera a reasonable ADA accommodation.
[126] Ex. 12, Declaration of Agharkar, pp. 5-6, Appx. 57-58.

the same as able-bodied people. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 533 (2004). *See also* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures…").

Other federal district courts in the Eleventh Circuit have denied dispositive motions in similar cases. In *Wolfe v. Florida Department of Corrections*, No. 5:10-CV-663, 2012 WL 4052334 (M.D. Fla. Sept. 14, 2012), the plaintiff alleged Florida prisons failed to accommodate her son, who died of an asthma attack. The Florida prison housed her asthmatic son in a cell without an emergency call button. When he suffered an asthma attack, he could not summon help, and died. The court determined, due to his known history of asthma, that the prison discriminated against him by failing to house him in a cell that accommodated his disability. *See id.*, at \*\*4-5. *See also Walton v. Fla. Dep't of Corr.*, No. 3:16-cv-1130, 2019 WL 2103024, \*11 (M.D. Fla. May 14, 2019); *Kruger v. Jenne*, 164 F.Supp.2d 1330, 1337-38 (S.D. Fla. 2000). Like the prisoner in *Wolfe*, GDOC locked Tavera in a cell made dangerous by his disability – and he died as a result.

### 2. *Tavera was Not Required to Request Additional Accommodations*

Rather than try to demonstrate Plaintiff's evidence does not satisfy the elements of her ADA/Rehabilitation Act claims, Defendants assert there is an additional element unsupported by the law – that Tavera must request an accommodation.

First, there is no basis in law for the "request" requirement. Defendants attempt to graft an element of an ADA Title I claim (the Act's employment provisions) onto Title II (the Act's public services provisions). All of Defendants' controlling Eleventh Circuit caselaw addresses Title I employment suits, not Title II suits. Requesting an accommodation is deeply embedded in the regulations implementing Title I – but wholly

absent from the Title II regulations. *See*, *e.g.*, 29 C.F.R. § 1630.9(a) (Title I implementing regulation, itemized "problem solving approach" employers use in assessing a requested accommodation). But even the Title I regulations recognize that a plaintiff is not always required to make a request: "the appropriate reasonable accommodation may be so obvious" to disregard the regulations' approach. 29 C.F.R. § 1630.9(a).

Instead, in a Title II suit, a plaintiff is not required to request an accommodation if "the need for one was obvious." *Schwarz v. The Villages Charter Sch., Inc.*, 165 F.Supp.3d 1153, 1173 (M.D. Fla. 2016) (citing *McCullum v. Orlando Regional Healthcare*, No. 6:11-cv-1387, 2013 WL 121860, *4 (M.D. Fla. Mar. 25, 2013)). *See also Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274 (1st Cir. 2006) (prisoner's medications obviously necessary to treat ALS); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (deaf litigant obviously required accommodation for court proceedings). At the Smith State Prison, before Tavera's suicide death, there had been 41 other suicide attempts in the past five years, with virtually all occurring in solitary confinement. Bipolar disorder patients are particularly unlikely to volunteer they need treatment.[127] A reasonable jury could certainly determine it was "obvious" that, given these conditions, there were prisoners with mental disabilities at the prison, and they were attempting to kill themselves in solitary – and those most at risk needed to be asked. Appropriate diagnostic screening, pre-segregation screening, adequate staffing, necessary equipment, and following established policies were reasonable accommodations to address this epidemic.

---

[127] Ex. 12, Agharkar Declaration, p. 5, Appx. 57.

*Robertson v. Las Animas County Sheriff's Office*, 500 F.3d 1185, 1189 (10th Cir. 2007), the sole Title II case cited by Defendants, is inapposite. There, the plaintiff did not tell anyone he was deaf, and could actually speak normally and understand some speech – his need for an accommodation was far from "obvious." But the case did not even turn on the lack of a request for an accommodation – the dispositive issue was the county's "*knowledge* of the individual's disability and the individual's need for an accommodation." *Id.* at 1196 (emphasis added). "[T]he entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual … has informed the entity of the disability." *Id. See also J.H. v. Bernalillo County*, 806 F.3d 1255, 1261 (10th Cir. 2015) (officer's duty to accommodate arrestee with a disability "arise[s] only if [the officer] had known [the person] needed an accommodation"). *Robertson* held that while "this knowledge may derive from an individual's request for an accommodation," it can also flow "from the entity's knowledge of the individual's disability and his need for … a certain service." *Id.* at 1197. *Robertson* recognizes "when a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA [Title II] claim." *Id.* at 1197. Thus, the Tenth Circuit actually concurs with the Middle District of Florida's approach in *Schwarz* – "the entity will know of the individual's need for an accommodation because it's 'obvious.'" 165 F.Supp.3d at 1173. *See also Medina v. City of Cape Coral, Fla.*, No. 2:13-cv-377, 2014 WL 4206056, *3 (M.D. Fla. Aug. 25, 2014).

Defendants' other authority is even less persuasive. In *Rylee v. Chapman*, 316 Fed. Appx. 901, 904 (11th Cir. 2009), the arrestee with a hearing disability not only did not request an accommodation, but also affirmatively disclaimed the need for one:

investigators asked "whether he could read lips" and he responded, "yes." When he did request accommodations – like officers providing written questions for him to answer – the officers complied. *Id. Freyre v. Gee*, No. 8:13-cv-2873, 2017 WL 1017837 (M.D. Fla. March 15, 2017) is also unpersuasive. The portion of the opinion Defendants rely on is dicta – the court concluded that the plaintiff's daughter had been provided reasonable accommodations, obviating the "request" issue. *Freyre*, 2017 WL 1017837, *7.

Secondly, a jury could conclude Tavera *did* request accommodations. When he was assessed by the counselor and Oliga, Tavera candidly told them both that he was diagnosed with bipolar disorder, and prescribed medication. The counselor recommended assignment to a "Level II" prison, where he would receive accommodations. Oliga disregarded the counselor's request, however, dooming Tavera to Smith State Prison instead. Yet even after Tavera was assigned to "non mental health" prisons, he continued reporting his diagnosis.[128]

Finally, if the law required Tavera to request an accommodation, and if he did not, his purported failure to do so here still cannot defeat Plaintiff's ADA/Rehabilitation Act claims because it would have been futile for Tavera to request again. "[A]n ADA claimant is not required to engage in a futile gesture if such person has actual notice that a person or organization … does not intend to comply." *Schwarz*, 2014 WL 12623013, at *5. Tavera had three-times previously requested accommodations for his bipolar disorder, and GDOC declined to assign him to an appropriate mental health unit. Tavera was being involuntarily placed in solitary confinement, after requesting not to return to the

---

[128] *See* Ex. 6, Case Notes: R. Tavera, pp. 4-5, Appx. 23-24 (tells counselor about "mental health issues," and of past treatment for bipolar disorder).

"Thunder Dorm." Tavera had no indication that a fourth time would be the charm – especially at a prison not "designed" to provide mental health services.

Thus, Tavera either was not required to request an accommodation, or a jury could conclude he did, or a jury could conclude additional requests were futile. Summary judgment should be denied on the ADA/Rehabilitation Act claims.

## IV.   Conclusion

Defendants' motion for summary judgment should be denied.

Date: October 11, 2019.

Edwards Law
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
Tel.    512-623-7727
Fax.    512-623-7729

By: /s/ Jeff Edwards        .
JEFF EDWARDS
TX State Bar No. 24014406
*Admitted Pro Hac Vice*
Scott Medlock
TX State Bar No. 24044783
*Admitted Pro Hac Vice*

Carter Franklin. LLP
Post Office Box 27
Metter, Georgia 30439
brent@carterfranklin.com
Tel.    912-685-5500
Fax.    912-685-5030

 /s/ Brent Carter    .
BRENT CARTER
State Bar No.: 153082

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing all attorneys of record.

*/s/ Scott Medlock*_____
Scott Medlock