IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARIA ARENAS, individually and )
in her capacity as heir and )
representative of the Estate of)
Richard Tavera, )
                           )
     Plaintiff, )
                           )
v. )     CASE NO. CV416-320
                           )
GEORGIA DEPARTMENT OF )
CORRECTIONS; GEORGIA )
CORRECTIONAL HEALTH CARE; MARK )
SHELBY, in his individual )
capacity; STANLEY WILLIAMS, in )
his individual capacity; and )
MARVIN DICKSON in his )
individual capacity; )
                           )
     Defendants. )
_____)

## O R D E R

Before the Court are Defendants Sergeant Mark Shelby and
Lieutenant Marvin Dickson's Motion for Summary Judgment (Doc. 95)
and Defendants Georgia Department of Corrections and Georgia
Correctional Health Care's Motion for Summary Judgment (Doc. 96).
For the following reasons, Defendants Shelby and Dickson's motion
is **GRANTED**. Additionally, Defendants Georgia Department of
Corrections and Georgia Correctional Health Care's motion is
**GRANTED IN PART** and **DISMISSED IN PART**.

## BACKGROUND

This case arises from the incarceration and subsequent suicide of Richard Tavera in 2014 at Smith State Prison.[1] (Doc. 1.) Tavera was a twenty-four-year-old male who struggled with depression and had been diagnosed with bipolar disorder as a teenager. (Doc. 122 at 5.) When he was sixteen, Tavera attempted suicide and, as a result, was hospitalized. (Doc. 96, Attach. 1 at 11.) After this hospitalization, Tavera was prescribed medication to treat his bipolar disorder. (Doc. 123, Attach. 4 at 227.)

As an adult, Tavera moved to Georgia where he was convicted of robbery by intimidation and sentenced to three years in prison. (Doc. 123, Attach. 3 at 14.) After his conviction, Tavera entered the custody of Defendant Georgia Department of Corrections ("GDOC"). (Doc. 103, Attach. 1 at 1.) Upon Tavera's incarceration, on January 7, 2013, Tavera underwent a routine mental and physical health evaluation. (Id.) During this evaluation, Tavera informed a counselor that he had attempted suicide as a teenager, however, Tavera denied having any recent suicidal thoughts. (Id.; Doc. 123, Attach. 3 at 8.) Because of Tavera's previous suicide attempt, the counselor referred Tavera for a mental health evaluation with a psychologist. (Doc. 123, Attach. 3 at 8.)

---

[1] These facts are assessed in the light most favorable to Plaintiff as the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

On January 9, 2013, Dr. Raymond Oliga conducted Tavera's mental health evaluation.[2] (Id. at 7.) During the evaluation, Tavera told Dr. Oliga he had not taken any medication for his bipolar disorder in two years. (Id. at 8.) Tavera disclosed his previous suicide attempt to Dr. Oliga, however, Dr. Oliga testified that Tavera blamed his parents' divorce, not his bipolar disorder, for the suicide attempt. (Id. at 5.) On the evaluation form, Dr. Oliga noted that Tavera "appears emotionally stable at this time." (Id. at 3, 8.) Dr. Oliga classified Tavera as a "Level I" inmate and determined he was fit for placement in the prison's general population. (Id. at 3.) As a Level I inmate, Tavera did not qualify for additional mental health services besides quarterly meetings with a counselor. (Doc. 96, Attach. 2 at 48.)

On December 6, 2014, Tavera complained to prison officers that he was experiencing chest pains and a severe headache. (Doc. 122 at 9.) Additionally, Tavera's muscles were contracted and his arms and hands were drawn up against his body. (Doc. 123, Attach. 3 at 15.) Because of his symptoms, officers took Tavera to the prison's infirmary. (Doc. 123, Attach. 1 at 27.)

In the infirmary, Frances Paulk ("Nurse Paulk"), a licensed practical nurse employed by Defendant Georgia Correctional Health

---

[2] Dr. Oliga is a psychologist employed by MHM Services, Inc., a private company that is contracted by Defendant GDOC to provide mental health treatment to inmates. (Doc. 96, Attach. 2 at 22.)

Care ("GCHC"), assessed Tavera's condition.[3] (Id. at 27.) In her assessment, Nurse Paulk noted that Tavera "refused to tell [her] what his pain level was when [she] asked" and that Tavera was "uncooperative at [the] time of assessment." (Id. at 27.)

To relax Tavera's muscles, Nurse Paulk performed a sternum rub. (Id.) To address Tavera's chest pains, Nurse Paulk called the on-call physician, Dr. Jefferson, and he instructed Nurse Paulk to perform an EKG on Tavera. (Doc. 122 at 10; Id. at 27.) Dr. Jefferson reviewed the results of the EKG and determined the results were normal. (Doc. 122 at 10.)

After Nurse Paulk's assessment, Tavera refused to return to his cell in the prison's general population. (Doc. 123, Attach. 1 at 27.) While the officers investigated Tavera's refusal, Tavera was placed in Dormitory J-1. (Doc. 121 at 4.) "Dormitory J-1 is an administrative segregation dorm for inmates who have engaged in acts of violence, are in need of protection, or are the subject of a pending investigation." (Doc. 95, Attach. 14 at 1.)

On December 7, 2014, Officer John Calhoun was monitoring Dormitory J-1. (Doc. 123, Attach. 2 at 21:49:03.) At approximately 9:49 p.m., Officer Calhoun saw Tavera tying one end of a sheet around his neck and the other end of the sheet around a sprinkler

_____

[3] Defendant GCHC contracts with Defendant GDOC to provide medical services to inmates. (Doc. 96 at 2.)

on the ceiling of Tavera's cell.[4] (Doc. 95, Attach. 3 at 17; Doc. 123, Attach. 2 at 21:49:03.) According to Officer Calhoun, when he initially saw Tavera through the cell window, he "was not able to see [Tavera's] feet . . . ." (Doc. 95, Attach. 3 at 3.) Because Officer Calhoun could not see Tavera's feet, he could not tell if Tavera was actually hanging or faking a suicide in an attempt draw officers into his cell. (Id. at 20.) Pursuant to prison policies, Officer Calhoun did not immediately enter the Tavera's cell alone. (Id. at 14.) Instead, he called for assistance over his radio. (Doc. 123, Attach. 2 at 21:49:17.) Officer Calhoun testified that he repeated the radio call four times because the other officers had difficulty understanding his transmissions. (Doc. 95, Attach. 3 at 10, 17.) Officer Calhoun then waited on other officers to arrive.[5] (Doc. 121 at 5.) In his deposition, Officer Calhoun also

---

[4] There are several different times offered by the parties regarding when Officer Calhoun initially saw Tavera tying the sheet around his neck. Defendants state that Officer Calhoun saw Tavera at 12:49 p.m. (Doc. 95, Attach. 14 at 1), however, Plaintiff states that Officer Calhoun saw Tavera at approximately 9:49 p.m. (Doc. 121 at 5). Additionally, in a previous order, this Court stated that Officer Calhoun initially saw Tavera at 10:50 p.m. (Doc. 63.) Ultimately, this discrepancy is immaterial because the time-period at issue involves the eight-minute delay between Officer Calhoun initially seeing Tavera and the officers opening Tavera's cell. After viewing the surveillance footage of Dormitory J-1 and considering the facts in the light most favorable to Plaintiff, for purposes of summary judgement, the Court will consider 9:49 p.m. as the time that Officer Calhoun initially saw Tavera.

[5] Officer Calhoun is not a defendant in this case. However, Plaintiff sued Officer Calhoun in his individual capacity in the Western District of Texas. See Arenas v. Calhoun, No. SA-16-CV-1203-XR, 2018 WL 852379, at *1 (W.D. Tex. Feb. 13, 2018).

testified that on the night of Tavera's suicide, the prison was short staffed. (Doc. 95, Attach. 3 at 9.)

Defendant Shelby was one of the officers who heard Calhoun's radio calls. (Doc. 95, Attach. 4 at 34.) At the time of the call, Defendant Shelby was in a different building than Dormitory J-1. (Id. at 34.) Initially, Defendant Shelby could not understand Officer Calhoun's radio transmissions. (Id. at 35.) In his deposition, Defendant Shelby testified that, although he could not understand Officer Calhoun, Defendant Shelby recognized from Officer Calhoun's tone of voice that there was an ongoing emergency. (Id. at 35.) To better understand Officer Calhoun's transmissions, Defendant Shelby ran outside of the building and requested that Officer Calhoun repeat his call. (Id. at 37.) After the call was eventually repeated, Defendant Shelby heard the code for suicide over the radio, but he did not know where the emergency was located. (Id. at 36, 42.) Once he heard the location, Defendant Shelby testified that he proceeded as fast as he could to Dormitory J-1. (Id. at 47.) Defendant Shelby testified that to get to Dormitory J-1 he had to go through numerous doors and wait for the control room officer to open and close each door. (Id. at 26, 34.)

Defendant Shelby arrived at Tavera's cell at 9:54 p.m., approximately five minutes after Officer Calhoun initially saw

Tavera.[6] (Id. at 41; Doc. 123, Attach. 2 at 21:54:02.) After he reached the cell, Defendant Shelby looked through the cell window and yelled at Tavera to see if he would respond. (Doc. 95, Attach. 4 at 59.) In his deposition, Defendant Shelby stated that from his view through the cell window, he thought Tavera was standing on the bed with his head drooped down. (Id. at 61; Doc. 95, Attach. 5 at 2.) Additionally, Defendant Shelby testified that he could not see Tavera's feet from the cell window. (Doc. 95, Attach. 4 at 62.) Defendant Shelby and Officer Calhoun did not enter Tavera's cell at this time.

Defendant Dickson also heard one of Officer Calhoun's radio calls. (Doc. 95, Attach. 6 at 12-13.) At the time, Defendant Dickson was in the security building, a different building than Dormitory J-1. (Id. at 49.) Defendant Dickson heard the code "25-10" over the radio, which he understood to mean "come immediately." (Id. at 13.) However, Defendant Dickson did not hear the radio call clearly and requested that the call be repeated. (Id. at 13, 16.) Specifically, Defendant Dickson needed to hear the location of the emergency. (Id. at 13, 16.) After the call was repeated, Defendant Dickson then heard the word "hanging" over the radio. (Id. at 17-18.)

---

[6] Officer Haas, the fourth officer involved in these circumstances, reached Tavera's cell approximately twenty seconds after Defendant Shelby. (Doc. 121 at 7; Doc. 123, Attach. 2 at 21:54:20.) Officer Haas is not a party to this lawsuit.

Once Defendant Dickson heard the word "hanging," he left the security building and went to the main control room to retrieve emergency equipment. (Id. at 50.) Pursuant to the prison's policy concerning emergencies, Defendant Dickson retrieved pepper spray and two use-of-force cameras before going to Dormitory J-1.[7] (Id. at 50.) After getting the equipment, Defendant Dickson proceeded to Dormitory J-1 as fast as he could. (Id. at 51.) According to the surveillance video, Defendant Dickson arrived at Tavera's cell at 9:54:59 p.m., approximately six minutes after Officer Calhoun initially saw Tavera. (Doc. 121 at 7; Doc. 123, Attach. 2 at 21:54:59.)

When Defendant Dickson arrived at Tavera's cell he assessed the scene and ordered that the cell door be opened. (Doc. 121 at 8.) However, the cell door was not immediately opened on Defendant Dickson's command because Officer Calhoun had the incorrect key. (Doc. 95, Attach. 3 at 29.) In the surveillance video, Officer Calhoun can be seen leaving the area to exchange keys. (Doc. 123, Attach. 2 at 21:55:43.) The video then shows the officers open the cell door at 9:56:08 p.m., approximately seven minutes after Officer Calhoun initially saw Tavera. (Doc. 121 at 7; Id. at 21:56:08.)

---

[7] Defendant Dickson testified that the use-of-force cameras were to document any resulting confrontation in the event that the inmate was faking a suicide. (Doc. 95, Attach. 4 at 55.)

After opening Tavera's cell door, Defendants Shelby and Dickson removed Tavera from the sheet while Officers Haas and Calhoun recorded the events on the use-of-force cameras. (Doc. 121 at 8.) The footage from one of the use-of-force cameras shows the officers struggling to get Tavera down and requesting assistance from Officers Calhoun and Haas. (Doc. 123, Attach. 3.) Once Tavera was removed from the sheet, the officers performed CPR, notified emergency medical services, and attempted to resuscitate Tavera using an Automated External Defibrillator ("AED") unit. (Id.)

After Tavera's suicide, Plaintiff Maria Arenas, Tavera's mother, filed several lawsuits premised on the circumstances of Tavera's suicide.[8] (CV416-320, Doc. 1; CV616-175, Doc. 1.) First, Plaintiff filed a complaint in the Superior Court of Tattnall County, Georgia against only Defendant GDOC. (CV616-175, Doc. 1.) In that complaint, Plaintiff asserted state law claims against Defendant GDOC pursuant to the Georgia Tort Claims Act ("GTCA"),

---

[8] As previously mentioned, Plaintiff filed a lawsuit premised on Tavera's suicide in the Western District of Texas against Officer Calhoun. See Arenas, 2018 WL 852379, at *1. Plaintiff sued Officer Calhoun pursuant to 42 U.S.C. § 1983, claiming that Officer Calhoun was deliberately indifferent to Tavera's medical needs when he waited approximately seven minutes to enter Tavera's cell. Id. In that case, summary judgment was granted in favor of Officer Calhoun on Plaintiff's § 1983 claim. Id. at *8. The Fifth Circuit Court of Appeals affirmed summary judgment in favor of Officer Calhoun and stated that "because Calhoun could not see Tavera's feet through the window, he was unable to tell whether the apparent emergency was real or contrived. Hence, Calhoun acted reasonably in refusing to enter the segregation dormitory alone." Arenas v. Calhoun, 922 F.3d 616, 621 (5th Cir. 2019).

O.C.G.A. § 50-21-20, and alleged claims pursuant to the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") against Defendant GDOC. (CV616-175, Doc. 1 at 15.) After Plaintiff filed her complaint in the Superior Court of Tattnall County, Defendant GDOC removed the action to the Southern District of Georgia pursuant to 28 U.S.C. § 1441(a). (CV616-175, Doc. 1.)

Second, on November 29, 2016, Plaintiff filed a complaint in this Court against Defendants Shelby, Dickson, GDOC, and GCHC.[9] (Doc. 1.) In her original complaint, Plaintiff claims against Defendants Shelby and Dickson pursuant to 42 U.S.C § 1983 alleging that Defendants Shelby and Dickson were deliberately indifferent to Tavera's medical needs. (Id. at 8.)

On February 8, 2017, Plaintiff's two cases in the Southern District of Georgia (CV616-175 and CV416-320) were consolidated.[10] (CV616-175, Doc. 7.) After consolidation, Plaintiff amended her complaint in this Court to add state law claims pursuant to the GTCA and claims pursuant to the ADA and RA against Defendants GDOC

---

[9] In her original complaint, Plaintiff also named Warden Stanley Williams as a Defendant. (Doc. 1.) However, this Court dismissed Plaintiff's claims against Williams. (Doc. 63.) Therefore, this Order will only address the claims Plaintiff asserted against Defendants Shelby, Dickson, GDOC, and GCHC.

[10] The consolidated case proceeded as case number CV416-320, the case at issue in this Order. Therefore, unless otherwise stated, all citations are to Plaintiff's case on this Court's electronic filing system, CV416-320.

and GCHC. (Doc. 34.) On July 17, 2017, Plaintiff filed her Second Amended Complaint. (Doc. 52.)

Defendants Shelby and Dickson have now filed a motion for summary judgment. (Doc. 95.) In the motion, Defendants Shelby and Dickson argue that they were not deliberately indifferent to Tavera's medical needs, but, instead, responded reasonably to his suicide. (Id., Attach. 1 at 12.) Alternatively, Defendants Shelby and Dickson argue that they are entitled to qualified immunity on Plaintiff's § 1983 claims. (Id. at 14.) Plaintiff has responded in opposition to Defendants Shelby and Dickson's motion. (Doc. 121.) Defendants GDOC and GCHC also filed a motion for summary judgment. (Doc. 96.) Plaintiff has also responded in opposition to Defendants GDOC and GCHC's motion. (Doc. 122.) Defendants' motions for summary judgment (Doc. 95; Doc. 96) are now ripe for review.

## STANDARD OF REVIEW

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

12

_Id._, 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. _See_, _e.g._, _Tidwell v. Carter Prods._, 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." _Barfield v. Brierton_, 883 F.2d 923, 933-34 (11th Cir. 1989).

**ANALYSIS**

I.   DEFENDANTS SHELBY AND DICKSON'S MOTION FOR SUMMARY JUDGMENT

In her second amended complaint, Plaintiff alleges that Defendants Shelby and Dickson were deliberately indifferent to Tavera's medical needs while he was committing suicide. (Doc. 52 at 11.) Specifically, Plaintiff argues that Defendants Shelby and Dickson were deliberately indifferent in two instances: (1) they unreasonably delayed responding to Officer Calhoun's radio calls for assistance; and (2) they unreasonably delayed opening Tavera's cell and providing him medical care. (Doc. 121 at 17.)

In their motion for summary judgment, Defendants Shelby and Dickson argue that they responded reasonably to Tavera's suicide and acted in accordance with prison policies. (Doc. 95, Attach. 1 at 13.) Alternatively, Defendants Shelby and Dickson argue that they are entitled to qualified immunity on Plaintiff's deliberate indifference claims. (Doc. 95 at 14.) The Court will first address

whether Defendants' individual responses to Tavera's suicide violated Tavera's constitutional rights under 42 U.S.C. § 1983, and then will address whether the Defendants are entitled to qualified immunity.

A. <u>Defendants Shelby and Dickson's Individual Responses to Tavera's Suicide</u>

As an initial matter, Defendants Shelby and Dickson argue that they were not deliberately indifferent to Tavera's medical needs because they responded reasonably to Tavera's suicide. (Doc. 95.) "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment . . . ." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (internal citations omitted). The Eighth Amendment prohibits "cruel and unusual punishments." <u>Id.</u>, 511 U.S. at 832, 114 S. Ct. at 1976. The standard for cruel and unusual punishment in the medical care context is whether a prison official exhibits deliberate indifference to the serious medical needs of an inmate. <u>Id.</u>, 511 U.S. at 829, 114 S. Ct. at 1974. However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 105, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976)).

To prevail on a deliberate indifference to a serious medical need claim, the plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). However, if a prison official "actually knew of a substantial risk to inmate health or safety," the official "may be found free from liability if they responded reasonably to the risk, even if the harm was not ultimately averted." Farmer, 511 U.S. at 844, 114 S. Ct. at 1982-83. Here, Defendants Shelby and Dickson do not dispute that, after they learned there was a potentially suicide, they knew Tavera faced a substantial risk of serious harm. (Doc. 95, Attach. 1 at 12.) Therefore, the only question is whether Defendants Shelby and Dickson deliberately disregarded Tavera's medical needs when they responded to Tavera's suicide.

In this case, Plaintiff alleges that Defendants Shelby and Dickson's delayed response to Tavera's suicide evidenced their disregard for Tavera's serious risk of harm. Whether a "delay in providing medical attention" is reasonable "depends on the nature of the medical need and the reason for the delay." Harris v. Coweta Cnty., 21 F.3d 388, 393-94 (11th Cir. 1994). "[T]he right reason for the delay can make a delay of any duration tolerable." Bozeman v. Orum, 422 F.3d 1265, 1273 (11th Cir. 2005) (abrogated on other grounds by Kingsley v. Hendrickson, 576 U.S. 389, 135 S. Ct. 2466,

15

192 L. Ed. 2d 416 (2015)). Nevertheless, a prison official cannot intentionally delay providing an inmate medical care. Id. The Eleventh Circuit has consistently held that "intentional refusal to provide [medical] care constitute[s] deliberate indifference." Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989).

1. Defendant Shelby's Response

To begin, Plaintiff argues that Defendant Shelby unreasonably delayed responding to Tavera's suicide. First, Plaintiff claims that Defendant Shelby unreasonably delayed going to Tavera's cell after hearing Officer Calhoun's radio calls. (Doc. 121 at 14-15.) Specifically, Plaintiff argues that Defendant Shelby waited five minutes before arriving at Tavera's cell and, therefore, "ignored the serious medical need of impending death from asphyxiation during Tavera's suicide attempt." (Doc. 121 at 14.)

The Court finds Plaintiff's assertion that Defendant Shelby unreasonably delayed going to Tavera's cell unpersuasive. Plaintiff provides no evidence that Defendant Shelby heard Officer Calhoun's first radio call and then deliberately ignored responding to the call for five minutes. Rather, according to Defendant Shelby's deposition, he heard one of Officer Calhoun's four radio calls and he did not understand the call. It is undisputed that the officers had difficulty understanding Officer Calhoun's radio transmissions and this difficulty caused reasonable delay. Instead of ignoring the call, Defendant Shelby

16

asked for the call to be repeated, immediately exited the building to better understand the call, and then, once he understood there was an emergency, he left his position to assist Officer Calhoun. Another obstacle that caused reasonable delay was the fact that Defendant Shelby had to go through numerous doors and wait for each door to be opened and closed by another officer. Considering these circumstances, the Court finds that Defendant Shelby's arrival at Tavera's cell within minutes of Officer Calhoun's radio calls was not deliberately indifferent to Tavera's medical needs.

Next, Plaintiff argues that the one-minute delay between Defendant Shelby arriving at Tavera's cell and Defendant Dickson arriving at Tavera's cell evidences Defendant Shelby's deliberate indifference. (Doc. 121 at 17.) Specifically, Plaintiff argues that Defendant Shelby violated three prison policies by not immediately opening Tavera's cell upon his arrival: (1) Standard Operating Procedure ("SOP") VG68-0001; (2) SOP VH34-0002; and (3) a Smith State Prison Post Order. (Doc. 121 at 10.) Plaintiff asserts that Defendant Shelby's violation of these policies is evidence of his deliberate indifference. (Doc. 121 at 10.) The Court will address each of these policies in turn.

First, SOP VG68-0001 requires an officer who finds an inmate hanging to "call for backup by radio or telephone and then immediately cut down the hanging inmate . . . and initiate CPR procedures." (Doc. 123, Attach. 4 at 217.) Plaintiff argues that

17

by not immediately entering Tavera's cell and cutting him down, Defendant Shelby violated SOP VG68-0001. However, the Court finds that argument unpersuasive. The Fifth Circuit evaluated whether SOP VG68-0001 applied to Officer Calhoun in its assessment of Officer Calhoun's response to Tavera's suicide. See Arenas v. Calhoun, 922 F.3d 616, 625 (5th Cir. 2019). In that case, the Fifth Circuit determined that SOP VG68-0001 "applies only to inmates who have been identified as potentially suicidal or self-injurious, and, based on such identification, have been placed in a designated stabilization unit." Id. However, "[Tavera] was neither identified as potentially suicidal nor assigned to a stabilization unit." Id. Therefore, the Fifth Circuit determined "it was reasonable that [Officer] Calhoun did not implement the procedures outlined in SOP VG68-0001." Id. Because Tavera had not been identified as suicidal or assigned to a stabilization unit, the Court finds it was reasonable that Defendant Shelby did not implement the procedures outlined in SOP VG68-0001.

Next, SOP VH34-0002 requires an officer that discovers an inmate hanging to "immediately initiate appropriate first aid measures, including but not limited to, cutting the apparatus that is choking the inmate . . . ." (Doc. 123, Attach. 4 at 204.) Similar to SOP VG68-0001, SOP VH34-0002 applies only to inmates who have been identified as "potentially suicidal" and are being "managed in accordance with established mental health practice."

(Id. at 200.) As previously mentioned, Tavera had not been identified as suicidal and had not been classified as a mental health inmate. Therefore, it was reasonable that Defendant Shelby did not implement the procedures outlined in SOP VH34-0002.

Lastly, Smith State Prison Post Orders governing inmates in solitary confinement, such as Tavera, state that "a minimum of two (2) officers must be present in the celldoor" before entering a cell. (Id. at 253.) Plaintiff highlights that when Defendant Shelby arrived at Tavera's cell two officers were present—that was, Officer Calhoun and Defendant Shelby. (Doc. 121 at 12.) Thus, Plaintiff contends that Defendant Shelby's failure to immediately open Tavera's cell upon his arrival demonstrates his disregard for Tavera's serious medical needs. (Doc. 121 at 19.) However, "[f]ailure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000). Additionally, Defendant Shelby delayed opening Tavera's cell because he could not see Tavera's feet and, therefore, was uncertain whether Tavera was hanging or standing on his bed. Rather than abruptly open the cell and expose himself and Officer Calhoun to a potential ambush, Defendant Shelby chose to assess the situation. The Court finds that Defendant Shelby's decision to take appropriate precautions to protect officers and, as a result, delay entering Tavera's cell for one minute was not

19

deliberately indifferent to Tavera's medical needs. See Arenas, 922 F.3d at 621 (considering that Officer Calhoun "did not know whether [Tavera's] suicide was real or a sham. . . Calhoun's decision to wait seven minutes before entering [Tavera's] cell did not constitute deliberate indifference"). Because Defendant Shelby responded reasonably to Tavera's suicide, the Court finds that, as a matter of law, he was not deliberately indifferent to Tavera's medical needs.

### 2. Defendant Dickson's Response

Similar to her claims against Defendant Shelby, Plaintiff contends that Defendant Dickson unreasonably and deliberately delayed responding to Tavera's suicide. First, Plaintiff asserts that the six-minute delay between Officer Calhoun seeing Tavera and Defendant Dickson arriving at Tavera's cell evidences that Defendant Dickson was deliberately indifferent to Tavera's medical needs. The Court disagrees and finds that Defendant Dickson reasonably responded to Officer Calhoun's radio transmissions and did not intentionally delay going to Tavera's cell. Defendant Dickson arrived at Tavera's cell at 9:55 p.m., approximately six minutes after Officer Calhoun initially saw Tavera. (Doc. 121 at 7; Doc. 123, Attach. 2 at 21:55:00.) Like Defendant Shelby, Defendant Dickson did not immediately understand Officer Calhoun's radio calls. Again, it is undisputed that the officers had difficulty hearing Officer Calhoun's radio transmission and this

difficulty caused some delay. After requesting clarification, Defendant Dickson understood there was an emergency situation and possible hanging. Pursuant to prison policies governing emergencies, Defendant Dickson went first to retrieve use-of-force cameras and pepper spray. Understandably, retrieving the equipment delayed Defendant Dickson's arrival at Tavera's cell, however, this detour was necessary. Additionally, like Defendant Shelby, Defendant Dickson had to wait for multiple doors to be opened and closed before he reached Dormitory J-1. In contrast to Plaintiff's arguments, Defendant Dickson promptly responded to one of Officer Calhoun's radio calls and did not deliberately ignore the emergency.

Next, Plaintiff contends that Defendant Dickson unreasonably delayed opening Tavera's cell after Defendant Dickson arrived in Dormitory J-1.[11] (Doc. 121 at 17.) Specifically, Plaintiff argues that the one-minute delay between Defendant Dickson's arrival and Tavera's cell being opened proves deliberate indifference. To support her argument a jury may infer deliberate indifference from a delay in providing medical care, Plaintiff cites to Bozeman v.

---

[11] To the extent that Plaintiff argues Defendant Dickson violated the prison's SOPs or post orders, the Court finds that this argument is unpersuasive. Defendant Dickson was the last officer to arrive at Tavera's cell and he ordered that Officer Calhoun open the cell. (Doc. 121 at 8.) Therefore, Defendant Dickson complied with any prison policies that required officers open a cell once multiple officers are present.

Orum, 422 F.3d 1265, 1273 (11th Cir. 2005), and Wallace v. Jackson, 667 F. Supp. 2d 1267 (M.D. Ala. 2009). The Court finds that these cases are distinguishable from this case.

In Bozeman, an inmate flooded his cell with toilet water. 422 F.3d at 1268. Prison officers entered the inmate's cell to relocate him and the inmate resisted the officers. Id. at 1269. After the officers shackled the inmate, they continued to push the inmate's body into the ground. Id. The inmate fell unconscious and stopped breathing. Id. Rather than administer CPR, the officers carried the inmate to another part of the prison. Id. The officers "knew [the inmate] was unconscious and not breathing" and then "failed for fourteen minutes to check [the inmate's] condition, call for medical assistance, administer CPR or do anything else to help . . . ." Id. at 1273. Because of the officers' complete failure to take any action for fourteen minutes and lack of an explanation for such a delay, the Eleventh Circuit found that the trier of fact may infer deliberate indifference. Id.

Similarly, in Wallace, an officer found an inmate hanging and unconscious in his cell. 667 F. Supp. 2d at 1274. The officer "did not simply delay in providing care for [the inmate]; he failed to provide any care whatsoever" and waited eight minutes to call for assistance. Id. Because the officer failed to take any action for eight minutes, the District Court for the Middle District of

Alabama found that the officer's conduct violated the inmate's constitutional rights. Id.

Defendant Dickson's conduct is distinguishable from the officers' conduct in Bozeman and Wallace. Notably, Defendant Dickson waited at most thirty seconds before he ordered Officer Calhoun to open Tavera's cell. However, the cell was not immediately opened only because Officer Calhoun had the wrong key. Unlike the officers in Bozeman and Wallace, Defendant Dickson did not fail to take any action whatsoever, but, instead, immediately initiated emergency procedures. Once Tavera's cell was opened, Defendant Dickson helped remove Tavera from the sheet and performed CPR. Because Defendant Dickson responded reasonably to Tavera's suicide, the Court finds that, as a matter of law, he was not deliberately indifferent to Tavera's medical needs.

B. Qualified Immunity

Even if Plaintiff had established constitutional violations based on Defendant Shelby and Dickson's alleged deliberate indifference, Plaintiff's 42 U.S.C. § 1983 claims against Defendants are barred by qualified immunity. Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). To determine whether

qualified immunity applies, the Court "first determines whether the officer[s'] conduct amounted to a constitutional violation" and then "analyzes whether the right violated was clearly established at the time of the violation." Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009).

"In analyzing whether a right was clearly established, we consider whether pre-existing law at the time of the alleged acts provided fair warning to Defendants that their actions were unconstitutional." Festa v. Santa Rosa Cty. Fla., 413 F. App'x 182, 185 (11th Cir. 2011) (citing Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002)). If the law was clearly established, the officials are not entitled to immunity because "reasonably competent public official[s] should know the law governing [their] conduct." Harlow, 457 U.S. at 818, 102 S. Ct. at 2738. However, if the law was not clearly established at the time of the offense, the government officials are entitled to qualified immunity. Id., 457 U.S. at 807, 102 S. Ct. at 2732; Stewart v. Baldwin Cty. Bd. Of Educ., 908 F.2d 1499, 1503 (11th Cir. 1990). "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins by Hall v. Talladega City Bd. Of Educ., 115 F.3d 821, 827 n.4 (11th Cir. 1997).

Plaintiff does not cite a case which clearly establishes that a two-to-three-minute delay in providing medical care is unreasonable, deliberately indifferent, or more than mere negligence. (Doc. 121.) In fact, as Defendants point out, courts have stated "[w]hat is clear is that, even if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability." Hyatt v. Thomas, 843 F.3d 172, 178 (5th Cir. 2016). Moreover, "[q]uestions of deliberate indifference to medical needs based on claims of delay are complicated questions because the answer is tied to the combination of many facts; a change in even one fact from a precedent may be significant enough to make it debatable among objectively reasonable officers whether the precedent might not control in the circumstances later facing an officer." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1318 (11th Cir. 2010) (finding that "[n]o preexisting law clearly established that an approximately two-to-five-minute delay of medical care . . . is a constitutional violation"); see also Murey v. City of Chickasaw, No. 1:18-00275-KD-N, 2019 WL 6270236, at *13-14 (S.D. Ala. Nov. 22, 2019) (finding the plaintiff "failed to show that the law was clearly established that failure to administer CPR [for twelve minutes] while waiting on medical personnel to arrive is unconstitutional"). Because Plaintiff has failed to show the law was clearly established that Defendants Shelby and Dickson's delay

violated Tavera's constitutional rights, the Court finds that Defendants Shelby and Dickson are entitled to qualified immunity. As a result, Defendants Shelby and Dickson's motion for summary judgment (Doc. 95) is **GRANTED**.

II.  DEFENDANTS GDOC AND GCHC'S MOTION FOR SUMMARY JUDGMENT

In addition to her § 1983 claims against Defendants Shelby and Dickson, Plaintiff alleges several claims against Defendants GDOC and GCHC. (Doc. 52 at 14.) In her second amended complaint, Plaintiff asserts claims against Defendants GDOC and GCHC for failure to provide Tavera with reasonable accommodations pursuant the ADA and the RA. (Id. at 14.) Plaintiff also asserts state law negligence claims against Defendants GDOC and GCHC for failure to provide Tavera with mental health treatment prior to his death. (Id. at 14.) In their motion for summary judgment, Defendants GDOC and GCHC argue that Plaintiff's claims fail as a matter of law and, as a result, summary judgment should be granted in Defendants' favor. (Doc. 96.) The Court will first address Plaintiff's ADA and RA claims and then will address Plaintiff's state law tort claims.

A. Plaintiff's ADA and RA Claims Against Defendants GDOC and GCHC

As an initial matter, Plaintiff alleges that Defendants GDOC and GCHC failed to properly accommodate Tavera's disability as required by the ADA and RA. (Doc. 52 at 13.) Specifically, Plaintiff contends that Defendants GDOC and GCHC should have

accommodated Tavera's bipolar disorder by placing him in a cell that accounted for his increased risk of suicide.[12] In their motion for summary judgment, Defendants GDOC and GCHC argue that Plaintiff's ADA and RA claims fail as a matter of law because Tavera did not request accommodation for his disability.[13] (Doc. 96 at 7.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The Supreme Court of the United States has found that state prisons are public entities subject to Title II of the ADA. Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1081 (11th Cir. 2007) (citing Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 211, 118 S. Ct. 1952, 1955, 141 L. Ed. 2d 215 (1998)). Accordingly, to state a claim pursuant

---

[12] In her second amended complaint, Plaintiff also alleges that Tavera was not provided with adequate mental health treatment before his suicide. (Doc. 52 at 13.) However, the Court dismissed Plaintiff's claims to the extent they were premised on the inadequate medical treatment of Tavera's disability. (Doc. 63 at 22.) Therefore, Plaintiff's only remaining claim under the ADA and RA is that Tavera's disability was not properly accommodated by placing him in an appropriate cell. (Id. at 23.)

[13] "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases . . . ." Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000). As a result, this Court will discuss these claims together by focusing on the ADA. Id. at 1305 n.2 ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa.").

to Title II of the ADA, Plaintiff must show (1) that Tavera was a qualified individual with a disability, (2) that he was excluded from participation in or denied the benefits of the prison's services, programs, or activities or otherwise discriminated against, and (3) that he was discriminated against by reason of his disability. Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) (citing 42 U.S.C. § 12132). For purposes of summary judgment, Defendants GDOC and GCHC do not dispute that Tavera's bipolar disorder was a qualifying mental impairment. Thus, the only remaining question is whether Tavera was discriminated against because of his disability and excluded from the benefit of appropriate housing.

A plaintiff may establish discrimination under the ADA by showing that a public entity failed to provide reasonable accommodations. Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009). When an individual is unable to access services or benefits because of his disability, the ADA requires that the public entity provide sufficient accommodations to ensure that individual is permitted access to the same benefits and services as others. See, e.g., Wolfe v. Fla. Dep't. of Corr., No. 5:10-cv-663, 2012 WL 4052334, at *5 (N.D. Fla. Sept. 14, 2012). In this case, Plaintiff is alleging that Tavera's mental disability limited his access to certain benefits and services offered at Smith State Prison, particularly his access to safe cell assignment. (Doc. 52.)

Specifically, Plaintiff argues that Defendants GDOC and GCHC should have provided Tavera with reasonable cell accommodations such as a cell without "tie off" points.[14] (Doc. 122 at 25.)

"In cases alleging a failure to make reasonable accommodations, the defendant[s'] duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation." Todd v. Carstarphen, 236 F. Supp. 3d 1311, 1327 n.33 (N.D. Ga. 2017) (quoting Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009)). However, an express demand for a reasonable accommodation may be unnecessary where the need for an accommodation is obvious. Todd v. Carstarphen, 236 F. Supp. 3d 1311, 1327 n.33 (N.D. Ga. 2017); see also Wolfe, 2012 WL 4052334, at *4 ("Plaintiff must show that [the

---

[14] In her response to Defendants' motion for summary judgment, Plaintiff lists eight additional accommodations that she alleges Defendants denied Tavera in violation of the ADA and RA. (Doc. 122 at 25-26.) The Courts finds that these additional accommodations are premised on the medical treatment provided to Tavera prior to his suicide. (Doc. 122 at 25.) However, this Court dismissed any ADA or RA claim premised on any allegations of inadequate medical treatment, explaining that those claims are more properly brought as state law negligence claims. (Doc. 63 at 22.) Accordingly, the Court will only consider Plaintiff's claim premised on "safe cell assignment" as a reasonable accommodation that Tavera was entitled to receive. Even if the Court were to consider Defendants' failure to screen prisoners for suicidal tendencies prior to placing them in solitary confinement as a failure to accommodate, the Court finds that Defendants' failure to screen a prisoner complaining of chest pains for suicidal tendencies was not so unreasonable as to constitute discrimination under the ADA or RA. See Lesley v. Chie, 250 F.3d 47, 55 (1st Cir. 2001); Kinman v. N.H. Dep't of Corr., 451 F.3d 274, 285 (1st Cir. 2006).

inmate] requested an accommodation or the need for one was obvious and the public entity failed to provide a reasonable accommodation.").

To begin, Defendants GDOC and GCHC are correct that Tavera did not explicitly request an accommodation for his disability. (Doc. 96.) Plaintiff submitted no evidence that Tavera, or anyone on his behalf, requested that he be housed in a safer cell. In fact, the only time that Tavera requested to change cells was the night before his suicide when he refused to return to his cell in the general population of the prison. At that time, the prison accommodated Tavera's request and placed him in Dormitory J-1. (Doc. 122 at 11.)

Notably, as Plaintiff argues, an inmate suffering from bipolar disorder likely would not request a suicide-proof cell. However, even if Tavera did not request an accommodation, if Tavera's need for a safer cell was obvious, Defendants GDOC and GCHC were required to provide Tavera such an accommodation. See Wolfe, 2012 WL 4052334, at *4; see also Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1197 (10th Cir. 2007) (finding that a public entity is on notice that an inmate "needs an accommodation when it knows that an [inmate] requires one, either because that need is obvious or because the [inmate] requests an accommodation"). In other words, Tavera was only required to request an accommodation "[w]here the disability, resulting

limitations, and necessary reasonable accommodations, are not open, obvious, and apparent." <u>Taylor v. Principal Fin. Grp., Inc.</u>, 93 F.3d 155, 165 (5th Cir. 1996). Although the Eleventh Circuit has not addressed the particular circumstances at issue—that is, the obviousness of an inmate's need for a suicide-proof cell—other federal courts have considered these particular circumstances in the ADA context. See <u>Zaragoza v. Dallas Cty.</u>, No. 3:07-CV-1704-K, 2009 WL 2030436, at *1 (N.D. Tex. July 13, 2009); <u>Gonzales v. Bexar Cty., Tex.</u>, No. SA-13-CA-539, 2014 WL 12513177, at *5 (W.D. Tex. Mar. 20, 2014).

In <u>Zaragoza</u>, the District Court for the Northern District of Texas considered whether a disabled inmate's need for a safer cell was so "open, obvious, and apparent" that the inmate need not request the accommodation from the Dallas County Jail. 2009 WL 2030436, at *11. The inmate suffered from severe depression and, as a result of his disability, committed suicide in jail. <u>Id.</u> at *1. Although the jail knew about the inmate's depression, received a call from his sister about the inmate's suicidal thoughts, and provided the inmate with antidepressant medication and counseling, the court found that "it does not appear that . . . the need for reasonable accommodations suggested here by [the] [p]laintiff [was] open, obvious, and apparent." <u>Id.</u> at *11. Particularly, the court relied on the fact that the inmate denied having suicidal thoughts, and, other than a call from his sister, the inmate had

31

no other suicidal indications that were apparent to prison officials. Id. at *13.

Similarly, in Gonzales, the District Court for the Western District of Texas also considered whether the Bexar County Jail failed to accommodate an inmate's disability when the jail did not provide the inmate "a more secure suicide-resistant cell . . . ." 2014 WL 12513177, at *5. The inmate denied having suicidal thoughts during a psychological screening, however, the inmate admitted to using anti-anxiety medication. Id. at *1. As a precaution, the inmate was temporarily placed in a detox cell. Id. The inmate committed suicide in the detox cell. Id. In granting summary judgment to the jail on the plaintiff's ADA reasonable accommodation claim, the court found that although the jail knew about the inmate's anxiety, the inmate's "need for additional suicide prevention treatment was not open, obvious, and apparent." Id. at *5 (internal quotation marks omitted).

In the Court's view, Tavera's need for a safer cell was even less apparent than the inmates' needs in Zaragoza and Gonzales. Plaintiff has submitted no evidence that Tavera's suicidal thoughts were apparent to prison officials. Plaintiff argues that Tavera's disclosure of a previous suicide attempt to Dr. Oliga makes his need for a safer cell obvious, however, the Court disagrees. Tavera's suicide attempt occurred several years prior to his incarceration. Moreover, Tavera told Dr. Oliga that he had

not taken medication for his bipolar disorder in two years. Additionally, Plaintiff provides no evidence that Tavera exhibited any suicidal tendencies or other symptoms of his bipolar disorder during his incarceration. In fact, Defendants GDOC and GCHC point to evidence that Tavera was in good mental health during his incarceration. Particularly, the notes from Tavera's quarterly meetings with counselors indicate that Tavera was driven to complete prison programs, in a good mood, well groomed, and had regular contact with family. (Doc. 123, Attach. 1 at 20-24.)

Plaintiff also argues that Tavera's muscle contractions and headache the night before his suicide should have indicated to Nurse Paulk that Tavera was having an anxiety attack and, therefore, needed a suicide-proof cell. The Court finds that this argument is unpersuasive. Plaintiff points to no evidence that these symptoms, even assuming the symptoms were the result of an anxiety attack, made Tavera's need for a suicide-proof cell obvious and apparent to prison officials. See, e.g., Gonzales, 2014 WL 12513177, at *5 (finding an inmate's anxiety did not make his need for a suicide-proof cell obvious). Moreover, Tavera refused to answer Nurse Paulk's questions about his condition, making any need for a safer cell even less apparent.

In a final attempt to argue that Tavera's need for a safer cell was obvious, Plaintiff points to evidence that thirty-five inmates attempted suicide in Smith State Prion's solitary

33

confinement cells within the past five years. (Doc. 122 at 29.) Although the Court recognizes that thirty-five suicide attempts is a substantial number, this evidence does not establish a genuine issue of fact that Tavera's specific need for an accommodation was obvious. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1105 (11th Cir. 2005) ("Other suicides occurring in the [prison] are in no way probative of the [defendant's] knowledge of [the inmate's] suicidal tendencies."). Because no reasonable jury could find that Tavera's need for an accommodation was obvious, Plaintiff's ADA and RA claims against Defendants GDOC and GCHC must fail as a matter of law. As a result, Defendants GDOC and GCHC's motion for summary judgment (Doc. 96) is **GRANTED IN PART** with respect to Plaintiff's ADA and RA claims.

B. State Law Claims Against Defendants GDOC and GCHC

Although Plaintiff sets forth several state law claims against Defendants GDOC and GCHC, the Court has discretion to decide whether to hear supplemental state law claims. See 28 U.S.C. § 1367(c)(3) (allowing a court to decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction"). In fact, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370 F. 1086, 1088-89 (11th Cir. 2004); see also Gray v. Royal, 181 F. Supp. 3d

1238, 1254 (S.D. Ga. 2016) ("Courts are encouraged to avoid exercising supplemental jurisdiction when original jurisdiction is lacking.").

In this case, the Court has granted Defendants Shelby and Dickson's motion for summary judgment on Plaintiff's § 1983 claims and granted Defendants GDOC and GCHC's motion for summary judgment on Plaintiff's ADA and RA claims. Therefore, only Plaintiff's state law claims against Defendants GDOC and GCHC remain. Because no federal cause of action remains in this suit, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendants GDOC and GCHC. Accordingly, Plaintiff's claims pursuant to the GTCA are **DISMISSED WITHOUT PREJUDICE** and Plaintiff may refile these claims in state court.[15]

---

[15] The parties have three additional motions pending in this case: (1) Defendants' Motion to Exclude the Expert Opinions of Ron McAndrew (Doc. 98); (2) Defendants' Motion to Exclude In Part the Expert Opinions of Dr. Bhushan S. Agharkar (Doc. 99); and (3) Plaintiff's Motion to Exclude Dr. Carol Terry's Testimony (Doc. 100). In reaching the foregoing conclusions, the Court did not rely on the opinions of McAndrew, Dr. Bhushan, or Dr. Terry, but instead dismissed Plaintiff's federal claims on other grounds. In light of the Court dismissing Plaintiff's state law claims and granting summary judgment to Defendants' on Plaintiff's § 1983 and ADA/RA claims, there is no need for the Court to consider the merits of Defendants' motions to exclude (Doc. 98; Doc. 99) or Plaintiff's motion to exclude (Doc. 100). See The Lamar Co., LLC v. City of Marietta, Ga., 538 F. Supp. 2d 1366, 1376 (N.D. Ga. 2008); Digital Concealment Sys., LLC, v. Hypersteal Biotechnology Corp., No. 4:11-CV-195, 2013 WL 6081774, at *1 (M.D. Ga. 2013); Powell v. Barrett, No. 1:04-CV-1100-RWS, 2012 WL 567065, at *6 n.1 (N.D. Ga. Feb. 17, 2012). Accordingly, Defendants' Motion to Exclude the Expert Opinions of Warden Ron McAndrew (Doc. 98), Defendants' Motion to Exclude In Part the Expert Opinions of Dr.

**CONCLUSION**

For the foregoing reasons, Defendants Shelby and Dickson's motion for summary judgment (Doc. 95) is **GRANTED**. Additionally, Defendants GDOC and GCHC's motion for summary judgment (Doc. 96) is **GRANTED IN PART** and **DISMISSED IN PART**. Accordingly, Defendants GDOC and GCHC are entitled to summary judgment on Plaintiff's claims pursuant to the Americans with Disabilities Act and the Rehabilitation Act. However, Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**. As a result, Plaintiff has no claims remaining and the Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this _11th_ day of April 2020.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

Bhushan S. Agharkar (Doc. 99), and Plaintiff's Motion to Exclude Dr. Carol Terry's Testimony (Doc. 100) are **DISMISSED AS MOOT**.